# EXHIBIT A

# *In The Matter Of:*

## Jeffrey Nicholas v. Delta Air Lines, Inc.

## Jeffrey Nicholas

## August 14, 2017



Jeffrey Nicholas
August 14, 2017

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JEFFREY NICHOLAS,
        Plaintiff,
    vs.        Case No. 2:17-cv-10481
                Hon. David M. Lawson
DELTA AIR LINES, INC.,
        Defendant.
_____

The Deposition of JEFFREY NICHOLAS,
Taken at 34977 Woodward Avenue, Suite 300,
Birmingham, Michigan,
Commencing at 9:16 a.m.,
Monday, August 14, 2017,
Before Lori Ann Baldwin, CSR-5207, RPR, CRR.

Page 2

1  APPEARANCES:
2
3  JEFFREY S. BURG
4  Law Offices of Jeffrey S. Burg
5  30700 Telegraph Road, Suite 1675
6  Bingham Farms, Michigan 48025
7  248.227.5027
8  jburg@comcast.net
9      Appearing on behalf of the Plaintiff.
10
11 SHARON RAE GROSS
12 Ogletree, Deakins, Nash, Smoak & Stewart, P.L.L.C.
13 34977 Woodward Avenue, Suite 300
14 Birmingham, Michigan 48009
15 248.593.6400
16 rae.gross@ogletree.com
17     Appearing on behalf of the Defendant.
18
19 ALSO PRESENT:
20 Andrea Bowman
21
22
23
24
25

Page 3

1                TABLE OF CONTENTS
2
3  WITNESS                        PAGE
4  JEFFREY NICHOLAS
5
6  EXAMINATION BY MS. GROSS:
7                    8
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 4

1                  EXHIBITS
2
3  EXHIBIT                        PAGE
4  (Exhibits 1 retained.)
5  (Exhibits 2-35 attached to transcript.)
6
7  DEPOSITION EXHIBIT 1           39
8  Photograph (Retained)
9  DEPOSITION EXHIBIT 2           48
10 Aircraft Load Agent Document
11 DEPOSITION EXHIBIT 3           62
12 12/6/2013 Jeff Lane Write-Up
13 DEPOSITION EXHIBIT 4           79
14 Delta Seven Safety Absolutes
15 DEPOSITION EXHIBIT 5           86
16 Handwritten Note dated 12/13/2013
17 DEPOSITION EXHIBIT 6           92
18  Appeal dated 1/27/2014
19 DEPOSITION EXHIBIT 7           106
20 Topics Discussed with Agent
21 DEPOSITION EXHIBIT 8           112
22 Melissa Seppings Document dated
23 3/13/2014
24 DEPOSITION EXHIBIT 9           128
25 11 December 2013 Parris Document

1 (Pages 1 to 4)

Jeffrey Nicholas
August 14, 2017

Page 5

1  DEPOSITION EXHIBIT 10              134
2  25 April 2007
3  DEPOSITION EXHIBIT 11              136
4  9/28/07 Interoffice Memo
5  DEPOSITION EXHIBIT 12              137
6  August 30, 3008 Interoffice Memo
7  DEPOSITION EXHIBIT 13              139
8  November 25, 2008 Interoffice Memo
9  DEPOSITION EXHIBIT 14              140
10  July 25, 2009 Level 1 Reminder
11  DEPOSITION EXHIBIT 15              143
12  December 20, 2010 Interoffice Memo
13  DEPOSITION EXHIBIT 16              143
14  January 13, 2010 Interoffice Memo
15  DEPOSITION EXHIBIT 17              147
16  October 14, 2011 Level 2 - Performance
17  DEPOSITION EXHIBIT 18              157
18  August 7, 2011 Level 2 - Attendance
19  DEPOSITION EXHIBIT 19              158
20  January 12, 2012 Level 2 Reminder
21  DEPOSITION EXHIBIT 20              162
22  Reported Employee Injury Statement
23  January 12, 2012
24  DEPOSITION EXHIBIT 21              176
25  Final Corrective Action Notice

Page 6

1  Regarding Attendance
2  DEPOSITION EXHIBIT 22              177
3  Sedgwick CMS - March 8, 2012
4  DEPOSITION EXHIBIT 23              178
5  Delta Leave & Disability
6  May 30, 2012
7  DEPOSITION EXHIBIT 24              180
8  Pennview Medical Clinic
9  DEPOSITION EXHIBIT 25              220
10  Complaint for Jury Demand
11  DEPOSITION EXHIBIT 26              232
12  Plaintff's Response to Defendant's
13  First Interrogatories to Plaintiff
14  DEPOSITION EXHIBIT 27              237
15  W-2s
16  DEPOSITION EXHIBIT 28              241
17  Fidelity Investments
18  DEPOSITION EXHIBIT 29              262
19  Work Rule Comparison
20  DEPOSITION EXHIBIT 30              265
21  April 1, 2010 Delta Memo
22  DEPOSITION EXHIBIT 31              270
23  How to Access Benefits Direct for
24  Health and Insurance Transactions
25  DEPOSITION EXHIBIT 32              272

Page 7

1  Andy Zarras Memo
2  DEPOSITION EXHIBIT 33              273
3  Congratulations and Thank You Memo
4  DEPOSITION EXHIBIT 34              278
5  Color Photograph
6  DEPOSITION EXHIBIT 35              280
7  ACS's 7 Safety Absolutes
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 8

1  Birmingham, Michigan
2  Monday, August 14, 2017
3  9:16 a.m.
4
5          JEFFREY NICHOLAS,
6  was thereupon called as a witness herein, and after
7  having first been duly sworn to testify to the truth,
8  the whole truth and nothing but the truth, was
9  examined and testified as follows:
10          EXAMINATION
11  BY MS. GROSS:
12  Q.  Could you state your full name for the record, please?
13  A.  **Jeffrey Charles Nicholas.**
14  Q.  Good morning, Mr. Nicholas.  My name is Rae Gross.
15      I'm representing Delta in your lawsuit.  I'm going to
16      be taking your deposition.
17          This deposition is being taken pursuant to
18      the Federal Rules of Civil Procedure, useful for all
19      purposes thereunder.
20          Have you ever had your deposition taken
21      before?
22  A.  **No.**
23  Q.  So let me sort of give you a few ground rules.  I will
24      be asking questions.  You will be giving the answers.
25      The court reporter will take down everything both of

2  (Pages 5 to 8)

Jeffrey Nicholas
August 14, 2017

Page 9

1  us are saying.  For that reason, I need to ask you to
2  give verbal responses, not shake your head or say
3  uh-huh or huh-huh.  If you do that, we'll try to catch
4  you and make sure you say yes or no.
5         I will try not to talk over you; if you
6  could do the same for me, that will make it easier for
7  the court reporter as well.
8  A.  Okay.
9  Q.  If you don't understand any of my questions, please
10  let me know that.  I will try to rephrase, do whatever
11  I can to clarify the meaning of the question.  If you
12  answer the question I'm going to assume you
13  understood.  Is that okay?
14  A.  Okay.
15  Q.  Are you currently taking any medications, sir?
16  A.  Two blood pressure pills.  I got them here, the names
17  of them somewhere.
18  Q.  Anything else?
19  A.  No, that's it.  Just a multi-vitamin.
20  Q.  And who prescribed the blood pressure pills for you?
21  A.  It's Pennview Medical Clinic.  It's in Riverview,
22  Michigan.  What is it, Ashwin Raval, I don't know his
23  first name.  His last name is Raval, R-A-V-A-L.  It's
24  an old family doctor I've been going to for years,
25  maybe 30 years.

Page 10

1         I didn't go to him for a few years,
2  because, for a while, he didn't take my insurance then
3  I went back after I got the insurance that he took.
4  So I've been back there maybe five, six years, I don't
5  know.
6  Q.  Do you have insurance now?
7  A.  I had to get on Medicaid.
8  Q.  To your knowledge, do any of the prescriptions you are
9  taking interfere with your ability to be able to
10  testify here today?
11  A.  No.
12  Q.  And how long have you been on the medications,
13  roughly?
14  A.  A couple years, these two blood pressures, maybe last
15  two years, I think.
16  Q.  And when did you get on Medicaid?
17  A.  After Delta, about a year after Delta, after, so it
18  was the fall, I think it was the fall of '14,
19  October maybe, or December, around there.
20  Q.  Did you review any documents in preparation for your
21  deposition today?
22  A.  No.
23  Q.  Now, you've provided some documents to your attorney
24  to be produced in the case, is that correct?
25  A.  Yeah.

Page 11

1  Q.  Do you have anything else besides what you've already
2  provided that you think is relevant to the case?
3  A.  We're still getting records.  We're still obtaining
4  records.
5  Q.  What are you looking for that you haven't already
6  provided?
7  A.  I want to get the -- I want to get they're hiring, the
8  list of the hiring --
9  Q.  Okay.  Let me -- let me just clarify.
10         I'm not asking about things you want to get
11  from Delta, but anything else you might have that you
12  are still looking for, that's your records?
13  A.  Oh, my records?
14  Q.  Yes.
15  A.  Oh, no, no.  I think I got the whole file, that they
16  sent me the whole file.
17  Q.  Did you keep any kind of notes about your employment
18  while you were still working at Delta?
19  A.  No.
20  Q.  You didn't keep a diary or a calendar or anything like
21  that?
22  A.  No, just memory.
23  Q.  Any audio recordings of any conversations you ever
24  had --
25  A.  No.

Page 12

1  Q.  -- with anyone at Delta?
2  A.  No.
3  Q.  Let me finish the question before you answer it --
4  A.  Okay.
5  Q.  -- if you can, because it will just make for a better
6  transcript.
7         Have you had any contacts with anyone at
8  Delta since you were terminated?
9  A.  Just friends, just casual talk.  I got a friend over
10  in Laguardia.  I got a friend here in Detroit.
11         One guy, he's been off work, I guess he
12  blew his knee out or something, he's been off for
13  about nine months.
14  Q.  Who is that?
15  A.  It's Cecil Pe -- Pe -- it's P-E-R -- I don't know if I
16  have his last name in my phone.  He's been out there
17  in Detroit for 20 years.  Let me see...
18         I didn't talk about my case or nothing, you
19  know what I mean?  I just talked to him as a friend.
20  I don't have his last name in here.
21  Q.  Is there anybody at Delta that you've talked to about
22  your case?
23  A.  No.
24  Q.  Have you told anyone that you are friends with from
25  Delta that you are bringing a lawsuit?

3 (Pages 9 to 12)

Jeffrey Nicholas
August 14, 2017

Page 13

1   A. That what?
2   Q. That you have a case?
3   A. I kind of mentioned that I was thinking about a
4      lawsuit because, this was maybe a couple years ago,
5      whenever I went to see him, it was about a year ago, I
6      guess.
7   Q. When you say "him," you are referring to your
8      attorney?
9   A. My attorney, Jeff Burg, I went to see him last
10     December.
11  Q. Who do you think you've talked to, that you've told at
12     Delta, that you have a lawsuit?
13  A. Well, I told my family that I was going to go talk to
14     a lawyer. And then I think I told Cecil; I think I
15     told him. He really doesn't even work there no more.
16     I think he's taken a medical retirement or something.
17     He got hurt and I don't think he's going back.
18  Q. When you worked at Delta, did you socialize with any
19     friends from Delta outside of the workplace?
20  A. Not really. I just had friends I talked to. I have
21     friends at work, you know. Most of them were at work
22     and I only had a couple numbers. And once I got
23     fired, they kind of drop you. They just don't answer
24     the phone or text no more. I tried talking to people
25     over the last, you know, after I got fired, and you

Page 14

1      kind of get dropped. Nobody wants nothing to do with
2      it. Because they don't want to get caught up in it, I
3      guess. I don't know what they're scared of.
4   Q. While you still worked there, you didn't socialize
5      with anybody from Delta outside the workplace?
6   A. No.
7   Q. Okay. And you, since you've left, you --
8   A. But I have friends at work, you know what I mean?
9   Q. No, I understand. But what, they were just friends at
10     work?
11  A. Yeah, yeah. Good friends at work. And some of them,
12     I didn't even have their number. And I feel bad, I
13     never even got their numbers.
14  Q. And since you've been out you've not been out on any
15     social occasions with anybody --
16  A. No, not from work. I haven't seen anybody. I bumped
17     into one guy, I don't even know his name, it was over
18     at like Costco's, I can't remember the name of that
19     place. It was over at the corner of Northline and 75.
20     I think it was called Costco's.
21        He just said "hey, Nick, how ya doing,"
22     because he hadn't seen me in a few years. He wasn't a
23     friend. He was just an acquaintance from work.
24  Q. What's your date of birth, sir?
25  A. 5-21-64.

Page 15

1   Q. So your current age is?
2   A. 53. I hate to say that.
3   Q. Why?
4   A. I don't feel that old. I mean, I don't know. Where
5      did the time go, is all I'm saying. Seemed like
6      yesterday I was 40.
7   Q. Okay. Your current address is 9838 Grosse Ile
8      Parkway?
9   A. Yeah. Yeah.
10  Q. How long have you lived there?
11  A. Forever. Thirty years.
12  Q. So all your adult life?
13  A. Yeah.
14  Q. Who owns the property?
15  A. My mom. I was starting to work out buying it from her
16     before I got fired, but then everything got kind of
17     put on hold. I was going to buy it subject to and
18     take over the loan and stuff. And she's getting
19     older, and I was taking care of her. And now that all
20     got put on hold.
21  Q. Okay. So your mom owns the house?
22  A. Yeah.
23  Q. Is she married?
24  A. No. Widowed.
25  Q. And is there still a mortgage on the house?

Page 16

1   A. Yeah.
2   Q. Who pays the mortgage?
3   A. My mom. She, I was starting to pay it, help her out.
4      And I was going to take over everything, and then
5      boom, you know, she had to take back over. And she's
6      on a fixed income, you know, she's retired. She's in
7      her mid 70s, like 74.
8   Q. And she has a retirement income?
9   A. She was born in '43, January 21st, '43. Yeah, she's
10     got retirement.
11  Q. From where?
12  A. Grosse Ile Schools. She did 30 years there.
13  Q. Did you ever live anywhere besides that address as an
14     adult?
15  A. Yeah, I lived out, I lived out in Flat Rock for a
16     while when I first came out of the Service. I went to
17     high school, and then I went to the Service. I was in
18     the Navy for three years. And then when I came out of
19     there, I was back home for a couple years, and back,
20     see, she got divorced from my father. He lived in
21     California, and we live in Grosse Ile. She got
22     divorced from him when I was in high school.
23        And then she met this other guy, the guy
24     that owned the house that we are in now. She married
25     him. I graduated in '82, so they got married '83,

4 (Pages 13 to 16)

Carroll Court Reporting and Video
586-468-2411

Jeffrey Nicholas
August 14, 2017

Page 17

1    around there.  So she married him and then he died in
2    '85.  And so she's been there the whole time.  So,
3    basically, she was alone, and she said, Jeff, come on
4    back.  My sister went there and my sister was too
5    wild, too party-like, so she said Jeff, come back.
6    Q.  Your sister's name is?
7    A.  Trina Miller.
8    Q.  And what is your mom's name?
9    A.  Judith Heath.  Her last name changed when she got
10    married.
11    Q.  So you lived on your own for a while when you came out
12    of the Navy but then you moved back in with your mom?
13    A.  Yeah, because it made it easier for her, and she
14    didn't want to live alone --
15         MR. BURG:  She didn't ask you that.
16         THE WITNESS:  All right.
17    BY MS. GROSS:
18    Q.  Have you ever been evicted from any place you lived?
19    A.  No.
20    Q.  Did you ever have any judgments against you in a court
21    for anything, any kind of debts or anything?
22    A.  Maybe a credit card.  That was so long ago, I can't
23    remember, you know.  I don't think that's on my credit
24    anymore.
25    Q.  Does anyone else live at the Grosse Ile Parkway

Page 18

1    address besides you and your mom?
2    A.  No.  Well, my sister's kid, my sister's boy uses --
3    has the address.  I'm against it, but he uses the
4    address for something about the medical for, I mean,
5    the insurance for the cars.  And she lives down the
6    street -- and my sister lives a couple doors down.
7    And she's got two boys, one is 27, one is 26 and one,
8    the daughter is like 23.
9         MR. BURG:  Okay.  She didn't actually ask
10    you that question.
11         THE WITNESS:  Oh.
12         MR. BURG:  Just answer what she asks you.
13    A.  He might come up as living there, but he doesn't live
14    there.  He lives two doors down.
15    BY MS. GROSS:
16    Q.  So, it's just you and your mom there?
17    A.  Yeah.
18    Q.  Your mom has retirement income and she pays for the
19    mortgage?
20    A.  Yeah.
21    Q.  Does she also pay for the utilities?
22    A.  Yeah.  Everything.
23    Q.  Food?
24    A.  Yeah.
25    Q.  Do you have any source of income at all?

Page 19

1    A.  No.
2    Q.  When's the last time you spent the night anywhere
3    besides that house?
4    A.  I don't know.  A long time ago.
5    Q.  Before you lost your job at Delta?
6    A.  Yeah.
7    Q.  Did you apply for unemployment after you got
8    terminated at Delta?
9    A.  Yeah, and I got denied.
10    Q.  Do you know why you got denied?
11    A.  Delta denied me.
12    Q.  Did you challenge that with the state?
13    A.  I tried to, yeah, I tried to challenge it and I ended
14    up missing a meeting.  I put the wrong date in my
15    phone.  And I told them what happened.  My alarm went
16    off the day I was supposed to be at the meeting.  I
17    was supposed to be there like at 3:00, my alarm went
18    off at 5:00.  I thought I set it up the day before to
19    go off the day before at 5:00.  And I missed it.  And
20    every two weeks I kept putting it in, you call in, you
21    know what I mean?
22    Q.  The state.
23    A.  Yeah.  You got to call in and say, I'm still alive and
24    I'm looking for work.  Do something on the phone, you
25    got to do that every two weeks to get your money.  And

Page 20

1    I kept doing that even though I got denied for the
2    appeal process, right?  And they finally -- it wore
3    itself out.  It started back after a month, after I
4    got fired, I signed up for all that and started
5    doing --
6         COURT REPORTER:  Slow down.
7    A.  -- all you got to do.  And then it all fell apart at
8    the end of the summer.  I got some statement saying
9    you are denied.
10         MR. BURG:  Slow down a little bit.
11    A.  You lost your appeal or something.
12    BY MS. GROSS:
13    Q.  So you never got --
14    A.  Because I missed the meeting.  What happened is, I
15    missed the meeting.
16    Q.  Okay.  So you never got --
17    A.  One of the meetings.
18    Q.  -- any back --
19    A.  Yeah, one of the meetings along the way somewhere.
20    And then I appealed that decision and that didn't go
21    no where.
22    Q.  And you don't have any kind of self-employment --
23    A.  No.
24    Q.  -- any kind of money that you are getting, nobody's
25    doing any withholding taxes on or anything like that?

Jeffrey Nicholas
August 14, 2017

Page 21

1   A.  No.
2   Q.  Do you receive any Social Security Disability
3       benefits?
4   A.  No.
5   Q.  Ever apply for them?
6   A.  No.
7   Q.  Do you have any kind of chronic conditions that would
8       disable you from --
9   A.  No.
10  Q.  -- working --
11  A.  No.
12  Q.  -- right now?
13  A.  No.
14  Q.  And that was also true when you worked for Delta?
15  A.  Yeah.
16  Q.  So, basically, you are pretty much relying on your
17      mother for support right now?
18  A.  Yeah.
19  Q.  Ever been married?
20  A.  No.
21  Q.  Don't have any children?
22  A.  I got close to it, but I couldn't afford it so I -- it
23      didn't work out anyway.
24  Q.  No children outside of marriage?
25  A.  No.

Page 22

1   Q.  Okay.  You mentioned the Navy.  When did you serve in
2       the Navy?
3   A.  June 2nd, '82 was my entrance date, and then it didn't
4       go right to three years, they let me out because it
5       was a weekend or something.  June 2nd, '85 was
6       supposed to be my release date, and you know, for
7       three years.  And that fell on a Sunday, so they let
8       me out on a Friday, so the paperwork came --
9   Q.  Where did you serve?
10  A.  I went to bootcamp over in Great Lakes over in
11      Waukegan, Illinois.  Then they sent me down to
12      Oceanea, NAS Oceanea, it was in Virginia Beach.  I was
13      there for about six months.  Then they sent me to
14      Japan for the rest of the time I was in.  I was on an
15      aircraft carrier over there, USS Midway.  And we were
16      home ported in Japan, Yokosuka, Japan.
17  Q.  Were you honorably discharged?
18  A.  Yeah, I've got a copy of the paperwork here somewhere.
19  Q.  Ever disciplined while you were in the military?
20  A.  No.
21  Q.  Ever been convicted of a felony?
22  A.  No.
23  Q.  Ever been evaluated for drug or alcohol abuse?
24  A.  No.
25  Q.  You hesitated on that a little bit.

Page 23

1   A.  I never been evaluated.  I never did drugs.
2   Q.  How about alcohol, any issues with any, any kind of
3       treatment for alcohol?
4   A.  No.
5   Q.  Ever file for bankruptcy?
6   A.  No.
7   Q.  Are you in debt now?
8   A.  Everything kind of just went away, you know what I
9       mean?  There might be something on my credit, an old
10      credit card or something, but no.  I had to walk away
11      from a couple credit cards.
12  Q.  "Walk away" meaning walk away from using them or --
13  A.  Just stopped paying them because I didn't have no
14      money.  That's about all that makes you up on the
15      credit.
16  Q.  Do you own a vehicle?
17  A.  No.
18  Q.  Any kind of property that you own?
19  A.  No.
20  Q.  And you've never been a party to any other kind of
21      lawsuit before this one?
22  A.  No.
23  Q.  And you think there might be some credit card-related
24      judgment against you somewhere but you don't remember
25      the details?

Page 24

1   A.  It was years ago.  I think it's not even around no
2       more.  There might be one or two on there.
3   Q.  Other than Delta, did you ever file any kind of
4       administrative charges against any of your other
5       employers, discrimination?
6   A.  No.
7   Q.  Ever claim workers comp from any other employer?
8   A.  No.
9   Q.  Ever claim unemployment compensation at any time
10      before you worked for Delta?
11  A.  When I first got out of the Navy, they had something
12      like you could get unemployment for six months when
13      you got discharged, even if you did your time, you
14      came out and I got it for, I think it was for six
15      months.  So I got it in June '82 -- or '85, I think I
16      got it right away for that fall of '85 -- or maybe it
17      was like four months, something like that.
18  Q.  Any other time that you collected unemployment?
19  A.  I worked for Simmons Airlines right after, in the
20      fall, I got hired in the fall of '85.  And it was, and
21      then it was, it was a commuter airlines and it was
22      part of Republic Airlines.  This is going back, way
23      back.
24          So I was there about three or four years
25      and then they got sold to American, American Eagle and

6 (Pages 21 to 24)

Jeffrey Nicholas
August 14, 2017

Page 25

1 they were moving out of state, moving out of here, and
2 so they had to take a layoff where they could travel
3 with them. And I could have gone with them to Chicago
4 but I wasn't making enough money.
5 Q. So because you got laid off from Simmons, you
6 collected unemployment?
7 A. Yeah, that was like four months, after I got laid off.
8 Maybe 1989, 1990, somewhere in there.
9 Q. Any other time?
10 A. No.
11 Q. Okay. And you've never made any discrimination claims
12 against any other employer?
13 A. No.
14 Q. The responses that you provided to -- well, let me
15 back up for a second.
16 Do you recall being asked to answer
17 something called "interrogatories" that Delta sent to
18 your attorney, questions?
19 A. Yes.
20 Q. Your answers to one of those questions indicated that
21 you filed an EEOC charge against Delta.
22 Do you remember doing that?
23 A. A what charge?
24 Q. An EEOC charge?
25 A. I don't know what the --

Page 26

1 Q. Equal Employment Opportunity Commission?
2 A. No. No. I...
3 Q. You've never filed, you've never gone down to the
4 Equal Employment Opportunity Commission and filed --
5 A. I think maybe she was asking -- I thought she was
6 asking me about unemployment.
7 Q. Okay.
8 A. I think maybe I got confused on the question, when I
9 was answering the questions.
10 Q. Okay. So, to the best of your recollection, you've
11 never gone to the Equal Employment Opportunity
12 Commission to file a charge?
13 A. Yeah, I didn't do that. Somebody told me I should
14 have, and I ran out of time, they told me you waited
15 too long, a friend of mine that I asked about it.
16 Q. Before your employment was terminated, you never made
17 any kind of internal complaints at Delta about
18 discrimination either, did you?
19 A. No.
20 Q. Are you a high school graduate, sir?
21 A. Yeah. I got the G -- well, I quit in the 11th grade
22 in Grosse Ile, when I went into the Navy. I got the
23 GED, when I was down in Virginia Beach there for three
24 months. But then when I came out of the Service in
25 '85, somewhere there in the fall, I went to night

Page 27

1 school over in Wyandotte. I got the diploma. It took
2 one semester of night school.
3 Q. So you have a GED --
4 A. GED plus the diploma from Roseville High School in
5 Wyandotte?
6 Q. Any college education?
7 A. I went to Henry Ford Community College for about a
8 semester, back in '85, '86, somewhere in there.
9 Q. What were you studying?
10 A. I was taking general classes. And I just didn't carry
11 through with it.
12 Q. Any kind of technical schools, or technical
13 certifications, anything like that?
14 A. No.
15 Q. Okay. Now, as I understand it, you originally hired
16 in with Northwest Airlines in June of 2006, is that
17 right?
18 A. June 12th, '06.
19 Q. And you would have been aged 42 at that time, correct?
20 A. I think I was 41.
21 Q. Your birthday is in May, as I understand.
22 A. Okay. I just turned 42, is that it?
23 Q. Well...
24 A. 6/12/06, yeah, I think I just turned 42.
25 Q. And while you were working for Northwest, Delta and

Page 28

1 Northwest merged, correct?
2 A. Yeah.
3 Q. Do you remember approximately when that was?
4 A. It happened over a few years, you know. They didn't
5 have a set date. It happened over a few years. They
6 started in '09, somewhere in there, and went to maybe
7 '11 or '12.
8 Q. Then it got announced and it took a while to put it
9 into effect?
10 A. They had a thing, like on this date we're going to
11 paint all the airplanes, on this date -- they had like
12 a graph they may have sent us. On this date, we are
13 going to merge this section and this section.
14 Somewhere at home I have the paperwork on all that.
15 Q. Is that part of what you provided to your lawyer?
16 A. I don't know if he's got that or not. Just some
17 literature that they were sending me to keep me
18 informed of what was going on with the merger. And it
19 took a few years for them to merge. I know there was
20 some drop dead date for them, you know, business-wise,
21 but it took a few years to get everything merged.
22 Q. So, just before you went to work for Northwest in
23 June of 2006, what was your last job before you
24 started at Northwest?
25 A. I was working, it was like an under-the-table job. I

Jeffrey Nicholas
August 14, 2017

Page 29

1   was working for Moving Van Lines. And they, I went
2   out to the warehouse in Livonia, and there was one out
3   in Farmington Hills for North American, what is it
4   called, North American? And they, drivers from
5   over-the-road, it wasn't working for them hourly
6   there, it was like guys that come from long distance.
7   They would call up and say I need labor tomorrow. And
8   then the manager would call and say, we need you
9   tomorrow. And I would go out there, and the driver
10  would just pay me cash and I would move people in and
11  out of their house.
12  Q.  So you would help long distance drivers for --
13  A.  North American Van Lines. I had a couple different
14  ones I went to. I went to Allied. It was over on
15  Kopernick Road over in Canton.
16  Q.  When you say it was "under the table", you were
17  getting paid in cash?
18  A.  Yeah, the driver paid me cash.
19  Q.  And no taxes were being withheld?
20  A.  Yeah, it's kind of shady. That thing was kind of
21  shady.
22  Q.  How long -- you are supposed to file, give them your
23  number and file it so they see it at the end of the
24  day. How long did you do that?
25  A.  I did that for a long time. That was about ten years

Page 30

1   I was doing that.
2   Q.  Always for the same --
3   A.  No, I moved around. I moved around. I had to call
4   around because they couldn't get the drivers every day
5   at the same place. I usually only averaged about
6   three days a week doing that. It was hard work. That
7   was hard work. And you didn't know how long the day
8   was going to be, you went to whatever house they took
9   you to, a couple guys would meet over at the warehouse
10  and then you'd go over there with the driver.
11  Q.  How did you get into it in the first place?
12  A.  I don't remember. That was way back, like in the
13  mid '90s. I think I went to the Allied first over on,
14  they were in Livonia, just south of the, what's that
15  freeway there? 96.
16  Q.  Mm-hmm.
17  A.  They were somewhere there. They were over by, I don't
18  know, Farmington Road or something like that.
19  Q.  How did you know they were looking for people --
20  A.  I was just -- I was just --
21         COURT REPORTER:  You have to let her finish
22  the question.
23  BY MS. GROSS:
24  Q.  She can't take it down --
25  A.  I was just looking for somewhere to work, and I looked

Page 31

1   up the warehouse in the Yellow Pages so I found them
2   all, and wrote them all down. And I was going around
3   talking, so the one guy that ran the one warehouse --
4         COURT REPORTER:  Look, you have to slow
5   down.
6   A.  -- at Allied, he said, can I use you for cash down
7   tomorrow. I said okay. And he said we got a driver
8   coming in. So that's how I started doing that.
9   BY MS. GROSS:
10  Q.  So you just walked up cold to the warehouse --
11  A.  Yeah. Yeah.
12  Q.  -- and talked to a guy? And --
13  A.  Well, I had to talk to the manager that ran it.
14  Q.  And it kind of took off from there?
15  A.  It kind of took off from there. He said how much they
16  were paid. He said, I got a cash driver coming in
17  tomorrow, you want to come in? I said yeah.
18  Q.  And you lasted for ten years doing that?
19  A.  Yeah, I did that for almost ten years. I didn't work
20  at the same place, I moved around. Like I might work
21  for this guy this day, and then the next day, I might
22  work -- I might take a day off because it was hard
23  work. I'd take a day off and get a little rest. And
24  then the next day, hey, how you looking tomorrow? I
25  might work Wednesday. And Tuesday night, I'd start

Page 32

1   calling around, how you guys looking tomorrow? I need
2   a guy tomorrow, Wednesday morning, 6 in the morning.
3   Okay, I will be there.
4   Q.  So you didn't have any set schedule?
5   A.  Yeah, there was no -- there was no -- I wasn't working
6   for nobody hourly like on the clock. They had their
7   regular workers, local workers, but I didn't do that.
8   Q.  You just picked up work when you felt like working,
9   number 1 --
10  A.  No, it wasn't when I felt, it was when they had work.
11  Q.  Let me finish the question.
12  A.  All right.
13  Q.  You said you might take a take a day off sometimes if
14  you --
15  A.  Because it was so hard --
16         COURT REPORTER:  Stop. Let her finish the
17  question.
18         MR. BURG:  Let her ask the question.
19  BY MS. GROSS:
20  Q.  So, you know, based on your testimony, if you had a
21  hard day, you might take a day off, and just not even
22  call to see if there was any work, right?
23  A.  It would be too late in the day. I would be exhausted
24  and I didn't call, yeah.
25  Q.  So --

8 (Pages 29 to 32)

Jeffrey Nicholas
August 14, 2017

Page 33

1  A. Or sometime they would let me know. Sometimes, I
2     would be leaving in the morning, and the driver would
3     say, I need you tomorrow at 7 a.m and I said okay.
4  Q. Okay. But if you didn't want to work, nothing was
5     going to happen to you if you said, no, I'm not
6     available tomorrow?
7  A. No, because I wasn't a regular worker. They call it
8     casual or something like that.
9  Q. Okay.
10 A. Casual labor.
11 Q. So you could kind of set your own schedule depending
12    on what work was available?
13 A. Yeah.
14 Q. That's a yes?
15 A. Yeah. And I had three or four places. I had them
16    all, the numbers in my head.
17 Q. Okay. And this went on from roughly 1996 to 2006?
18 A. No, it was more in the early '90s to maybe a year or
19    two before Delta. It kind of slowed down and I
20    started trying to get out of it.
21 Q. How much were you making?
22 A. I was only making like 13, 14 an hour cash. It just
23    depended. You could negotiate with the drivers. And
24    they all played hardball with you, you know. They all
25    tried to lowball you.

Page 34

1  Q. Did you have any other source of income during this
2     period?
3  A. No.
4  Q. Did you file tax returns during this period?
5  A. Not really because I -- it was all kind of under the
6     table.
7  Q. Did you file and not report the income or did you not
8     file at all?
9  A. I just didn't file. But I wasn't trying to get no
10    aids like Medicaid or stuff like that. I wasn't doing
11    none of that. I was just making the amount of money I
12    was making. I was making a living.
13 Q. But not paying taxes?
14 A. Yeah, it's kind of shady. They just give you a
15    receipt and you just kind of put a number on there and
16    put your name on there.
17 Q. You said that that might have lasted until about a
18    year or two before you went to Northwest.
19        Did you have any other jobs in between
20    doing that and going to Northwest?
21 A. I worked a little bit at a warehouse.
22 Q. As a regular employee?
23 A. It was a casual basis, that was a casual basis, too.
24 Q. So it was cash-based?
25 A. Yeah. No, that was a check. They get checks. But it

Page 35

1     was just on call. They called you when they needed
2     you.
3  Q. Where was that?
4  A. Yellow Freight down on Delray. It's in Detroit.
5  Q. Roughly when do you think you worked there?
6  A. I wasn't there very long. It was -- I worked there
7     way back in, before the early '90s, like '91, I worked
8     there for about a year, as a casual. And then I
9     worked there for a little while right before Delta.
10 Q. And when you worked there in the early '90s as a
11    casual, why did you leave?
12 A. That was -- I was a lot smaller back then. That was
13    hard work, man. We were unloading the trucks, you
14    know, and I was only about like 30 -- I was a little
15    guy. I know I'm big now, but... that was hard work.
16    And the guys there were pretty mean. The foremen on
17    the, you know, inside there.
18 Q. So you just, you left --
19 A. I kind of just got tired of it. It was getting to be
20    too mean. It was a mean place.
21 Q. So when you left there, is that when you started
22    picking up the moving --
23 A. Yeah, yeah.
24 Q. -- work?
25        And then after you, just before you got to

Page 36

1     Northwest, at some point, you went back there for a
2     little while?
3  A. Yeah. Not very long, yeah. It was changed, and I
4     said nah.
5  Q. Why did you leave the second time?
6  A. I was looking for something different.
7  Q. So you left on your own?
8  A. Yeah. I wasn't a real employee. We need you to come
9     in at midnight. Okay. I would go in when they called
10    me.
11 Q. And neither of these jobs, either the Yellow Freight
12    warehouse in Delray or the casual stuff with movers
13    never gave you any benefits?
14 A. Yeah.
15 Q. No?
16 A. Yeah, no.
17 Q. Were you unemployed by the time you got hired by
18    Northwest?
19 A. Yeah.
20 Q. Ever hold any other jobs with any other employers
21    besides the work that you've mentioned already?
22 A. I was at a place, a factory, when I -- I'm trying to
23    think what it was -- when I got laid off from the
24    airlines I told you about. And I think it was '89 or
25    '90. Simmons Airlines, I was working for.

9 (Pages 33 to 36)

Jeffrey Nicholas
August 14, 2017

Page 37

1           Then, there was this little warehouse out
2    in, it was north of Michigan Avenue, I think it was
3    Newburgh Road and Palmer, somewhere there, they are
4    not in business no more. I worked there maybe about a
5    year.
6    Q. Any place else? We've got the airlines, we've got the
7       Simmons warehouse?
8    A. Not that I can think of.
9    Q. Ever been fired from a job besides Delta?
10   A. No.
11   Q. Have you tried to pick up any of the cash-based kind
12      of moving work that you were doing since you've been
13      fired from Delta?
14   A. Yeah, I've been trying to stay out of that. It's
15      pretty hard work.
16   Q. So the answer would be no?
17   A. No. I was just living on my savings I had. And I had
18      to withdraw my 401(k).
19   Q. And you haven't been doing any kind of under-the-table
20      cash work since you've left Delta?
21   A. No.
22   Q. Did you have to interview for the job from Northwest
23      when they first hired you?
24   A. Yeah, it was like an open house thing. It was at a
25      hotel out there in Livonia, I think it was.

Page 38

1    Q. And when you first --
2    A. I think there was a little interview. I can't
3       remember.
4    Q. Okay.
5    A. It was a quick deal.
6    Q. At this point, you can't remember who you would have
7       interviewed with?
8    A. Yeah. Yeah. I can't remember the name.
9    Q. And when you first hired into Northwest, you were
10      covered, you were represented by union, weren't you?
11   A. Yeah. I -- what was it? The IM.
12   Q. What was your --
13   A. I was on probation for the first six months, I had to
14      get through probation to get into the union.
15   Q. What was your first job?
16   A. What do you mean "first job"?
17   Q. At Northwest?
18   A. Oh, wherever they assigned me. Ramp. I was on the
19      ramp. Ramp worker, that's what we call it. But
20      what's the terminology now? It used to be called ESE,
21      equipment service employee, I think it was. That was
22      Northwest terminology. Now I think it's called
23      customer service agent for Delta.
24   Q. What did the job consist of? What did you have to do?
25   A. Load and unload baggage from the aircraft, park the

Page 39

1    plane. Well, I was ALA, I was lead for a while, too.
2    It was called ALA for Delta and Northwest. And park
3    the plane, I parked the plane. And I had to scan bags
4    going on the plane. Had to get the, you know, the
5    weight and balances out of the computer, you know, how
6    to load the plane.
7           Other parts of the airport, I could deliver
8    baggage to different areas of the airport. I could
9    work over at the freight house. I could work down in
10   the bag room. Just depended where you bid, where you
11   wanted to work.
12   Q. You were always part of what was essentially --
13   A. Yeah, yeah, the below wing.
14   Q. -- ramp --
15   A. Delta calls it "below wing".
16   Q. It your duties include driving at all?
17   A. On the tugs, yeah.
18              MARKED FOR IDENTIFICATION:
19              DEPOSITION EXHIBIT 1
20              Photograph (Retained)
21              9:50 a.m.
22   BY MS. GROSS:
23   Q. I'm going to hand you what has been marked as
24      Exhibit Number 1 to your deposition. This is a
25      picture that actually was produced with the documents

Page 40

1    that we got from your attorney.
2           Can you identify the picture for me?
3    A. That's one of their tugs to pull their baggage around
4       the airport.
5    Q. This is typically one of the vehicles you would drive
6       at the airport?
7    A. Yes.
8    Q. Any other kind of vehicles you would drive?
9    A. Belt loaders to load the bags on the airplane.
10   Q. And those are the ones that have the conveyors on the
11      back --
12   A. Yeah, yeah. The big, long ones with the conveyer
13      belt.
14          And then I would drive the push-backs, that
15      would push the plane out when I was a lead, out from
16      the gate area, so they get out on an alleyway behind
17      the zipper road.
18   Q. What is the zipper road?
19   A. That's the road that goes behind the aircraft that you
20      drive the tugs on. It's kind of shaped like a zipper,
21      the sides of it. And it's like a road where you just
22      drive around the whole terminal.
23   Q. So if you are driving a tug, you are supposed to --
24   A. Yeah, you are supposed to stay on the zipper road,
25      stay on the zipper road until you get to the gate that

10 (Pages 37 to 40)

Jeffrey Nicholas
August 14, 2017

Page 41

1  you got to go to the plane.  Then you just pull into
2  the gate, to the aircraft, you know, if you are
3  delivering bags, by the belt loader there.
4  Q.  Where did you get this picture from?
5  A.  Oh, that, that, I took that, just the tug there, I was
6  inside the bag room, you can see the door there in
7  front of it.  That's the door that pops open when you
8  drive close to it.  I just took that picture inside
9  the bag room one day.  I was working in the bag room.
10 Q.  Any particular reason you took the picture?
11 A.  I think I was just playing around with a guy.  I think
12 I sent the picture to a guy in New York.  The guy used
13 to work, he was working over here, and now he trains
14 for Laguardia in New York, so I sent him the picture
15 from here.
16 Q.  What did you take the picture with, a phone?
17 A.  Yeah, a cell phone.
18 Q.  When you provided it in the case, was it still on your
19 phone or had you printed it off?
20 A.  What now?
21 Q.  Is it still on your phone?
22 A.  No.  I printed it and gave it to my lawyer.
23      MR. BURG:  Rae, if you want to make a color
24 copy of it, you can.
25      MS. GROSS:  I might.  Thank you.

Page 42

1  BY MS. GROSS:
2  Q.  Did you take the picture for any reasons related to
3  your lawsuit?
4  A.  No.  That was, that was maybe a couple years before,
5  before I got terminated.  I never knew I was going to
6  need the picture or nothing.
7  Q.  Okay.  You think you might have just sent it to
8  somebody --
9  A.  I think I just took it to have a picture of it, I
10 don't know.
11 Q.  Is this the type of vehicle in Exhibit Number 1 that
12 you were driving when Delta says they observed you not
13 wearing your seatbelt?
14 A.  Yeah.
15 Q.  Okay.  And you've never worked in any part of Delta
16 other than what they now call the "below the wing"
17 area?
18 A.  Yeah, just below wing, ramp.
19 Q.  Now you talked about being an ALA.  You originally
20 took some kind of lead person when it was still
21 Northwest, right?
22 A.  Yes.
23 Q.  As a lead, how were your job duties different at all
24 than when you were just an agent?
25 A.  When you were just an agent, you didn't have to worry

Page 43

1  about -- I had to park the plane.  I had to be at the
2  gates for the planes when they came in.  I had to
3  get the tow tractor hooked up for pushing it out when
4  it was ready to go.  I had to talk to the pilots a lot
5  when I had to push the plane out.  I had to go in and
6  get the weights and balances off the computer, they
7  would tell you how to load on the computer, where it
8  will go, front and back, where you would put freight.
9  You got a lot more duties than you do as a regular
10 worker, you know.  I'm not, I'm not -- actually, I'm
11 in the bin, too, because when the plane pulled in, I
12 had to get in the bin.  There is a front and an aft
13 bin in a lot of the planes.  And I had to get in the
14 front bin to dump the front, you know, we called it
15 dumping the plane, dumping the bags out.  We didn't
16 have enough employees.  They never gave us enough
17 employees to work the planes, so I had to get in there
18 and help them out.  And so they would be dumping the
19 back and I would be dumping the front.
20 Q.  So even as a lead, you would still be handling
21 baggage?
22 A.  Yeah, I had to, or the work wouldn't get done.
23 Q.  You would also still be driving tugs sometimes as a
24 lead.
25 A.  Yeah -- not -- not -- yeah.  Sometimes I had to go get

Page 44

1  an air start for the plane, or an electrical unit if
2  they didn't have it.  Sometimes it wasn't working, it
3  was connected to the jetway and sometimes those
4  weren't working and you had to get one for the plane.
5  Q.  Now as a lead --
6  A.  So I would go fetch one.
7  Q.  -- you are not the supervisor of the rest of the crew,
8  are you?
9  A.  You are kind of like the supervisor.  You are the
10 supervisor of you crew.
11 Q.  Are you leading the work, are you giving them work
12 direction?
13 A.  No, they kind of follow this thing, real -- what do
14 they call it?  Real-Time?  I can't remember the name
15 of it now.  Real-Time.  This is a computer program.
16 They got your name, it shows your eight-hour shift.
17 It puts little boxes on there, shows the airplane.
18 One box will say inbound, one will say outbound.  It
19 will have the whole day set up and all the hours.  And
20 for that period of time, a half hour, it shows that
21 box, and you ar good to work on that aircraft, dumping
22 that aircraft, getting it in the gate.
23 Q.  Okay.  But as lead, you've got other grounds people
24 just working with you, right?
25 A.  Yeah, there was people working with me.  And I had to

Jeffrey Nicholas
August 14, 2017

Page 45

1    tell them stuff to do sometimes.
2    Q.   Right.
3    A.   I had to give them duties sometimes.
4    Q.   You are --
5    A.   Maybe I would tell them when to go get an air start,
6        to go get the bags.
7    Q.   You would give them work direction?
8    A.   Yes.
9    Q.   But you are not -- you can't discipline or anything?
10   A.   Yeah, you can't write nobody out or nothing.
11   Q.   Okay.  Well --
12   A.   I guess I could go to the manager above me if I was
13       having trouble.
14   Q.   And when you were still Northwest, even as a lead, you
15       were still part of the union, right?
16   A.   Northwest, yeah.
17   Q.   Okay.  The system you mentioned a minute ago, was it
18       called the Real-Time Staffing?
19   A.   Yeah.  Yeah.  So, basically, get their work from
20       there.  You know, they might have to, usually, they
21       were in my area all day.  But sometimes the Real
22       Staffing would pull them somewhere else.
23   Q.   So that would tell an individual agent where he's have
24       supposed to be --
25   A.   Yeah.  It would say, maybe he got pulled from me and

Page 46

1    he still has to go to another gate.
2    Q.   Let me just try to remind you again.  This poor lady
3        will go absolutely nuts if you don't let me --
4    A.   All right.
5    Q.   -- finish asking my question before you answer it.
6    A.   All right.
7    Q.   I don't mean to be rude but I'm going to do this
8        because I don't want you jumping in, okay?
9    A.   Real-Time, Real-Time didn't work --
10       MR. BURG:  No.
11   A.   Go ahead.
12   BY MS. GROSS:
13   Q.   So, when you mentioned Real-Time, you mentioned that
14       because they might be getting directions from
15       Real-Time to go to --
16   A.   Right.  Right.  They didn't just listen to what I
17       said.  They had to follow what that said.  That took
18       priority over me.
19   Q.   While they were working on the planes, and you were
20       the lead, you might be telling them to go do this --
21   A.   Right.  Go get me an air start, or can you get the
22       bags in the bag room now?  Usually, they knew when to
23       go.  I didn't have to say nothing.  They would know 30
24       minutes prior, 45 minutes prior, we had to start
25       loading.

Page 47

1    Q.   So if they had any kind of performance issues or
2        disciplinary issues, that would be dealt with by a
3        supervisor?
4    A.   Yeah.  And if I was having trouble with them, I would
5        go to a manager or something and say something.
6    Q.   Okay.
7    A.   But I didn't have -- I couldn't write them up.
8    Q.   So, in the time that you worked at Northwest and at
9        Delta, you were never somebody that was responsible
10       for making disciplinary decisions?
11   A.   Yeah, no, no.
12   Q.   Now, when Delta and Northwest merged, you were still a
13       lead for a while but they called it an ALA, is that
14       right?
15   A.   Yeah, they changed the terminology.  I can't even
16       remember -- oh, man, what was it with Northwest for a
17       lead there?  ESE is a ramp worker, regular worker.  I
18       think we were called LSE.  I think that was it.  Lead
19       Equipment Services, or something like that.  And when
20       Delta became ALA, I don't know what that stood for I
21       got to think now for a second.  That was a lead spot,
22       though, ALA.
23   Q.   And eventually, after you merged with Delta, you
24       didn't have the union anymore, did you?
25   A.   Yeah, it got voted out after a couple years.

Page 48

1    Q.   Do you remember whether or not you got asked to say if
2        you wanted to continue to be in a lead position as
3        part of Delta?
4    A.   They just kind of kept who they had, who was already
5        working with Northwest.  But I had to go to training,
6        extra training --
7        MR. BURG:  Hold on, Jeff.  I need a break.
8        (Off the record at 9:59 a.m.)
9        (Back on the record at 10:06 a.m.)
10       MARKED FOR IDENTIFICATION:
11       DEPOSITION EXHIBIT 2
12       Aircraft Load Agent Document
13       10:06 a.m.
14   BY MS. GROSS:
15   Q.   Mr. Nicholas, I'm going to hand you what has been
16       marked as Exhibit Number 2 to your deposition.
17       Do you recognize your signature at the
18       bottom?
19   A.   Yeah.
20   Q.   Okay.  There's no date on this, but it looks to me,
21       and take a minute and read it, first of all.
22   A.   It's talking about ramp pay for leads.
23       MR. BURG:  Just...
24   BY MS. GROSS:
25   Q.   It appears to me to be something, a document that was

Carroll Court Reporting and Video
586-468-2411

Jeffrey Nicholas
August 14, 2017

Page 49

1    prepared during the transition from Northwest to Delta
2    and it asking you if you want to continue to be in an
3    ALA program with Delta?
4    A. Yeah, I can't remember if we did this or not. I just
5       remember I stayed as a lead.
6    Q. Okay.
7    A. They kept it basically who they had, you know, because
8       I think maybe some people stepped out.
9    Q. So this was just asking you to acknowledge that
10      you wanted to continue to be a lead?
11   A. Yeah, I guess that's what it looks like.
12   Q. And you signed it?
13   A. Yeah.
14   Q. Do you think you would have read it before you signed
15      it?
16   A. I might not have read all of it.
17   Q. Is it your practice to read things before you sign
18      them generally?
19   A. Yeah, but I mean, sometimes -- it's a pretty
20      fast-paced environment out there. It's not a lot of
21      time. If I was in the training department, I probably
22      read it.
23   Q. Among other things, the document says under
24      paragraph 2 that the ramp crew you lead is an
25      extension of you. This means that Delta expects you

Page 50

1    to lead your crew by setting a positive and
2    professional example of how to perform all of the
3    necessary duties safely and properly and in full
4    compliance.
5    A. Yeah.
6    Q. You understood that to be part of your duties as an
7       ALA?
8    A. Yeah.
9    Q. Now, when you were with Northwest, and you were
10      represented by a union, there was a progressive
11      disciplinary system, wasn't there?
12   A. Yeah.
13   Q. And you could file a grievance and the union would
14      negotiate?
15   A. If something happened and they, yeah, you could file a
16      grievance.
17   Q. Okay. After it became Delta and the union was voted
18      out, was there still some sort of a progressive
19      disciplinary system in place?
20   A. Delta didn't really -- they didn't know how to merge
21      the two together, I guess, Delta system and Northwest.
22      So the managers had meetings over like a whole year
23      period, what are we going to do? What are we going to
24      do? What are we going to do?
25          And they said, what they came up with, is,

Page 51

1    they didn't put it in writing, they did it by word of
2    mouth. They said, if you are on a level for
3    Northwest, you are going to stay on the old leveling
4    system until you age out of it, you know what I mean.
5          And so, if they catch something else that
6    they got to write you up for, they are still going to
7    write you up the old way. So most people, whoever is
8    not on a level, just go into the Delta system, the way
9    they write up people, and you will stay on the old way
10   if you are on a level, or whatever level you are on,
11   until you age out of it.
12   Q. Once you aged out of whatever you had from
13      Northwest --
14   A. Then you could go over there.
15   Q. And Delta system had what kind of levels, if you know?
16   A. Their's was, I don't know, because they didn't clarify
17      it. They weren't cut and clear. They didn't say,
18      here's how it goes. They had, like somebody said you
19      get a verbal and then you get a written and then you
20      are out the door.
21          I think I, I don't know, somebody told me
22      that. I didn't never seen, I don't think I ever seen
23      Delta disciplinary, the whole thing.
24   Q. While you were there even as --
25   A. How it works, I didn't know how.

Page 52

1    Q. While you were there working for Delta, you did
2       receive some discipline, though, correct?
3    A. For when we became Delta?
4    Q. Yes.
5    A. Yeah, but I was on the old ways still. I will still
6       being disciplined the old way.
7    Q. So all the way up through the termination of your
8       employment, you were getting disciplined under what
9       used to be the Northwest way?
10   A. Yeah, there's levels, 1, 2, 3, 4. They had a level
11      beyond 3, but I don't know what that was called.
12   Q. And level -- they had coachings, correct?
13   A. Yeah, yeah. You had two or three coachings between
14      the levels.
15   Q. And level 1 was something that stayed on your record
16      for how long?
17   A. I think level 1 was nine months. Level 2, it might
18      have been a year.
19   Q. And the final corrective action was two years?
20   A. That was called "last chance level 3". It was three
21      years. But then they also had a level beyond that.
22      They would -- if you got in trouble on the last chance
23      they would send you home for a couple days. They
24      called it like a decision-making leave. And then they
25      would bring you back on a final, or something like

13 (Pages 49 to 52)

Jeffrey Nicholas
August 14, 2017

Page 53

1  that, I think they called it.
2  Q. Northwest had decision-making leaves, correct?
3  A. You mean where they sent you home at the end?
4  Q. Yes.
5  A. Yes.
6  Q. Delta didn't have decision-making leaves?
7  A. But I was on the old way. I was on the old system.
8  Q. Okay. But you never got any decision-making leaves
9     from Delta?
10 A. No, they never sent me home on that and brought me
11    back.
12 Q. Do you know of anybody who got a decision-making leave
13    from Delta in the last year or two that you were
14    there?
15 A. No, but I know people that got them over the whole
16    time I was working out there.
17 Q. But again, they were something that you got as part of
18    the Collective Bargaining Agreement when you still had
19    the union in Northwest, correct?
20 A. Yeah. I never had to take, I never got one so I
21    didn't really know a lot about it. I don't think it
22    was even in the book. I don't think it was even in
23    their contract, in the book. But they used it. It
24    was like four levels.
25 Q. When it was Northwest?

Page 54

1  A. Yeah.
2  Q. Okay. And once Delta started making the transition,
3     you don't know one way or the other if Delta was
4     giving decision-making leaves?
5  A. I don't know what Delta -- Delta was doing whatever
6     they wanted. They didn't put a lot on paper. They
7     just changed the rules as they went.
8  Q. Okay. Well, in the time that you were there, even
9     under Delta, you were still getting the same kind of
10    discipline, correct?
11 A. Yeah.
12 Q. The Level 1s?
13 A. Yeah.
14 Q. Level 2s?
15 A. Yeah.
16 Q. Final Corrective Actions?
17 A. Yeah.
18 Q. And some coachings here and there?
19 A. I didn't have a meeting when I was in the Delta
20    system, I mean, after we merged, there was only a
21    couple entries, I think.
22 Q. When you say "entries," where are those kind of
23    entries being made?
24 A. Whatever is on my record.
25 Q. Was there something called a "Journal" that was kept?

Page 55

1  Does the word "Journal" mean anything to you in terms
2  of your disciplinary record at Delta?
3  A. No, I didn't know about no Journal.
4  Q. But you do have an understanding that there is some
5     kind of, is it electronic entry that is being made if
6     you get coached?
7  A. Any time they wrote you up, they had to call you in to
8     tell you what was wrong. And they had to have you
9     sign it. And they had to coach you to do what
10    they wanted -- you know, tell you what you did wrong
11    and what they wanted and expected from you in the
12    future.
13 Q. So, in terms of things changing, they never really
14    changed as far as you were concerned?
15 A. Yeah, mine didn't because I was already on a level. I
16    think it was -- I was on a level 1 for, I think it was
17    attendance.
18     So then I asked attendance lady, the
19    manager, Janet Manns there, I think she's still out
20    there, what is going to go on with this? And they
21    said, they are still having meetings and management is
22    trying to figure out what they are going to do. And
23    she said, you are going to stay on the old way,
24    because you are already on the Delta -- you are
25    already on the old way of doing stuff.

Page 56

1  Q. Okay.
2  A. She explained it to me. That's where I kind of heard
3     the first time about it.
4  Q. Umm --
5  A. Because we all wanted to start with a clean slate,
6     that's the word going around the ramp, I think we all
7     should start with a clean slate. I guess Delta didn't
8     want to do that. We all thought we thought we should
9     be able to start clean, you know, when we became
10    Delta, once the union went away. I think the union
11    stuck around for a year or so, contesting the vote --
12 Q. Mm-hmm.
13 A. -- and fighting it. And so, and then, but then they
14    told us we're still going to be leveled on the old
15    way, the old system, because they didn't have no way
16    to merge the two.
17 Q. Once the union went away, as far as you know, is it up
18    to management to decide how serious your offenses were
19    and what level they should put you on?
20 A. No, I understood I was on the old way. And if they
21    leveled me, it had to be the old way. They had to
22    give me two or three coachings in between each level.
23 Q. Where, if anywhere, is there anything in writing that
24    you are aware of that says you are supposed to get two
25    it or three coachings between each level?

Carroll Court Reporting and Video
586-468-2411

Jeffrey Nicholas
August 14, 2017

Page 57

1  A.  That's the way they did it.  It might have been in the
2  union book, I don't know, but that's the way they did
3  it.
4  Q.  That's the way they did it when you were in Northwest
5  with the union?
6  A.  Yeah.  And Delta maybe had verbal warnings and maybe
7  write-ups, too.  But they told me I was on the old
8  way.  They said I got to ride that out, whatever I was
9  on.  I never made it off the levels that I was on for
10  Northwest, or for the old way of doing stuff.
11  Q.  Because before you aged out of whatever you had from
12  Northwest, you picked up new stuff from Delta?
13  A.  Yeah, the guy put me on last chance and that was a
14  three-year hitch.  And he wasn't supposed to put me on
15  last chance --
16  Q.  We're going to get into that.  I don't really want to
17  do that now --
18  A.  All right.
19  Q.  -- because your lawyer is going to take a break in a
20  minute here, but we will get into that later.
21      MR. BURG:  Ten minutes.
22  BY MS. GROSS:
23  Q.  Now, as I understand it, Mr. Nicholas, the final issue
24  that caused the termination of your employment was
25  that you were observed by a member of Delta management

Page 58

1  driving a tug without wearing your seatbelt, is that
2  correct?
3  A.  He accused me of not wearing a seatbelt.  I don't know
4  how he could because I was in a tug in the winter and
5  I had the canvas closed.  And there is no way you can
6  see into the canvas.
7  Q.  Okay.  The person in question is Jeff Lane, correct?
8  A.  Yeah.  Yeah.
9  Q.  Is it your testimony today that you were wearing a
10  seatbelt that day?
11  A.  I think I was wearing a seatbelt but I didn't know for
12  a hundred percent, so I just put that I didn't know
13  for sure on my statement.  They called me in about a
14  week later and they said, Nick, we just need you to
15  write up what happened last week with that seatbelt.
16  Nobody talked to me in the intervening time.  It
17  happened on December 6th.
18  Q.  Weren't you off work between December 6th and
19  December 13?
20  A.  Yeah.  They gave me a couple days off, yeah.
21  Q.  So you took a couple days off and then when you
22  returned to work is when they asked you about it,
23  correct?
24  A.  Yeah.
25  Q.  So the reason you didn't get asked about it until the

Page 59

1  13th is because you weren't there --
2  A.  No, I was there.  I took my days off were Wednesday,
3  Thursday.  So I was there for when it happened on
4  Friday the 6th.  I was there Saturday, Sunday, Monday,
5  Tuesday.  I had to work the whole week there.
6  Q.  Let's back up for a second and talk about what your
7  schedule was.
8  A.  What do you mean what my schedule was?
9  Q.  What was your normal work schedule?
10  A.  It's where you bid, they bid twice a year, it was in
11  the fall and winter.  It was where you could hold --
12  it went by seniority, whatever you could hold, you
13  could bid.
14      And on that one, when the incident
15  happened, I was in online and I think I was on the ten
16  hour, they experimented with a four-day workweek out
17  there.  And through the summer of '13, I was on, I was
18  on four 10-hour days, and three days off, until the
19  fall, until the winter bid started.
20      And this incident was on the last day of
21  work in that, that area, of my old area.  We already
22  bid like a month before we were going to go to the new
23  area.  And so when I was in the new area, that's when
24  they came and got me and said, we need you to write up
25  what happened last week.

Page 60

1  Q.  So had you ever worked four ten-hour days before the
2  summer of 2013?
3  A.  No, they never had that.  And I think they did away
4  with that after that, too.  I don't think they kept
5  it.
6  Q.  So, in all the years leading up to that time frame,
7  when you had the experiment with four tens, were you
8  working eight-hour days?
9  A.  Yeah.  But when I first started, I was part time.  I
10  was only five hours a day and we complained to the
11  management, because it was, you know, because gas
12  prices, not so bad when I first started.  But remember
13  a few years back how the gas prices went through the
14  roof?  It was up to four dollars a gallon.  Well,
15  through then, all the part-timers were crying because
16  they were making everybody come out there for five
17  hours every day.
18  Q.  You hired in part time, and at some point, you got to
19  be full time.
20  A.  Yeah.  I think I got to the full time when I went into
21  the lead spot, in '08, to the lead spot.
22  Q.  That's still Northwest, still union?
23  A.  Yeah.  I think it was the spring of '08 I took my lead
24  spot.
25  Q.  After the merger when it becomes Delta, you are

15 (Pages 57 to 60)

Jeffrey Nicholas
August 14, 2017

Page 61

1  working full time, eight hours a day, until that
2  experiment in 2013?
3  A.  Yeah, and then I just switched over to that four-day
4  deal.
5  Q.  What days of the week would you work?
6  A.  I think I was off, it was bad days off.  It was like
7  Tuesday, Wednesday, Thursday, something like that.
8  Q.  Did the schedule change or was it always the same?
9  A.  Always the same, for the whole six-month bid, whatever
10  it was.  I think I worked there from the spring of
11  '13, on that four-day deal, until the fall.
12  Q.  Okay.  When you didn't have the four tens, when it was
13  just eight hours a day, how many days a week, did you
14  work?
15  A.  Five.  Five eight-hour days.
16  Q.  And what days of the week did you work --
17  A.  I couldn't -- the guys with a lot of seniority, they
18  got the weekends.  I could only get Wednesday,
19  Thursday off, or Tuesday, Wednesday.  Like that.
20  Q.  And whatever schedule you were on, you stayed on --
21  A.  Yeah, yeah.
22  Q.  -- that schedule --
23  A.  Right, for the whole --
24  Q.  -- until it was time to bid again?
25  A.  Right.

Page 62

1  Q.  But under any scenario, your normal schedule called
2  for you to work for 40 hours a week once you were full
3  time?
4  A.  Yeah.
5  Q.  Any opportunity for overtime?
6  A.  Oh, yeah.  They'd sometimes call your area and say,
7  can you stay another two hours, hold over?  And you
8  would say yes or no if you wanted to stay or not.
9  They would call around before the end of the shift to
10  see if they, you know, whoever they needed, if they
11  liked overtime, they would call them first.  The guys
12  in the schedule are down there and they had to find
13  bodies.
14  Q.  So your normal hours -- did you get paid every two
15  weeks?
16  A.  Yes.
17  Q.  So your normal hours in a two -week pay period would
18  be 80 or --
19  A.  Yeah, 80.  And I worked a little bit of overtime
20  sometimes.
21          MARKED FOR IDENTIFICATION:
22          DEPOSITION EXHIBIT 3
23          12/6/2013 Jeff Lane Write-Up
24          10:21 a.m.
25  BY MS. GROSS:

Page 63

1  Q.  Mr. Nicholas, I'm going to hand you what has been
2  marked as Exhibit 3 to your deposition.  You've seen
3  this document before because it was provided to you
4  when you requested your personnel file from the
5  company, correct?
6  A.  Yeah, but I -- no, no.
7  Q.  You didn't see it at the time you were still there?
8  A.  Yeah.
9  Q.  But you've seen it since your employment was
10  terminated?
11  A.  I think I looked over it real quick.  I don't know.
12  Let me look... okay.  Wait... he didn't assist me in
13  dumping a bag --
14  Q.  I didn't ask you a question, sir.
15  A.  Okay.
16  Q.  The first question was, you knew who Jeff Lane was?
17  A.  Yes.
18  Q.  He was a performance leader?
19  A.  Yes.
20  Q.  Which is Delta's name for sort of a first line
21  supervisor?
22  A.  Yeah, the lowest management.  Yeah.
23  Q.  Was he your supervisor at the time?
24  A.  No.  He just, he drove around looking at how he could
25  write people up.  He was in a truck and that's what he

Page 64

1  did.
2  Q.  Do you know whether or not Mr. Lane had any particular
3  responsibilities with respect to safety?
4  A.  Oh, I don't know what his -- yeah, I don't know what
5  his deal was.
6  Q.  So you don't know one way or another whether he was
7  the PL that was supposed to be doing any kind of
8  safety audits or monitoring?
9  A.  Yeah, I don't know that.
10  Q.  And he had never been your immediate supervisor, had
11  he?
12  A.  He might have been through the years, I don't know.
13  Depending where you bid.  And they assigned these guys,
14  like zone 1, zone 2, the terminal was cut up into
15  different zones.
16  Q.  Do you remember any -- working for him at any point in
17  time?
18  A.  I remember having to deal with him, having to talk to
19  him on the ramp, but I can't remember.  So I must
20  have, I don't know.  I talked to him over the years.
21  He didn't like me.  I know that.
22  Q.  How do you know that?
23  A.  I just had a feeling he didn't like me.
24  Q.  Anything more than a feeling?
25  A.  When I, when I stepped out of the lead spot, and I

Carroll Court Reporting and Video
586-468-2411

Jeffrey Nicholas
August 14, 2017

Page 65

1    told him I was going to go back to lead spot, he got
2    real mad at me on the ramp, and he said, no, you're
3    already out of that, don't go back.  He was
4    encouraging me not to go back.  And I told him I
5    enjoyed my lead spot and I was going to go back and
6    take the lead spot back.
7    Q.  You got taken out of the lead spot, didn't you, sir?
8    A.  They kind of leveled me out, yeah.  The guys came
9        after me and gave me levels and management told me to
10       step out of it.
11   Q.  Okay.  So you weren't getting back into lead spot
12       unless management let you back into the lead spot,
13       correct?
14   A.  No, I went through a period, Mohammad Suri (ph), they
15       were going to help me back in after a little bit of
16       time.  They wanted me to step out for a while.
17   Q.  So sometime after you stepped out of lead position,
18       you mentioned to Jeff that you were going to try to
19       get back into it --
20   A.  Yeah, and he got all frustrated in his truck.  He was
21       sitting in his truck on the ramp and I was just
22       talking to him, and I said, let me get my lead spot
23       back, and he got all mad at me.  He said, no don't
24       worry about that.  Don't go back to that.
25   Q.  How is telling you not to worry about it not going

Page 66

1    back --
2    A.  He just --
3    Q.  Sir, let me ask the question, please.  You really need
4        to let me ask the question before you answer it, okay?
5        It's really important.
6            How is Mr. Lane telling you, you are out of
7        that now and don't go back to that and don't worry
8        about it, getting mad at you?
9    A.  Because he's not encouraging me to seek a higher
10       profession with the airlines.  He's discouring me
11       from it.
12   Q.  Okay.  So because he was not encouraging you to seek a
13       higher position that you had already been taken out of
14       with the airlines, you think he didn't like you?
15   A.  Yeah, I just felt he didn't like me anyway, too,
16       before that even.
17   Q.  Did Mr. Lane ever make any derogatory comments to you
18       about your age?
19   A.  I don't think so.  I don't think he liked my
20       personality.
21   Q.  Well, sir, you know, forgive me for saying this, but
22       it doesn't sound like you liked his personality all
23       that much either, did you?
24   A.  I didn't have no opinion of his personality.
25   Q.  And based on that conversation that he had with you,

Page 67

1    you think he had an opinion about you?
2    A.  Yeah, that gave me a bad taste in my mouth towards him
3        when he's telling me, discouraging me not to go for an
4        advancement in the company.  You know, he's acting
5        like I'm a nobody, and, you are out of there now, and
6        don't worry about getting advanced no more.  And
7        that's the feeling he gave me when he told me that.
8            MS. GROSS:  We need to take a short break.
9            MR. BURG:  Well, I mean, it's a 10:30
10       telephonic conference.
11           MS. GROSS:  I just heard the ballad.
12           MR. BURG:  You have two minutes if you
13       want.
14   BY MS. GROSS:
15   Q.  Any other specific conversations that you can recall
16       with Mr. Lane that gave you the impression that he
17       didn't like your personality?
18   A.  I can't remember no certain day, but, you know, just
19       over, just having dealings with him over the years.
20       On the lead spot, I had to talk to the managers, and
21       they were on duty, you know.  He was never very
22       helpful to me when I was a lead.  If I called him to
23       help on something, he never was very helpful.
24   Q.  Did you observe how helpful he was with other people?
25   A.  He seemed more helpful to other people.

Page 68

1    Q.  Who?
2    A.  I couldn't name anybody specific because I wasn't
3        making a logbook of it at the time.  I just observed
4        it.
5    Q.  So you observed it but you can't name anybody --
6    A.  Yeah, I don't know who, whoever the leads were at the
7        time.  If they needed help, he was over there helping
8        him more than he was me.
9    Q.  Okay.  Mr. Lane prepared the write-up that is Exhibit
10       3 which says that on Friday, December 6th, he observed
11       you moving from zipper road from B2 to the T-belt,
12       abeam B10.
13           Do you see that about the middle of the
14       write-up?
15   A.  Yes.
16   Q.  So zipper road is the road you told me about a minute
17       ago, that's the road that the tugs were supposed to
18       stay in around the perimeter of the plane?
19   A.  Yeah.
20   Q.  And B2, is that the gate?
21   A.  Yeah, that must be a gate.
22           MR. BURG:  Rae, it's time for me to go make
23       my call.
24           MS. GROSS:  We'll go off the record for a
25       couple of minutes.

17 (Pages 65 to 68)

Jeffrey Nicholas
August 14, 2017

Page 69

1          (Off the record at 10:28 a.m.)
2          (Back on the record at 10:40 a.m.)
3    BY MS. GROSS:
4    Q.   So, Mr. Nicholas, Mr. Lane says that day he observed
5         you driving on zipper road from gate B2 to the T-belt
6         at abeam B10.
7              So is the T-belt one of the things that
8         carries --
9    A.   Oh, yeah, I don't know the exact gate, but if that's
10        where it's located, that's what he's saying.
11   Q.   So sitting here today, do you know one way or the
12        other whether or not on December 26th of '13, you
13        drove a tug along zipper road --
14   A.   Yeah, I did.  I --
15             MR. BURG:  Let her finish the question.
16   BY MS. GROSS:
17   Q.   -- from B2 to the abeam at B10?
18   A.   Yes.
19   Q.   You actually did?
20   A.   Yes.
21   Q.   Mr. Lane goes on to say he parked and approached you
22        as you were unloading bags on to the T-belt.
23             Do you remember that?
24   A.   I was already inside.  Most of my bags were already on
25        the belt.  And then the zip -- the door that you

Page 70

1         pulled up to, it automatically opens as you approach
2         it with a tug.  But I think he hit the button outside
3         and he came in.  And I was already in there a minute
4         or two before he came in.
5    Q.   And he came in and he said he observed you, that you
6         had not been wearing a seatbelt when you were driving?
7    A.   Yeah, he said something like, I need to talk to you
8         about safety.  I don't think you had the belt on back
9         there.
10   Q.   Okay.  He says you admitted to him that --
11   A.   Yeah, that's false.
12   Q.   Please, sir.
13   A.   Yeah.
14   Q.   Let me ask the question before you try to answer,
15        okay?  We are going to be here --
16   A.   Yeah.
17   Q.   -- very late in the evening if you don't stop doing
18        this.
19             So my question is, Mr. Lane says that you
20        admitted to him that you were not wearing the seatbelt
21        and asked him not to write you up.
22   A.   Yeah, that's false.  I didn't --
23             MR. BURG:  She did not ask a question.
24             THE WITNESS:  Oh.
25   BY MS. GROSS:

Page 71

1    Q.   Now, I understand, based on what you've already
2         mentioned, that you are testifying today that you did
3         not admit that you weren't wearing a seatbelt; that's
4         false?
5    A.   Yeah, I didn't say that to him.
6    Q.   Did you answer his question one way or the other, did
7         you say, yes, I was wearing it?
8    A.   No, he didn't ask me.  He didn't ask me.  He told me
9         that he thought I wasn't -- he said I don't think you
10        were wearing your seatbelt back there.  He didn't ask
11        me, were you wearing your seatbelt back there?
12   Q.   Okay.
13   A.   And I didn't tell him I was not wearing my seatbelt.
14        That's totally false.
15   Q.   Okay.  So when he said to you, I don't think you were
16        wearing your seatbelt back there, you also didn't say
17        to him, oh, yes, I was, did you?
18   A.   I told him, I said, look, Jeff, I said, you know, I'm
19        the only one out here.  I said, I don't need no
20        trouble right now.  They got me on last chance.  I
21        said, I'm on last chance right now and I don't need no
22        trouble from you.  Because those people are write-up
23        happy, those managers that drive around in trucks.
24        They like writing people up.  That's what he's out
25        there to do, is find something to get you on.

Page 72

1              It was one of those times in the airport
2         where you kind of look around, sometimes you are out
3         there working, and you look around there like, why am
4         I the only one on the ramp?  You know, it's like
5         between pushes.  They got the busy times.  I looked
6         around the ramp and I was on the only one out there.
7    Q.   Okay.
8    A.   So I was the only one he could mess with.
9    Q.   So you still didn't answer my question.
10             My question is:  When he said to you, I
11        don't think you are wearing your seatbelt, you didn't
12        turn around to him, and say, oh yes, I was, did you?
13   A.   I don't know.  I don't know about that.
14   Q.   Okay.  But you did tell him that you didn't want any
15        trouble because you were on a last chance --
16   A.   I said, I don't want no trouble from you Jeff, I said,
17        because I knew he didn't like me and I know he was
18        looking to settle it.
19   Q.   Sir, you told him that you didn't need any trouble
20        because you were on a last chance?
21   A.   Yeah, and I didn't need no trouble from him.
22   Q.   And you knew that getting written up when you were on
23        a last chance meant that you might be fired?
24   A.   No, I didn't know that I would get fired, but I didn't
25        need no trouble, you know what I mean?  I didn't need

18 (Pages 69 to 72)

Jeffrey Nicholas
August 14, 2017

Page 73

1      no trouble out of him.  I just said, Jeff, you know,
2   leave me alone.  He said, well, I need to talk to you
3   about safety.  He said, I don't think you were wearing
4   a seatbelt back there, he says.
5   Q.  Okay.  And you didn't tell him whether you were or
6      were not wearing a seatbelt?
7   A.  I didn't say one way or another.  And nobody, he
8      didn't ask me to go make no statement or nothing.
9   Q.  But you did tell him that you didn't need trouble
10     because you were on a last chance?
11  A.  I didn't say, I don't need no trouble.  I just said,
12     look, Jeff, I need -- yeah, I said something along the
13     lines, Jeff, I don't need this right now.  I'm on last
14     chance and I don't need no trouble out of you.
15     Because those guys are write-up happy.  They will
16     write people up.
17  Q.  What would -- when did you normally wear a seatbelt
18     when you were driving a tug?
19  A.  If I was in that tug, I had my seatbelt on.  If there
20     was a seatbelt in the tug.  For seven-and-a-half years
21     I worked out there, they didn't have seatbelts.
22  Q.  Let's talk about that.  When you first started
23     working, there weren't seatbelts in many of the tugs?
24  A.  For the whole time I worked out there.  I didn't see
25     seatbelts until the last month or two.

Page 74

1   Q.  And when you first worked out there, nobody from
2      management was requiring you to wear seatbelts either,
3      were they?
4   A.  Yeah.  There was no seatbelts.
5   Q.  Do you remember --
6   A.  But they talked about safety in the --
7   Q.  Sir, there is no question pending.
8         Do you recall that sometime in the last
9      year or two that you worked at Delta, they came in and
10     retrofitted all those tugs with seatbelts?
11  A.  It took them a long time.  They didn't get it done
12     right away.  And it wasn't during the last year or
13     two.  I only noticed them the last couple of months I
14     was out there.
15        I took family leave on December 13, and
16     when I came back from leave, I started seeing some
17     equipment with seatbelts.  The belt loaders never, the
18     belt loaders had old seatbelts.  I asked the older
19     employees when I first started, what's this right
20     here?  You would see it right below the little wooden
21     seat, a belt holder, and they said that's where the
22     seatbelts used to be.  I guess those came originally
23     with seatbelts, but they got torn off over the years.
24  Q.  So the answer to my question is, at least sometime
25     before you left or before your employment was

Page 75

1      terminated with Delta, you did observe they were
2   retrofitting tugs with seatbelt?
3   A.  They were starting like a transition.  They wanted you
4      to start wearing seatbelts.  They were starting to
5      transition into seatbelts.
6   Q.  And management communicated to you that they wanted
7      you to start wearing seatbelts?
8   A.  But it wasn't cut and dry like that.  It wasn't cut
9      and dry.  They were changing the rules as they went
10     along.
11  Q.  And did you ever hear that one of the reasons that
12     they were changing the rules was because a ground
13     service agent at another airport had been thrown from
14     a tug and killed?
15  A.  No.  No.  No.  I didn't hear it was because of that.
16     I heard that story before but I thought it was because
17     somebody got injured.  Somebody said somebody got
18     injured somewhere and OSHA was after Delta.
19  Q.  So you did hear that OSHA got in trouble with Delta
20     because people weren't wearing seatbelts on tugs?
21  A.  No, I didn't hear it like that either.  I just heard
22     it they got in trouble with OSHA.  I didn't know what
23     the reason was or what happened.
24        I heard a story -- besides that, a whole
25     other incident.  A year before, I heard this story

Page 76

1      about somebody getting killed, somebody got killed for
2   something.  I heard of somebody getting killed at
3   another airport for doing the pushback, the tug that I
4   told you I operated to push the planes out, right?
5   Some of those aren't covered, some of them are
6   enclosed and some of them aren't.
7         I guess she -- it was a woman, I guess --
8   she leaned over and tried to do the tow up by herself
9   and I guess she fell in between the tow hook and the
10  tug, and got squished, is the story I heard about
11  somebody getting killed.
12  Q.  And you never heard any stories one way or the other
13     about somebody being ejected from a tug and getting
14     killed?
15  A.  No.
16  Q.  Did you ever hear any stories, one way or the other,
17     about anybody being injured at Detroit because of
18     falling out of a tug?
19  A.  I knew one girl that drove too fast, it was a belt
20     loader, it is a different operating -- wasn't this.
21     She drove fast, super fast.  You would see her going
22     by and she could be going 60 miles an hour on this
23     belt loader.
24  Q.  Okay.  And for the record, the belt loader is --
25  A.  The one --

19  (Pages 73 to 76)

Jeffrey Nicholas
August 14, 2017

Page 77

1  Q.  -- the vehicle that has the --
2  A.  She drove too fast and she --
3  Q.  Okay.  Let me -- I'm trying to find the words.
4         The belt loader is the vehicle that has the
5  belt on the back of it that the bags go up and down --
6  A.  Yeah, yeah, yeah, yeah, yeah.  And you can also drive
7  it around the airport.  People use that to get
8  somewhere.
9  Q.  And it's got a cab on it that's very similar to the
10  cab on the tugs?
11  A.  No.  It's no cab.  It's just a flat -- do we have a
12  picture of it?  It's just a flat.  It's just a seat
13  over there.
14  Q.  There's no cab?
15  A.  And there used to be, years ago I guess when they
16  bought them, there used to be seatbelts, but they
17  weren't on none of them anymore.
18  Q.  And you are aware, you have some knowledge that there
19  was a girl --
20  A.  Yeah, I heard about her getting injured.
21  Q.  Oh, God.
22         MR. BURG:  Excuse me, Jeff.
23  A.  Yeah, I heard about her getting injured.
24         MR. BURG:  Hold on.  Hold on.  Let me just
25  make a statement.  This is unlike a conversation.

Page 78

1         It's really just question, it's more technical than a
2  conversation, it's a question followed by an answer.
3         THE WITNESS:  All right.
4         MR. BURG:  It's not a give and take like a
5  social conversation.
6         THE WITNESS:  All right.
7         MR. BURG:  Go ahead.
8  BY MS. GROSS:
9  Q.  So you are aware that there was a female employee who
10  got injured driving a belt loader at Detroit?
11  A.  I heard.  I heard that, yeah.  I heard people talking
12  about that.
13  Q.  And you don't know anything about the details?
14  A.  No.
15  Q.  You don't know who she was?
16  A.  I heard who she was.  I knew the name when they said
17  it, when I heard them talking about it.
18  Q.  But sitting here today, do you know the name?
19  A.  Let me think for a second.
20  Q.  It's okay if you don't.
21  A.  No.  It might come to me during the day.  I will think
22  about it for a while.  Potter.  Potter.
23  Q.  Okay.  Do you know if she ever came back to work?
24  A.  I don't know.  I don't think she ever returned because
25  I seen her one time, I was waiting for the employee

Page 79

1  bus to get out of the airport, about a year after tis
2  happened to her, I guess, and I asked somebody, is
3  Potter back to work?  And they told me no.  And I
4  think she was just going to Human Resources or
5  something.  I saw her waiting for the employee bus to
6  get back out of the airport.
7  Q.  So, sometime in 2013, you understood that you were
8  supposed to be wearing a seatbelt when you were
9  driving a tug?
10  A.  No.  I heard we were transitioning into seatbelts, and
11  they -- they weren't clearcut in their rules.  They
12  come out with the rules saying you could go one gate
13  without a seatbelt and then two -- and then all of a
14  sudden, they changed the setting, you can go two or
15  three without seatbelts.
16  Q.  Uh-huh.
17  A.  And they never put it in writing --
18  Q.  Sir, stop, there's no question pending, okay.
19         MARKED FOR IDENTIFICATION:
20         DEPOSITION EXHIBIT 4
21         Delta Seven Safety Absolutes
22         10:49 a.m.
23  BY MS. GROSS:
24  Q.  Okay.  I'm going to show you what has been marked as
25  Exhibit 4 to your deposition.

Page 80

1         Is this your signature at the bottom of
2  Exhibit 4, sir?
3  A.  Yeah.
4  Q.  Dated November 3rd of 2013?
5         MR. BURG:  October.
6         MS. GROSS:  November.
7         MR. BURG:  Oh, I'm sorry.
8  A.  Yeah.
9  BY MS. GROSS:
10  Q.  And you wrote the date as well, is that the way you
11  write your numbers?
12  A.  Which -- what are you talking about, the date?
13  Q.  Bottom of the page, did you print your name?
14  A.  Yeah.
15  Q.  Did you sign your name?
16  A.  Yeah.
17  Q.  Did you write your employee ID number?
18  A.  Yes.
19  Q.  Did you also write the date?
20  A.  Yes.
21  Q.  Does that indicate that you signed this form on
22  November 3rd, 2013?
23  A.  Yes.
24  Q.  This is a memo from Rogermike Rowe, the department
25  manager at Detroit, correct?

Carroll Court Reporting and Video
586-468-2411

Jeffrey Nicholas
August 14, 2017

Page 81

1  A. Yeah, I guess. Yeah.
2  Q. Do you remember being asked, on or about November 3rd
3    of 2013, to sign this document with the Seven
4    Safety --
5  A. No, I don't remember it, but I guess if that's my
6    signature, that's my signature.
7  Q. Okay. And --
8  A. I don't recall this, this Seven Safety Absolutes.
9    See, this stuff, they come whipping up. You can see
10   this happened a month before I got the...
11 Q. Okay. You don't know whether or not you were the only
12   person who was asked to sign this, do you?
13 A. No, I don't know.
14 Q. So it's possible everybody was asked to sign this?
15 A. Yeah, I don't know who was asked to sign it.
16 Q. Okay. And this says that, as of October 19th, 2013,
17   at the bottom of the first paragraph, any
18   non-compliance with these seven safety absolutes was
19   likely going to result in administrative action and
20   Journal entry.
21     Do you see that?
22 A. Where do you see that at?
23 Q. Bottom of the first paragraph, in bold, underlined:
24   As of 10-19-13, any non-compliance will likely result
25   in admin action and Journal entry.

Page 82

1  A. Yes, but -- okay. Okay.
2  Q. I haven't asked a question.
3  A. What's the question?
4  Q. Well, first question is: Do you know what "Journal
5    entry" means?
6  A. I guess that would be your -- no, I don't know
7    Journal. It says "admin action". That would be your
8    admin file. I don't know what Journal is.
9  Q. You used the word "Journal" earlier in the deposition.
10   Isn't "Journal" your disciplinary record?
11 A. Well, okay. I thought that would all be admin or
12   something.
13 Q. So, do you think you read this document before you
14   signed it?
15 A. No. I don't think I read this because this was pushed
16   at me. I was in a fast-paced work environment and I
17   was working an online. And I got my, what do they
18   call it? I got my job, my work order, I think they
19   called it a work order. They didn't call it that at
20   Northwest, but I got my list of what I was going to be
21   doing, going out on my next plane run, pick up bags
22   and deliver bags.
23 Q. Do you remember who gave it to you to sign it?
24 A. I think this was the one the guy, I was running out
25   the door, I already had my work assignment, figured

Page 83

1  out which gates I was going to deliver bags to, and I
2  was going out the door, and he said, Nick, Nick, I
3  need your signature. And I put my signature on it
4  real fast.
5  Q. Look at the words right above your signature, it says:
6    I confirm receipt and understanding of the Seven
7    Safety Absolutes.
8  A. Yeah. Yeah.
9  Q. See that?
10 A. I just didn't -- I don't recall the document. I just
11   signed it. It's one of those things where you just
12   sign and I kind of asked him, what's it about? And he
13   said something about seatbelts, that's all he said.
14   And I signed it and I was out the door. I had to get
15   to my plane.
16 Q. The first, number 1 of the Seven Safety Absolutes on
17   this piece of paper that you signed in November 2013
18   says: Non-compliance with wearing a seatbelt when
19   operating a motorized GSE in the operation.
20     What does a GSE stand for, do you know? Is
21   it ground service equipment?
22 A. Yeah, something like that.
23 Q. So that includes a tug, doesn't it?
24 A. Yeah, I would say so. Yeah.
25 Q. Okay. So, you signed a piece of paper in November of

Page 84

1  2013 saying that you had confirmed receipt and
2  understanding of the Seven Safety Absolutes, correct?
3  A. Yeah, I guess I just didn't take the time to read it
4    because I didn't have the time. And he just pushed it
5    at me when I was running out the door.
6  Q. But is it your testimony, sir, that you never wore a
7    seatbelt?
8  A. No, I -- if there was a seatbelt in the tug, I had it
9    on, because I followed safety procedures.
10 Q. Okay. But you said, for the first seven years you
11   were there, nobody cared about seatbelts and nobody
12   had seatbelts?
13 A. There was no seatbelts in the tugs. You can't wear a
14   seatbelt if there is no seatbelt in the tugs.
15 Q. When did you learn that you were supposed to be
16   wearing seatbelts and how did you learn that?
17 A. The word started coming down that they were going to
18   start putting seatbelts in the tugs. I think managers
19   had a meeting in the work areas and they said, we're
20   going to start putting -- retrofitting the tug with
21   seatbelts.
22 Q. And word started coming down that you were supposed to
23   wear them, too, didn't it?
24 A. They were changing their rules daily out there. They
25   said, you can go one gate without a seatbelt, you can

21 (Pages 81 to 84)

Jeffrey Nicholas
August 14, 2017

Page 85

1    go two gates without a seatbelt.  People are
2    complaining because you have to go gate to gate.  You
3    are only in the tug for a hundred feet, and you got to
4    go from gate to gate delivering bags in the tug.  It
5    wasn't clearcut.  They didn't have no clearcut deal on
6    the seatbelt.  It was all uncharted territory.
7  Q.  But you are sure, nonetheless, that you always wore a
8    seatbelt?
9  A.  What was that?  I was thinking to myself...
10 Q.  It's okay.  Looking at the picture of the tug, is that
11   the kind of tug that you were driving on the day that
12   Mr. Lane says he saw you?
13 A.  Yeah, yeah.  I was towing bags, yeah.
14 Q.  That's got a seat for the driver.  Is there room for a
15   passenger as well?
16 A.  It's a bench seat.  And there's room to put two people
17   there, yeah, if you want to.
18 Q.  It's got a zipper?
19 A.  Yeah, and I had it closed.  It was winter.  It was
20   December.  So there's no way that he could have saw in
21   there that I didn't have a seatbelt on.
22 Q.  Okay.  Well, if you were jumping out of the tug every
23   30 feet, how could you have the zipper closed?
24 A.  I wasn't -- on that one, I think I had to drive a
25   couple gates.  I had to drive two, three gates.

Page 86

1  Q.  Well, if you are driving two or three gates, you
2    should have had your seatbelt on, correct?
3  A.  No, they were changing the rules daily.  No, I had my
4    seatbelt on.  If there was a seatbelt in that tug, I
5    had it on.
6         MARKED FOR IDENTIFICATION:
7         DEPOSITION EXHIBIT 5
8         Handwritten Note dated 12/13/2013
9         10:56 a.m.
10 BY MS. GROSS:
11 Q.  I will ask you to take a look at what's marked
12   Exhibit Number 5.
13 A.  Yeah.
14 Q.  This is your handwriting, correct, sir?
15 A.  Yeah, I just jotted it real quick.
16 Q.  And you jotted it real quick on the 13th of
17   December of 2013, correct?
18 A.  Yeah.  Yeah.
19 Q.  Which is seven days after Mr. Lane says that he
20   observed you not wearing your seatbelt, correct?
21 A.  Yeah.
22 Q.  Would you agree with me, sir, that your memory is
23   probably better about whether you were wearing your
24   seatbelt seven days after it happened than it is
25   today, years later?

Page 87

1  A.  No, my memory is probably about the same.
2  Q.  Okay.  Well, if it's the same, then, if you would
3    look, please, at the bottom of your statement, the
4    very last sentence, it says, I could not recall if I
5    had my seatbelt on --
6  A.  Because I couldn't be a hundred per sure.  It's second
7    nature, you put the seatbelt on when they are in the
8    tug.  It's like you do it without even thinking about
9    it.  Because once you got used to it, you just put
10   them on.
11 Q.  Okay.  Well, sir, I'm a little confused because you
12   told me minutes ago that they didn't put seatbelts on
13   until probably the summer of 2013.  But now you are
14   pretty sure that it's second nature that you always
15   wore a seatbelt --
16 A.  When I saw a seatbelt in the tug, I put it on.  You
17   can see the seatbelt sitting in the tug on the seat,
18   so when you get in the tug, you put the seatbelt on.
19 Q.  Okay.  But you mentioned a few minutes ago that the
20   rules weren't clear about when you were supposed to
21   wear it and when you weren't?
22 A.  Yeah, they were -- no, they were unclear.  They were
23   changing the rules monthly out there about seatbelts.
24   Because everybody complained that there was, the job
25   wasn't, I don't know what word I'm looking for, it was

Page 88

1    against the, it was counterproductive to the job to
2    put seatbelts on.
3  Q.  Right, because you are jumping on and off of that tug
4    all the time?
5  A.  You are on and off all the time.
6  Q.  So it's kind of a pain in the neck to put the seatbelt
7    on --
8  A.  No, it's not a pain in the neck.  If the belt was in
9    there, I put it on.
10 Q.  So, even with knowing that if the belt was in there
11   and you put it on, you couldn't say, seven days after
12   Mr. Lane observed you, whether you were wearing the
13   seatbelt when you drove past him or not?
14 A.  I mean, I was being honest with him, I think.  I
15   couldn't be a hundred percent.
16 Q.  Okay.  And you still can't be a hundred percent?
17 A.  I think I had it on.  I think I had it on.
18 Q.  But at that point in time --
19 A.  If there was a belt in that tug, I had it on.  But I
20   didn't want to say no, I didn't want to say, yeah, I
21   had it on, and I don't know, maybe they come up with
22   some video or something.
23 Q.  Mr. Nicholas, you just told me that you were being
24   honest on December 13th of 2013 when you said you
25   could not say one way or the other whether you had

Jeffrey Nicholas
August 14, 2017

Page 89

1    your belt on, correct?
2    A.  I couldn't be a hundred percent.
3    Q.  Okay.  And you were trying to be honest?
4    A.  I was being honest.  It was a hundred percent.  I was
5        being honest in my statement.  But I had said when I
6        was driving the tug, if there was a seatbelt in the
7        tug, I am safety conscious, I followed the safety
8        rules, I had it on.
9    Q.  Because you knew it was a safety rule to put it on,
10       didn't you, sir?
11   A.  Yeah, we had a -- we -- they had a couple gates that
12       you didn't have to put it on, they said.  And they
13       were wishy-washy about the exact wording on when you
14       needed it, when you didn't need it.  It was just word
15       of mouth.  They didn't put a memo out on it.
16       Everybody complained because -- everybody in the ramp
17       complained they had to deliver bags because it was
18       counterproductive to the job.
19   Q.  How so?
20   A.  So they starting coming up -- because you had to go,
21       whatever gate you had to go to, it was a hundred feet
22       away to the next gate, a hundred feet away to the next
23       gate.
24   Q.  How is it counterproductive to the job --
25   A.  It's slowing people down.

Page 90

1    Q.  Sir, let me finish the question.
2            How is it counterproductive to the job to
3        put your seatbelt on to go a hundred feet?
4    A.  It was slowing people down.  They couldn't get there
5        job done in time for -- you got wrote up if you didn't
6        get the bags delivered and you had to connect.  They
7        would write you up.
8    Q.  That was true for you, too, correct?
9    A.  Yeah.
10   Q.  So were there times when, because it was slowing you
11       down, you were complaining about wearing your
12       seatbelt, too, or it was just other people?
13   A.  No, I didn't complain about it.  I mean, I might have
14       complained about it, this seatbelt rule is crazy.
15       Because they weren't clear on what was going on with
16       the seatbelts.  And not all the equipment had
17       seatbelts in it.
18   Q.  The equipment that you were riding on the 6th of
19       December that Mr. Lane saw you riding, had a seatbelt,
20       did it not, sir?
21   A.  Yeah, it had a seatbelt.
22   Q.  And you told the company seven days after Mr. Lane
23       says he observed you not wearing your seatbelt that
24       you could not recall one way or the other whether you
25       were wearing your seatbelt, correct?

Page 91

1    A.  That's what I said in my statement.
2    Q.  And you said that in your statement because, at the
3        time in question, you were trying to be honest,
4        correct?
5    A.  Yeah, I was being honest, and I couldn't be a hundred
6        percent for sure if I, you know, I didn't know for a
7        hundred percent.  But I followed the safety rules and
8        if there's a belt in that tug, I'm going to use it.
9    Q.  Because the company had made it known to you that that
10       was a safety rule, correct?
11   A.  Well, they got my signature over here on this piece of
12       paper but I don't remember signing this one.
13   Q.  Well, how else would you know to wear it if somebody
14       didn't tell you to wear it, sir?
15   A.  They said, we want to start wearing seatbelts.  We're
16       getting seatbelts in the tugs.  We want to start
17       getting used to wearing them.  There was a phase-in
18       type thing.  It wasn't cut and dried, a certain date
19       that it was law.
20   Q.  You didn't read the part on Exhibit 4 that you signed
21       that says that not wearing them would likely result in
22       administrative action in your Journal entry?
23   A.  Where are we at, over here?
24   Q.  The Seven Safety Absolutes.
25   A.  I didn't even read that.  I just jotted my name on it.

Page 92

1        I didn't think it was going to be something like this.
2    Q.  So you knew you were supposed to where it, but you
3        didn't necessarily think you were going to get
4        disciplined for not wearing it?
5    A.  I, I didn't know what would happen if you didn't wear
6        a seatbelt.  I never seen anybody get in trouble for
7        not wearing a seatbelt.
8    Q.  Okay.  And per your testimony from a few minutes ago,
9        until 2013 -- or 2013, they didn't even have seatbelts
10       in a lot of those vehicles?
11   A.  Yeah, right.  But I never, in the time that they did
12       have, start seeing them, I never heard of anybody
13       getting in trouble for a seatbelt.
14           MARKED FOR IDENTIFICATION:
15           DEPOSITION EXHIBIT 6
16           Appeal dated 1/27/2014
17           11:02 a.m.
18   BY MS. GROSS:
19   Q.  Mr. Nicholas, I'm going to ask you to take a look at
20       what's been marked as Exhibit Number 6 to your
21       deposition okay.  And I specifically want to direct
22       your attention to what is page 5.
23           First of all, do you recognize Exhibit
24       Number 6?
25   A.  Yeah, it's my handwriting.

23  (Pages 89 to 92)

Jeffrey Nicholas
August 14, 2017

Page 93

1   Q.  And this is an appeal that you sent to Delta after you
2       were terminated, correct?
3   A.  Yeah, I was trying to remember certain write-ups that
4       I had.  And one of the managers out there encouraged
5       me to write everything that I could write remember, to
6       challenge all the write-ups I could challenge.  And so
7       I could only go by memory.  I didn't have to record
8       with me when I was doing this.
9   Q.  So the purpose of the letter was to challenge your
10      termination?
11  A.  That's what I understood, yeah.
12  Q.  But what I'm hearing you say is, part of that is you
13      were trying to challenge all of the other write-ups
14      that you had leading up to your termination, too?
15  A.  That's what the managers encouraged me to do.
16  Q.  Who encouraged you to do that?
17  A.  Mohammad Suri (ph), he told me to challenge
18      everything.
19  Q.  Is it possible his name is Sarsour?
20  A.  Yeah.  I don't know how to spell it.  It's in the file
21      somewhere, I think.
22  Q.  When did he encourage you --
23  A.  When he told me they were terminating me.  I think it
24      went through Human Resources and he called me about a
25      couple weeks later, I think it was about the 31st of

Page 94

1       December.  And he said, we're pushing through with
2       this termination and I got to give you this address.
3       He gave me the address and he said, Nick, I want you
4       to write -- you challenge all of it, everything you
5       can.  And I go, what do you mean?  He says, it's
6       everything they wrote you up for during the years.  I
7       can't remember that.  I didn't have no file.  I
8       couldn't remember everything.
9   Q.  Did he say anything else?
10  A.  No, that was about it.  And he stayed online until I
11      got the address and that was it.  He gave me the
12      address to appeal to.
13  Q.  And you wrote this letter that is Exhibit 6 yourself?
14  A.  Yeah, I did this myself.
15  Q.  Did anybody assist you with it?
16  A.  No.
17  Q.  I will direct your attention to what is page 5 of your
18      letter.
19  A.  I don't know if I numbered them.
20  Q.  You did off the top.  Top of page 5 says:  I was
21      parked at T-belt putting bags on belt when a PL walked
22      up and said, I need to talk to you about safety.
23          You are referring to the same incident that
24      relates to the seatbelt, correct?
25  A.  Yeah.

Page 95

1   Q.  So it's Jeff Lane that's the PL that you are talking
2       about?
3   A.  Yeah.  Yeah.
4   Q.  "I don't think you were wearing your belt.  I told him
5       I couldn't recall because I'm in and out of the tug so
6       much."
7   A.  Yeah.
8   Q.  So you wrote that on the 27th of January of 2014,
9       correct?
10  A.  Yeah.
11  Q.  Which is a little less than a month after you were
12      terminated?
13  A.  Yeah.
14  Q.  You were terminated on January 2nd of 2014?
15  A.  Yeah.  I didn't tell him that, I didn't tell him like
16      he said, his statement, that I wasn't wearing it, I
17      told him I couldn't recall when he claimed he saw me
18      not wearing it.
19          MR. BURG:  Let her ask the question.
20  BY MS. GROSS:
21  Q.  On January 27th, after you knew you were had already
22      been terminated, you were still --
23  A.  Oh, no, no, no.  What's the date on this letter?
24  Q.  The date on this letter is January 27th, 2014.  You
25      had been terminated on the 1st of January of 2014 --

Page 96

1       or 2nd of January, so...
2   A.  All right.  Okay.  What's the question now?
3   Q.  So you wrote this letter after you were terminated,
4       correct?
5   A.  I was terminated on the 13th.  That's the time, that
6       was the time he come and asked me for my ID, the 13th
7       of December.
8   Q.  But you didn't get notified of your official
9       termination until --
10  A.  He told me I was seeking -- he said, we're seeking
11      termination.  On the 13th he told me that.  Stacy did.
12      He said, I need to give you a ride to the parking lot
13      and take your ID.  I said, okay.  I went with him.
14  Q.  And then you later got some telephone call in which
15      you were told you were being terminated and you were
16      given the address that you could appeal to?
17  A.  Right.  Right.
18  Q.  And the effective date of your termination, as I
19      understand it, is January 2nd of 2014?
20  A.  Also, in the meantime -- Jeff accused me of that on
21      the 6th.  About an hour later, I went and saw
22      Mohammad -- whatever his last name is, Suri (ph)?
23      Sword?
24  Q.  Sarsour.
25  A.  And I explained to him that Jeff accused me of not

24  (Pages 93 to 96)

Jeffrey Nicholas
August 14, 2017

Page 97

1    wearing a seatbelt on the ramp.  And he told me he was
2    going to take care of it.  He said, I will take care
3    of this.  Don't worry.  And he said, and Jeff, they
4    are starting to -- they want us to put the seatbelts
5    on.  You got to make sure at all times the seatbelt is
6    on.  And I said okay.  And I told him I thought I was
7    wearing it.  And he told me he would take care of the
8    seatbelt ticket.  They call it seatbelt ticket now.
9    They didn't even call it that when I was there.
10   Q.  Let's get back to the exhibit that's in front of you,
11       if you would, please.
12          You wrote this exhibit on the 27th of
13       January of 2014, correct?
14   A.  Yeah.
15   Q.  So that was -- you already knew you had lost your job
16       at Delta at that point, correct?
17   A.  Yes.  I had like 30 days --
18          MR. BURG:  Just answer the question.
19   BY MS. GROSS:
20   Q.  The whole purpose of this letter was to appeal what
21       you called "wrongful termination"?
22   A.  Yeah.  And I just jotted a few things down to
23       remember.
24   Q.  Okay.  All right.  So you wrote this after you already
25       knew you lost your job?

Page 98

1    A.  Yeah.
2    Q.  Looking at the top of page 5 again, if you would,
3        please.
4           Back to that sentence I just read, I told
5        him I couldn't recall because I'm in and out of the
6        tug so much.
7    A.  That's why --
8    Q.  I haven't asked you a question yet.
9           MR. BURG:  Let her ask a question.
10   BY MS. GROSS:
11   Q.  So, you wrote that statement after you already lost
12       your job, correct?
13   A.  Yeah.
14   Q.  And it was a truthful statement when you wrote it,
15       correct?
16   A.  I guess, yeah.
17   Q.  Well, you didn't lie about it, did you, sir?
18   A.  No, I didn't lie.
19   Q.  Okay.  So you truthfully, said, on the 27th of
20       January, 2014, that you told Mr. Lane you couldn't
21       recall because you were in and out of the tug so much?
22   A.  That's what I put on my statement right here, is that
23       what you're asking me now?
24   Q.  No, I'm asking you, you were telling the truth when
25       you wrote this even in January?

Page 99

1    A.  I wrote the same things both times.
2    Q.  It was true then and it's true now, isn't it?
3    A.  I, because I -- you are in and out of the tug so much
4        times, you don't know which time -- I didn't know
5        which time he was talking about.  I dropped bags at
6        the gates, and he's telling me -- he didn't stop me in
7        the tug.  He never stopped me in the tug not wearing a
8        belt.  Nobody approached me in the tug when I was
9        driving the tug.  There was no way he could have saw
10       inside that tug with the canvas closed.  And I never
11       told anybody I wasn't wearing a belt.
12   Q.  You never told anybody you were wearing a belt either,
13       did you?  We've seen twice now in writing you saying
14       you couldn't say one way or the other in both of these
15       record --
16   A.  I told Mohammad, I said that I thought I was wearing a
17       belt.
18   Q.  You thought you were wearing it?
19   A.  Yes.
20   Q.  But you've indicated in your statement, while you
21       still worked for the company, and your statement
22       within a month after you were terminated from the
23       company, that you couldn't say one way or the other,
24       correct?
25   A.  That's what it says here.

Page 100

1    Q.  And that was the truth when you wrote it, right?
2    A.  Yeah.
3    Q.  Towards the bottom of that page, same page, it says:
4        Words going around the airport is they are using me as
5        a poster child for seatbelts.
6    A.  Where is this at?
7    Q.  Very last bullet point down at the bottom there.
8    A.  Oh, yeah.  Yeah.  I didn't know I put that in there.
9    Q.  "Word going around the airport is that they were using
10       me as a poster child for seatbelts -- "
11   A.  Yeah, that's true.
12   Q.  Let me finish, sir.  "Saying this is what can happen
13       if you don't wear your seatbelt."
14   A.  Yeah.
15   Q.  So, you heard that they were using you as a poster
16       child for seatbelts to warn everybody else that they
17       can get fired if they didn't wear their seatbelt?
18   A.  Everybody is calling it the "Nervous Nick Rule".
19       Everybody called me Nervous Nick out there.  That was
20       my nickname.  And I couldn't help that.  Everybody
21       called me that.
22   Q.  Your friends, too?
23   A.  Yeah.  Everybody.  If you go to the airport and refer
24       to me as Nervous Nick, they will know who you are
25       talking about.  A lot of people, they didn't know my

25 (Pages 97 to 100)

Jeffrey Nicholas
August 14, 2017

Page 101

1    real name.
2    Q.  So who did you hear from that they were using you as a
3        poster child?
4    A.  Ray Painter.  Ray Painter.  He is an old union
5        steward.
6    Q.  And when did Mr. Painter tell you this?
7    A.  He called me about two weeks after I got fired.  And
8        he says, Nick, did you get fired?  And I said, yeah.
9        And he said, he said, you got everybody so scared
10       out here, he says, the whole airport is putting belts
11       on now.  They are calling it the Nervous Nick Rule.
12       He says, you got everybody scared out here.
13              And so at the airport, everybody is making
14       a joke of me about it.
15   Q.  Who used the term "poster child"?  Mr. Painter or you?
16       Is that your word or his?
17   A.  He said, they are calling it the Nervous Nick Rule.
18       Maybe if you pull up in a work area and maybe you
19       weren't wearing a belt, they would say, hey, don't be
20       a Nervous Nick.  You better strap up.  He said they
21       were calling it the Nervous Nick Rule.
22   Q.  Okay.  So I asked you at the beginning of the
23       deposition if you talked to anybody from Delta since
24       your termination and you didn't mention Mr. Painter?
25   A.  I couldn't remember that one.  I couldn't remember it.

Page 102

1    It's been, you know...
2    Q.  Anybody else that you can remember?
3    A.  I didn't talk to him.  He called me.  I wasn't seeking
4        him out.  He called my phone.  He had my phone from
5        years ago.  He had my phone number.  And he asked me
6        if I got fired.  And I said, yeah.  Because he used to
7        be a union steward; he could help in certain matters.
8        And he told me he was staying out of this one.  He
9        wasn't a union steward this time, but he could maybe
10       probably helped.  You know, maybe he could have did
11       something.  And he said he wasn't going to get
12       involved.  But he said, Nick, they are calling it the
13       Nervous Nick Rule.  And everybody's got everybody
14       scared and putting on seatbelts around the airport.
15   Q.  Everybody wasn't wearing seatbelts before you got
16       fired?
17   A.  I guess.  That's the way he made it sound.
18   Q.  Okay.  You worked there.  Did you see whether or not
19       other people were wearing seatbelts?
20   A.  They wore them if they were in the tugs from what I
21       observed.  When I was in the statement, when I was in
22       the room --
23   Q.  Sir.  You mentioned a minute ago that you went to talk
24       to Mohammad Sarsour about this?
25   A.  Yeah.

Page 103

1    Q.  The day that it happened?
2    A.  Yeah.
3    Q.  Okay.  Well, if you didn't think that you were going
4        to be disciplined for it, why would you go talk to
5        Mohammad about it?
6    A.  I knew I was going to be disciplined with Jeff Lane.
7        I think he told me at the belt that he was going to
8        write me up.  And I knew he didn't like me.  I knew I
9        was on last chance.  I didn't need no problems.  I
10       said, he accused me of not wearing a seatbelt.
11   Q.  And what did Mr. Sarsour say?
12   A.  He told me he would take care of it.  He told me that,
13       he said, Nick, we're going to start wearing seatbelts
14       from here forward.  You know, make sure you are
15       strapped up.  I said, okay.  He didn't ask me if I had
16       a belt on or not.  He just said, make sure you are
17       strapped up.
18              He said, they are starting to discipline,
19       something like that.  They are getting tight on it.
20       And when I was in making my statement on the 13th, on
21       the 13th, on the day they took me off the property,
22       Stacy asked me to write a statement of what happened.
23       Is that right here?
24   Q.  What exhibit are you referring to, sir?
25   A.  November 13 -- yeah, Number 5.  When I was there on

Page 104

1    this one, they always have two managers in the room
2    when they get wrote up or something.  So, the guy
3    named -- I can't think of his name here, Kevin
4    Hammond, he was in the room.
5           And Stacy said, Nick, I need you to write
6    up what happened.  And he walked out of the room,
7    Stacy walked out of the room.
8           And Kevin Hammond says Nick, he said, the
9    bigwig, we kept hearing words that the bigwig is hard
10   on safety.  The bigwig they hired from Atlanta, some
11   new bigwig that took over the whole operation, I guess
12   it was a ramp manager.  If you said a name, I'd
13   probably know it.  But I can't think of the name right
14   now.
15   Q.  This would be somebody that was above Mohammad
16       Sarsour?
17   A.  Yeah.  So he was head of the whole airport here for
18       Delta.  He was definitely for ramp.  He was the head
19       of Mohammad.  And Kevin told me the guy just called
20       him into a meeting about two weeks prior, all the
21       leads, the guys that are the low level, what do they
22       call them, performance leads now.  The level that
23       Stacy is on and Jeff Lane is on.  And Kevin Hammond
24       was on that level.  Lowest manager involved.
25           And he says Nick, he said, they are, he

26  (Pages 101 to 104)

Jeffrey Nicholas
August 14, 2017

Page 105

1  acted to me, at that point, he acted like they want
2  somebody's head for seatbelts.  He didn't know it was
3  going to go -- he didn't know I was getting fired.  He
4  was just sitting and talking to me as a friend from
5  way back.
6       He said, Nick, they are cracking down on
7  seatbelts.  He said, the manager called us in and he
8  lectured us real hard, all the performance leads, and
9  said that he wants people wearing seatbelts.
10      And then, all of a sudden, here comes Stacy
11 back through the room, coming walking back in the
12 room.  And he was telling me how it wasn't pleasant to
13 sit through a meeting with a manager telling him that,
14 those managers.  He said, he yelled at us and
15 everything.  He wants people wearing seatbelts.
16 Q.  Did he say that why?
17 A.  I don't know.  He just said the guy was real mean to
18 him and it wasn't pleasant being in there.  Then Stacy
19 walks back in the room, and Stacy says to me, he asked
20 me for my ID, he says, I got to give you a ride to the
21 parking lot.  And Kevin Hammond was just sitting there
22 with his jaw hung open like this.  He couldn't believe
23 it.  He felt so bad that I was getting walked off the
24 property.  He looked at me like, damn, Nick.
25 Q.  Okay.  Thank you, sir.

Page 106

1       MS. GROSS:  Can I have a sticker, please?
2       MARKED FOR IDENTIFICATION:
3       DEPOSITION EXHIBIT 7
4       Topics Discussed with Agent
5       11:17 a.m.
6  BY MS. GROSS:
7  Q.  Okay.  I would ask you to take a look at what has been
8  marked as Deposition Exhibit 7, sir.
9       You received a copy of this document from
10 the company after you requested the personnel file.
11 Did you look over it?
12 A.  Is my signature on it?
13 Q.  No, you got it after you left.  You produced it to me
14 in this litigation, so clearly --
15 A.  Oh, yeah, I never looked through this.
16 Q.  So, even after they sent it to you, you never looked
17 at it?
18 A.  Just glanced at it.  Never really read it.
19 Q.  Do you know one way or the other whether this is part
20 of your Journal entries at Delta?
21 A.  I guess it's in my Journal because they sent it,
22 right?  I requested my file.
23 Q.  If you would look at the bottom -- well, first of all,
24 do you know who Jerry Walter is?
25 A.  I don't think so.

Page 107

1  Q.  Do you remember him being a performance leader at
2  Delta?
3  A.  That's the lowest level, right?
4  Q.  Yes.
5  A.  Say the name again.
6  Q.  Jerry Walter.
7  A.  Yeah, I didn't know the name.
8  Q.  So he wasn't anybody that --
9  A.  I don't know.
10 Q.  Not somebody that you remember having a particular
11 dislike for you one way or the other?
12 A.  I don't know.  I would have to see him.  I don't know
13 the name.
14 Q.  Well, according to your Journal at Delta, if you look
15 at the bottom of the second page, Mr. Walter made an
16 entry to your Journal on the 7th of March of 2013
17 saying that he had given you a verbal coaching.
18 A.  Yeah, I wasn't aware of that.
19      MR. BURG:  She didn't ask a question.
20 BY MS. GROSS:
21 Q.  Sir, I haven't asked a question.
22      The Journal entry says, I discussed with
23 Jeffrey his failure to wear a seatbelt while driving
24 his tug.  I explained that not wearing a seatbelt
25 while driving any piece of GSE that is equipped with a

Page 108

1  seatbelt is prohibited.  I told him he must comply
2  with the seatbelt standard set by OSHA.
3  A.  Yeah, I don't remember that incident.
4  Q.  Okay.  You don't remember Mr. Walter --
5  A.  No, I can't recall that one at all.
6  Q.  You can't --
7  A.  Wait.  Wait.  If he's got something to say to me like
8  that, coaching, if that's called a coaching, it says
9  coaching right here, he's got to call me in and talk
10 to me about it and have me sign it.  He didn't do
11 that.
12 Q.  It's a verbal coaching, sir.  There is no paperwork.
13 A.  Yeah, I didn't know.  Well, once again, I'm not on
14 verbal coaching.  I'm on the old way of leveling.  I'm
15 on the old Delta -- Northwest way.
16 Q.  Sir, you've received verbal coaching numerous times
17 when you worked at Delta --
18 A.  See, so it was all gray area.  It was all gray areas.
19 I didn't know these verbal coachings.  And I'm not
20 aware of that incident.
21 Q.  Okay.  Let me ask you this question, sir.  If
22 Mr. Walters says that he told you on the 7th of
23 March of 2013 that you needed to wear your seatbelt if
24 the vehicle had a seatbelt, can you say one way or the
25 other if that happened?  You just don't remember?

27  (Pages 105 to 108)

Jeffrey Nicholas
August 14, 2017

Page 109

1  A.  I just can't remember that.  I don't recall that.
2  Q.  But you can't say it didn't happen either, can you?
3  A.  I'm not saying it didn't happen but I don't recall it.
4      And if he told me to wear a seatbelt, I was wearing it
5      from that point on.  But like I said, back then,
6      hardly any of the equipment had seatbelts.
7  Q.  But it's possible that you were told in March of 2013
8      that, if you were driving a tug that had a belt, that
9      you should be wearing it per OSHA?
10  A.  I don't remember him talking to me at all.
11  Q.  But you are not saying that he absolutely didn't.  You
12      just don't remember?
13  A.  Yeah, I thought, you know, I thought when you got
14      wrote up, you had to get called in and explain what
15      happened and told what they expect of you in the
16      future and sign something.
17          And if somebody said something to me, when
18      we are out there in the ramp, it's a fast-paced
19      environment.  He might have said something to me
20      maybe.  I don't know.  If the manager told me to make
21      sure I'm wearing a seatbelt, I had it on.
22  Q.  So even as of March of 2013, if a manager had told
23      you --
24  A.  Back then, we didn't even have seatbelts.  We had some
25      seatbelts.

Page 110

1      MR. BURG:  Got to let her finish the
2      question.
3  A.  Go ahead.
4  BY MS. GROSS:
5  Q.  I just want to make sure I understand.
6          You don't think that most of the vehicles
7      even had seatbelts in March and you don't remember if
8      Mr. Walter told you one way or the other if you should
9      be wearing a seatbelt, but you are pretty sure that,
10      if he told you, you had a seatbelt on?
11  A.  If he come over to me and told me, he's not saying
12      right here that he stopped me in no tug or nothing.
13      What is he saying?  Most of the equipment had no
14      seatbelts back then.
15  Q.  Okay.  But if it did, you would have worn it?
16  A.  That's right.
17  Q.  Because you knew you were supposed to even by 2013?
18  A.  No.  They were changing the rules daily out there.
19  Q.  How do you know, how could you be so sure that you
20      were wearing a seatbelt if the rules were so gray,
21      sir?
22  A.  How do I know what?
23  Q.  If the rules were so gray and they were changing the
24      rules on a daily basis, how can you be so sure that
25      you were always wearing a seatbelt?

Page 111

1  A.  Because if there was a seatbelt in the tug, I had it
2      on.
3  Q.  So it doesn't really matter if the rules were changing
4      all the time, does it?  Because your personal rule was
5      that, if there was a seatbelt in the tug, you had it
6      on?
7  A.  Yeah, I follow the safety rules.  But the rules were
8      changing out there, monthly -- monthly, weekly, not
9      daily.
10  Q.  So I'm asking again, how can you be so sure that you
11      always had a seatbelt on if you were in a tug with a
12      seatbelt, if the rules were changing all the time?
13  A.  Because when I saw a seatbelt, I put it on.
14  Q.  No matter what the rules were, if you saw a seatbelt,
15      you put it on?
16  A.  That's right.  But I didn't see a seatbelt very often
17      back then especially.  It took them a couple years to
18      get these seatbelts in the tugs.  And they weren't
19      even all in when I got terminated.
20  Q.  Okay and you never had any particular problems with
21      Mr. Walter before ever when you worked for Delta, did
22      you?
23  A.  I can't remember him.  He's one of the ramp managers,
24      I guess.
25  Q.  He is a performance leader.

Page 112

1  A.  Yeah, I can't remember him that much.
2  Q.  And you don't know whether Mr. Walter had any
3      particular duties related to safety?
4  A.  Yeah.  I don't know what his duties were, yeah.
5  Q.  Mr. Walter never made any derogatory comments about
6      your age?
7  A.  I don't remember.
8  Q.  Did any manager at Delta ever make any derogatory
9      comments to you about your age?
10  A.  I can't name anybody.
11  Q.  Do you recall that after you sent in the letter
12      challenging your termination that you had a telephone
13      call with somebody at Delta in Atlanta?
14  A.  I don't know.  Wasn't it just by writing?  I don't
15      think they called me.
16  Q.  You don't remember having a telephone call with
17      someone named Pam Kelly?
18  A.  Oh, okay.  Okay.  Yeah.  I kind of vaguely remember
19      it.  And I remember her not knowing --
20  Q.  She's doing a sticker right now, okay?
21          MARKED FOR IDENTIFICATION:
22          DEPOSITION EXHIBIT 8
23          Melissa Seppings Document dated 3/13/2014
24          11:25 a.m.
25  BY MS. GROSS:

28  (Pages 109 to 112)

Jeffrey Nicholas
August 14, 2017

Page 113

1  Q. Okay. I'm going to ask you to take a look at what's
2     been marked as Exhibit Number 8 to your deposition.
3           The first page of Exhibit number 8 is the
4     letter telling you that your appeal was essentially
5     being denied, correct?
6  A. Oh, yeah. Yeah.
7  Q. Now, you received this document when you requested
8     your personnel file from Delta because you produced it
9     back again to us in this litigation?
10 A. Okay.
11 Q. So if you look at the second page of the document,
12    while you might not have seen it at the time, you have
13    since had an opportunity to read what is the record of
14    the phone call that you had with Pam Kelly.
15          Have you looked at this?
16 A. Yeah, I didn't look at this.
17 Q. If you would look at the entry for February 14th,
18    2014, second paragraph, well, first paragraph says:
19    PDK: Called Mr. Nicholas on the phone number listed
20    above. I provided an overview of the process,
21    confirmed his contact information and gave him the
22    option to discuss his appeal at the time of this call
23    or at a scheduled later date. He chose to speak at
24    this time.
25          Do you remember this call?

Page 114

1  A. Yeah.
2  Q. During the call, Mr. Nicholas stated the following.
3     He stated that his write-ups and levels are shaky. He
4     did not know about the crackdown on seatbelts.
5           Did you tell Pam Kelly that you didn't know
6     about the crackdown on seatbelts?
7  A. Oh, wait, where do you see that that at?
8  Q. The second sentence of the second paragraph.
9  A. Yeah. What date didn't I know about the seat, the
10    shakedown? I don't understand what you are saying.
11 Q. Did you tell Pam Kelly when you spoke to her on the
12    telephone that you did not know about the crackdown on
13    seatbelts?
14 A. I'm confused on the question. I don't understand.
15    Wait a minute. He stated... I didn't know what -- I
16    didn't know they were having a huge crackdown on
17    seatbelts when I was working there. I learned it from
18    Jeff Hammond --
19 Q. Okay.
20 A. -- on my last day.
21 Q. But as I understood it, sir, your personal rule was
22    that, if there was a belt in the vehicle, you had it
23    on, so it shouldn't matter if they were having a big
24    crackdown on seatbelts, should it?
25 A. That's true, too.

Page 115

1  Q. "He stated that he recently learned there was a new
2     station manager -- "
3  A. So it was like they were headhunting. That's what
4     they called a crackdown, when they came after me.
5  Q. Did you tell Pam Kelly that you recently learned that
6     there was a new station manager that was big on
7     safety?
8  A. Wait a minute. What's this now?
9  Q. The very next sentence.
10 A. Yeah, because I recently learned that from...
11 Q. From Mr. Hammond?
12 A. Yeah, on the last day I was there.
13 Q. Ever learn that from anybody else other than
14    Mr. Hammond?
15 A. No.
16 Q. Did you tell -- next sentence, did you tell Pam Kelly
17    that a station manager named -- or that a manager
18    named Jeff Lane walked up to him and talked about
19    safety and not wearing a seatbelt? I mean, that's
20    what you said --
21 A. What's the question? I don't understand this.
22 Q. You repeated for Pam Kelly what you've said here
23    today, which is what happened that day on the 6th of
24    December 2013, is that Jeff Lane walked up to you and
25    said he needed to talk to you about safety and that he

Page 116

1  thought that you weren't wearing your seatbelt?
2  A. Yeah, okay. That's true. And if I said that to her,
3     that's the way it happened.
4  Q. According to her notes, you also said, he stated that
5     he would not lie because he was in and out of the tug
6     every 30 to 40 seconds.
7           Did you make that statement to Pam Kelly?
8  A. I don't understand what they are saying here. He
9     stated that he would not lie -- what are they trying
10    to say?
11 Q. I'm not asking -- I'm asking you, do you remember what
12    you told Pam Kelly? Did you tell her anything about
13    being in and out of the tug every 30 to 40 seconds,
14    and not being able to lie about whether you weren't
15    wearing a seatbelt?
16 A. I told her I wouldn't lie. That's true.
17 Q. Did you also tell her that, because you wouldn't lie,
18    you couldn't say whether your were or weren't wearing
19    your seatbelt?
20 A. I don't understand that question.
21 Q. Did you tell Pam Kelly that, because you wouldn't lie,
22    and because you were in and out of the tug every 30 to
23    40 seconds, you couldn't say whether you were wearing
24    a seatbelt when Jeff Lane saw you or not?
25 A. I didn't say it like that. I said it the way it says

29 (Pages 113 to 116)

Carroll Court Reporting and Video
586-468-2411

Jeffrey Nicholas
August 14, 2017

Page 117

1     right here.  I said I would not lie.
2   Q.   What were you not lying about?
3   A.   Whatever she was asking me.  They were talking about
4     seatbelts right here.
5   Q.   Okay.  And you couldn't lie and say that you
6     absolutely were wearing it because you couldn't be
7     sure?
8   A.   I wouldn't lie if I was wearing a seatbelt or not.  If
9     there was a seatbelt in the tug, I had it on.
10  Q.   Sir you've told me three times already that -- and
11    you've signed two different statements saying that you
12    couldn't say one way or the other whether you had your
13    seatbelt on when Mr. Lane saw you.  And didn't you
14    repeat that when you talked to Pam Kelly?
15        MR. BURG:  I'm going to make an objection
16    here, I just realized; foundation.  Mr. Lane, did he
17    clarify when he saw Mr. Nicholas not wearing a
18    seatbelt that Mr. Nicholas was driving the vehicle or
19    in it?
20        MS. GROSS:  The statement says he was
21    driving.
22        THE WITNESS:  It doesn't say that.  It says
23    he observed me.
24        MS. GROSS:  Well, it doesn't matter at this
25    point.  I'm asking the witness what he said.

Page 118

1         MR. BURG:  No, he didn't say he was
2     driving.  Exhibit 3 says --
3         THE WITNESS:  That's when I got in the
4     tug --
5         MR. BURG:  Excuse me.  It says, I observed
6     in an employee with a zip-up door open who was clearly
7     not wearing a seatbelt.
8         THE WITNESS:  That's when I got in the tug.
9         MR. BURG:  It doesn't say he was driving.
10        MS. GROSS:  He says he's moving from one
11    gate to the other.
12        THE WITNESS:  There's no way.  I had this,
13    I zipped this closed, I turned the heater on, and I
14    put my belt on, and I go.  There is no way he could
15    observe me without a seatbelt.  That's what I'm
16    saying.
17        MR. BURG:  Yeah, that does not say that he
18    observed him driving without a seatbelt.
19        MS. GROSS:  Mr. Burg, I'm not going to
20    argue with you about what Mr. Lane said.  You can ask
21    Mr. Lane that question.  I am asking your client the
22    question.
23        MS. BOWMAN:  It's his deposition.
24        MR. BURG:  I had to inject something.
25        MS. GROSS:  Well, I understand why, but it

Page 119

1     really wasn't appropriate.
2   A.   Yeah, it was, because the only time he could have saw
3     me is when I was getting in the tug.  The only time he
4     could have saw me is when I was getting in and out of
5     it.
6   BY MS. GROSS:
7   Q.   Okay.  So --
8   A.   And the tug was parked.  The tug was parked.
9   Q.   So when you signed a statement on December 13th, and
10    again, in January 27th in your letter and said that
11    you couldn't be sure one way or the other, were you
12    lying about that?
13  A.   No, that's not a lie.  I just wasn't a hundred
14    percent.  And I'm not going to lie on my statement.
15  Q.   Okay.  And you are still not going to lie here today,
16    are you, sir?
17  A.   But if there was a seatbelt in that tug --
18  Q.   Sir --
19  A.   -- I was wearing it.
20  Q.   You are still not going to lie here today --
21  A.   That's right.
22  Q.   -- are you, sir?
23  A.   Yeah, I'm not going to lie.
24  Q.   So, if you didn't know in December of 2013 or
25    January of 2014 whether or not you for sure were

Page 120

1     wearing a seatbelt when Mr. Lane saw you, you still
2     can't say today for sure either, can you?
3   A.   I can say if there was a seatbelt in that tug, I had
4     it on.
5   Q.   Because even though the rules were all messed up and
6     changing --
7   A.   Yeah, the rules change daily out there.  The rules
8     change daily out there.
9   Q.   But notwithstanding that, you understood you were also
10    supposed to have that seatbelt on?
11  A.   If it was a seatbelt in that tug, I had it on.
12  Q.   What is -- did you say anything to Pam Kelly about
13    getting in and out of the tug every 30, 40 seconds?
14  A.   No, I don't recall that.
15  Q.   Does getting in and out of the tug every 30 or 40
16    seconds have anything to do with whether or not you
17    were wearing a seatbelt?
18  A.   No.
19  Q.   So if you got on a tug --
20  A.   This is the complaint that everybody on the ramp is
21    using, though, saying we got to go from gate to gate
22    and there's no time to put seatbelts on.  That's what
23    everybody's crying.  That's why they started changing
24    the rules to one gate, two gates.  And started, they
25    started wobbling around, what they want, what they

30  (Pages 117 to 120)

Jeffrey Nicholas
August 14, 2017

Page 121

1    don't want.  It was all uncharted territory.  They
2    never had seatbelts before.  We never had seatbelts.
3    Q.  Okay.  So notwithstanding --
4    A.  And I became the poster child, like I said.  I became
5    the poster child.
6    Q.  I didn't say it.  You said it, sir.
7    A.  Yeah, that's what the word is going around the
8    airport.
9    Q.  Again, I asked you whose words those were.
10   A.  That was Ray Painter.
11   Q.  He used the words "poster child"?
12   A.  I don't think he used the words "poster child".
13   Everybody says Nervous Nick rule.  They call it the
14   Nervous Nick rule.
15   Q.  So the "poster child" is yours?
16   A.  The same thing, Nervous Nick Rule, making an example.
17   They used me as an example.  If you don't want to get
18   fired, make sure you are strapped up.
19   Q.  Now, you indicated in your responses to the
20   interrogatories that were sent to you that you talked
21   to somebody named Al Martin about getting disciplined
22   for seatbelts?
23   A.  Oh, yeah.  Yeah.  Yeah.
24   Q.  Who is Al Martin?
25   A.  He was a ramp up, just like I was, a ramp agent out

Page 122

1    there at the airport.
2    Q.  Is his full name Al, do you know?
3    A.  I don't know his full name.  They call him Big Al.
4    That's his nickname at the airport.
5    Q.  When did you talk to Big Al?
6    A.  I talked to him about a year-and-a-half ago, two years
7    ago.
8    Q.  How did you come to talk to him?
9    A.  I was coming out to try to find an old friend of mine
10   and he was working in the area at north online, and he
11   was Big Al and we just started talking.  And he asked
12   me what happened and I said they accused me of a
13   seatbelt.
14   Q.  What old friend were you trying to find?
15   A.  I can't remember now.  Just trying to get a hold of
16   somebody out there.  And I didn't have their number.
17   Q.  So what did Big Al have to say?
18   A.  He said, I got one of those, Nick.  I just got one of
19   those, when I said about the seatbelt.  And I said,
20   what happened?  He said, they just wrote me up and
21   gave me a ticket.
22   Q.  So he got disciplined less than termination?
23   A.  That's right.
24   Q.  Did you ask him whether or not he was on a final
25   Corrective Action Notice when he got disciplined?

Page 123

1    A.  He -- I was on a corrective action because I was put
2    on a Corrective Action that I wasn't supposed to be
3    on.
4    Q.  Sir, we can talk about that later.  This is a pretty
5    simple question.
6    Did you ask him whether he was on a final
7    Corrective Action Notice or not?
8    A.  I don't recall if I asked him that or not.
9    Q.  So you don't know one way or the other if he was on a
10   final Corrective Action then?
11   A.  I said, what happened?  He just said, they gave me a
12   write-up, a seatbelt ticket.  And they got some rule
13   where you can't run for lead.  For six months after
14   you get a seatbelt ticket, you can't run for a lead
15   spot.  You can't put in for a lead spot.  You get
16   exempted from it, from like trying to be a lead.
17   Q.  He told you that?
18   A.  I think I heard that from him, yeah.  I can't be a
19   hundred percent on that, but I think I heard that from
20   him.
21   Q.  Well, who else would you have heard it from?
22   A.  Maybe talking to somebody.  Who did I say I talked to?
23   Didn't I say I talked to somebody?
24   Q.  Well, so far, a Tim and Ray Painter are the only names
25   I've heard.

Page 124

1    A.  No, I think I mentioned -- what names did I mention?
2    I can't remember now.  The guy that they told you was
3    out on medical leave.  Cecil.  He might have told me.
4    I might have heard that from him.
5    Q.  So, you can't say what level of discipline that Al
6    Martin was on when he got his --
7    A.  Yeah, I don't know what level he was on.  I didn't ask
8    him.
9    Q.  You guys didn't talk about that?
10   A.  Yeah.
11   MR. BURG:  You have to make a special
12   effort to wait until she finishes her question.
13   THE WITNESS:  All right.
14   BY MS. GROSS:
15   Q.  Any idea how old Al Martin is?
16   A.  I think he's a few years younger than me.  At least
17   maybe five, six.  I think he's in his mid 40s.
18   Q.  Would it surprise you to learn that he is actually
19   older than you are?
20   A.  I can't tell because he was a big guy.  Big Al was a
21   big guy.  Nobody ever got disciplined for a seatbelt
22   when I worked there.  And I learned this afterwards.
23   I wish I would have heard of anybody getting in
24   trouble.  They came after me and I'm off the property.
25   Q.  Nobody got disciplined for a seatbelt when you were

31  (Pages 121 to 124)

Jeffrey Nicholas
August 14, 2017

Page 125

1  there. And you've also indicated that, in the last
2  year you were there, they were still putting the
3  seatbelts in, and there wasn't seatbelts everywhere in
4  all the gateways?
5  A. Yeah, I never heard of anybody getting in trouble for
6  a seatbelt.
7  Q. So you were the first one?
8  A. I think I was. I don't know. I don't know. But I
9  never heard of anybody getting in trouble for a
10  seatbelt.
11  Q. Why do you think your age had something to do for you
12  getting in trouble with a seatbelt as opposed to you
13  being in trouble with the first one?
14  A. I think management let me go because of my age,
15  because I'm older. And they have a tendency to fire
16  older people out there.
17  Q. Sir, it's a really specific question.
18      What information do you have that suggests
19  to you that your age had something to do with you
20  being made, as you put it, the poster child for the
21  seatbelt rule?
22  A. I don't know if that had anything to do with my age or
23  not. I can't say that.
24  Q. Do you know who was involved in making the
25  determination to terminate your employment?

Page 126

1  A. No. I don't know who -- I just thought it was Stacy
2  was the one that initiated it.
3  Q. Do you think Stacy had the authority all by herself to
4  terminate you?
5  A. No. I think when they got the rubber stamp, I think
6  once I was on the conveyor belt, nobody can pull you
7  off the conveyor belt once you are on. To get you out
8  the door, they just rubber stamp it all the way along.
9  That's my belief.
10  Q. When you say "conveyor belt," you mean once she
11  recommended?
12  A. Yeah, once you are in the system, and they recommend
13  it's going to go all the way to Human Resources in
14  Atlanta, and they are going to make the decision down
15  there.
16  Q. Okay. And why do you believe that it's Stacy who
17  initiated? Because she was your PL at the time?
18  A. Stacy is a guy.
19  Q. Okay. I'm sorry.
20  A. Stacy Parris, is it? I don't know the last name
21  exactly.
22  Q. Yes.
23  A. He's a guy anyway. What was the question now?
24  Q. Stacy was your PL at the time?
25  A. Yeah, I didn't even know that Stacy was my, it just

Page 127

1  didn't dawn on me. It goes by what area you work in.
2  Stacy was in charge of online. He was an older
3  manager. It was younger one that I saw on a daily
4  basis over in my work area. He was a new-hire and I
5  can't remember his name at all.
6      MR. BURG: May I know what PL stands for?
7      THE WITNESS: Performance leader.
8      MS. GROSS: Performance leader.
9  A. That's a new terminology. They used to call it
10  something else with Northwest.
11  BY MS. GROSS:
12  Q. Okay. Well, for lack of a better word, supervisor?
13  A. Yeah, lowest management level. One above a lead.
14  Q. Correct. So, at the time that the recommendation was
15  made to terminate your employment, Stacy was your
16  supervisor?
17  A. No. I had some younger guy. They had some younger
18  guy that they were training at the time. And I
19  never -- looking back on it, damn, I didn't even know
20  Stacy was in that work area. But I did. I did know
21  that he worked in online. But I never saw him. He
22  was like -- he never came out to the work area and
23  talked to people or nothing. Hardly ever. It just
24  didn't dawn on me. You know what I think? Stacy ran
25  north online. I think the other guy ran south online.

Page 128

1      And I was assigned to south online. That's why I
2  didn't see Stacy, I think. I think Stacy was the
3  overall manager, through, of the area, of the onlines.
4  And I just thought that Stacy --
5  Q. Hey, stop. Please.
6      MARKED FOR IDENTIFICATION:
7      DEPOSITION EXHIBIT 9
8      11 December 2013 Parris Document
9      11:42 a.m.
10  BY MS. GROSS:
11  Q. Okay. Mr. Nicholas, I'm going to hand you what has
12  been marked as Exhibit Number 9 to your deposition.
13      You would not have seen this at the time
14  but this was provided to you as part of your personnel
15  record when you requested it from the company.
16      Have you had an opportunity to look at this
17  document before?
18  A. No.
19  Q. Well, if you take a minute and look at it, it is the
20  recommendation to terminate your employment going from
21  Stacy Parris to Rogermike Rowe.
22  A. Well, who along the way sees it?
23  Q. Sir...
24  A. Oh, this is Barb Franz, the Human Resources lady.
25  Q. Okay. So Stacy Parris?

32 (Pages 125 to 128)

Jeffrey Nicholas
August 14, 2017

Page 129

1   A. He initiated it.
2   Q. So Stacy Parris was your --
3   A. I thought he initiated it, I don't know for a fact
4        that he initiated it. That's my belief.
5   Q. It's your belief. Why do you have that?
6   A. Because he's the one that came and got me that last
7        day.
8   Q. And had you sign the statement and walked you out?
9   A. Yeah. Yeah.
10  Q. Okay. Had you worked --
11  A. So I thought he initiated it.
12  Q. Had you worked for Stacy Parris as your supervisor
13       before that?
14  A. On and off over the years, I was in his area in
15       online.
16  Q. Any particular quarrels, right, disagreements?
17  A. No, I don't think he, he didn't like me. He didn't
18       like me. I don't think he liked my personality.
19  Q. Anything else? Any fights you had? Any words
20       exchanged?
21  A. I don't think he ever wrote me up. I can't remember
22       that.
23  Q. Your record does not indicate that he --
24  A. I don't think he wrote me up. But he was never very
25       friendly towards me when I tried to talk to him. Just

Page 130

1        making small talk in the work area as he came through.
2        Maybe he'd come through and tell us all something and
3        he would be walking away and I would say something.
4             And I would just kid with him about his --
5        he was a big guy, a real big guy, real muscular, old
6        football -- and I said, damn, Stacy, did you play? He
7        says, heck, yeah, I did. He told me the university, I
8        can't remember which one. He said, I played college
9        ball, too. He's a real big guy, real muscular, small
10       waist. But he gave me a feeling like he didn't really
11       care for me, didn't care to even talk to me at all.
12  Q. Okay. Even though he told you what college he played
13       for, you thought he didn't like you?
14  A. Yeah, he told me because I asked him, I said, you play
15       college ball? And he said, yeah. I said, I know you
16       played college ball. And he goes, yeah. I don't
17       think he told me where, he just said yeah.
18  Q. To the best of your recollection, he never disciplined
19       you before?
20  A. Yeah, I don't think he -- he had a reputation out
21       there of being --
22  Q. Sir, that's not what I asked you.
23            To the best of your recollection, he never
24       disciplined you before?
25  A. Yeah, but he --

Page 131

1   Q. Sir.
2   A. Yeah, I don't remember him disciplining me.
3   Q. And to the best of your recollection, you never had
4        any heated exchanges or any kind of words or arguments
5        with him?
6   A. No.
7   Q. Best of your recollection, he never made any
8        derogatory comments about your age?
9   A. No, I don't -- no.
10  Q. I'm sorry, did you say no?
11  A. No, he never said anything to me about my age.
12  Q. Who is Rogermike Rowe, if you know?
13  A. He is one below Mohammad Suri (ph), or whatever the
14       guy's last name is.
15  Q. Okay.
16  A. He's right above -- the lowest one -- it's one notch
17       above Stacy, I think it is. There was a guy, Roberto,
18       and then there was Rogermike. There was two of them
19       at the same level, I think.
20  Q. Okay. So, to the best of your knowledge, did Stacy
21       report to Rogermike?
22  A. Yeah, I think so.
23  Q. And Rogermike reported to Mohammad?
24  A. Yeah. And then, above him, was a guy, I think, named
25       Kerchin. I can't remember the names. It was above

Page 132

1        Mohammad.
2   Q. Had Rogermike ever been a supervisor of you in years
3        past?
4   A. It might have been. It might have been in one of my
5        areas.
6   Q. Ever have any kind of disagreements with Rogermike?
7   A. No.
8   Q. Did Rogermike ever make any derogatory comments to you
9        about your age?
10  A. No.
11  Q. Did you ever discuss with Rogermike whether you were
12       or weren't wearing a seatbelt?
13  A. No.
14  Q. Okay. Looking at this recommendation, the second or
15       the -- the second paragraph to the end, it says: Upon
16       his return to work on December 13th, 2013, I discussed
17       with Jeff this violation. He states as well as in his
18       statement that he does not recall if he was wearing a
19       seatbelt or not.
20            That was true, was it not, sir, that is
21       what you told Stacy, that you could not recall whether
22       you were wearing a seatbelt or not?
23  A. That's what I put in my statement on the 13th, yeah.
24  Q. And you were on a final Corrective Action Notice at
25       the time you were terminated?

Jeffrey Nicholas
August 14, 2017

Page 133

1   **A. A Corrective Action that I should haven't have been**
2   **on. And Mohammad Suri (ph) was aware of.**
3  Q. Sir, I understand. We'll talk about your, we will
4   talk about that in a few minutes but it's pretty much
5   a yes or not question.
6        Were you off on a final Corrective Action
7   or not?
8  **A. From what they tell me, yeah.**
9  Q. Let's go back to the beginning of your employment and
10   go through some of your job history, if we could.
11        So, if I understand it, you were hired on a
12   part-time basis in June of 2006, is that correct?
13  **A. Yeah.**
14  Q. You had to go through a probationary period, then you
15   got into the union?
16  **A. Yeah. Six months on probation to get into the union.**
17  Q. Okay. And then were you part time in 2008 when you
18   went to the lead position?
19  **A. Yeah, I think so. I don't think I got full time**
20   **before I went to the lead.**
21  Q. And once in the lead position, if you were working for
22   a time, your schedule would have been 40 hours a week
23   at least?
24  **A. Yeah. Yeah.**
25  Q. Do you recall whether or not you had any disciplinary

Page 134

1   action while it was still Northwest?
2  **A. I don't know. I might have had a write-up here and**
3   **there. I remember a union steward --**
4  Q. You can't talk while her hands are off the machine.
5       MARKED FOR IDENTIFICATION:
6       DEPOSITION EXHIBIT 10
7       25 April 2007
8       11:49 a.m.
9  BY MS. GROSS:
10  Q. Okay. Sir, I'm going to hand you what has been marked
11   as Exhibit 10 to your deposition. It's dated
12   April 25th, 2007.
13       So this would be less than a full year into
14   your employment, correct?
15  **A. Yeah.**
16  Q. Take a minute to read this, but it appears to me to be
17   a grievance hearing for a Level 1 performance
18   discipline that you had gotten.
19  **A. All right.**
20  Q. It looks like the company agreed to remove the Level 1
21   and just make it a coaching.
22  **A. Okay.**
23  Q. Do you remember what that was for?
24  **A. No. Does it say that here?**
25  Q. Doesn't say what it was for, no.

Page 135

1  **A. No, I can't remember.**
2  Q. But in the normal course of events when you had a
3   union, the union would have been trying to do
4   something like this, getting your Level 1 changed into
5   a coaching?
6  **A. Yeah, that's what they say. I don't know, you know.**
7   **Did they actually get this one lowered? I can't**
8   **remember.**
9  Q. Well, look at the third paragraph. It says: Based
10   upon discussion and your overall work record, the
11   company will agree to remove the Level 1 is and make a
12   job performance and safety coaching record in your
13   file. The coaching will outline this --
14  **A. It doesn't matter how many write-ups you get, as long**
15   **as you don't level out, as long as you don't level**
16   **through the system. It doesn't matter if you are**
17   **there for 20 years and you get 100 write-ups. As long**
18   **as you don't level out of the system, you are okay.**
19   **There's people out there with no write-ups for 10, 15**
20   **years. I might have had 20 write-ups. Maybe I've got**
21   **20 write-ups in the file. Until I age out of the**
22   **system through the levels, I'm okay, because they had**
23   **a level zoom.**
24  Q. That was when the union was there?
25  **A. But when they take you and put you on a last chance**

Page 136

1   **which they shouldn't be on, there's nothing underneath**
2   **my last chance.**
3  Q. Okay. Mr. Nicholas, we are never going to get through
4   the day if we don't start doing questions and answer,
5   okay?
6       So my only question about this is, do you
7   remember that, before you were even a year into your
8   employment --
9  **A. I can't remember -- if that's what it says here, I**
10   **guess that's what it says.**
11  Q. So if there's paperwork that says that your union
12   negotiated down a Level 1 performance discipline in
13   April of 2007, that's probably true, right?
14  **A. Yeah. But does it say what the level is about? All**
15   **right.**
16       MARKED FOR IDENTIFICATION:
17       DEPOSITION EXHIBIT 11
18       9/28/07 Interoffice Memo
19       11:52 a.m.
20  BY MS. GROSS:
21  Q. Okay. If you would look at what's been marked as
22   Exhibit Number 11.
23  **A. Okay.**
24  Q. So this is dated September 28th, 2007, correct?
25  **A. Yes.**

34 (Pages 133 to 136)

Jeffrey Nicholas
August 14, 2017

Page 137

1  Q. So that's year and three months after you hired in,
2     correct?
3  A. Yeah.
4  Q. And you are getting a Level 1 for attendance, right?
5  A. Yes.
6  Q. And back under the rules of Collective Bargaining
7     Agreement back at that time this was supposed to
8     remain in your file for nine months?
9  A. Okay.
10 Q. Is that right?
11 A. Yeah. That's from what I can recall, but if we looked
12    it up, maybe it's different but I think it's nine
13    months for the Level 1.
14 Q. Well, it says at the bottom, this Level 1 will remain
15    in your file for nine months?
16 A. Okay.
17 Q. You will report to the attendance office... three days
18    of any absence or tardy.
19 A. Yeah, you have to report into them once you get back
20    to work from being off three days.
21       MARKED FOR IDENTIFICATION:
22       DEPOSITION EXHIBIT 12
23       August 30, 3008 Interoffice Memo
24       11:53 a.m.
25 BY MS. GROSS:

Page 138

1  Q. So if that one expired in nine months, it would have
2     been up --
3  A. When did they write it?
4  Q. September of 2007.
5  A. Yeah, it says it right there. Yeah.
6  Q. So it says at the bottom it would have been up in nine
7     months correct?
8  A. Yeah.
9  Q. So that would have expired around June of 2008?
10 A. Wait a minute. Okay.
11 Q. Please look at what is marked as Exhibit 12.
12 A. Okay.
13 Q. So this is about a year later in August of 2008,
14    correct?
15 A. Mm-hmm. Yes.
16 Q. So this was after the first one probably expired in
17    June of 2008, correct?
18 A. Yes.
19 Q. You are back up at a Level 1 attendance, correct?
20 A. Yes.
21 Q. Do remember why you were having so much trouble with
22    your attendance in 2008?
23 A. 2008? It was a couple times I took family leave.
24 Q. They didn't count family leave against you.
25 A. Right. So I don't know what was going on here, I

Page 139

1     don't know.
2  Q. So, these were the days that were not covered with
3     your family leave, right?
4  A. Yeah, because they don't level you for family leave.
5       MARKED FOR IDENTIFICATION:
6       DEPOSITION EXHIBIT 13
7       November 25, 2008 Interoffice Memo
8       11:55 a.m.
9  BY MS. GROSS:
10 Q. Okay. Take a look at what has been marked as
11    Exhibit 13 to your deposition.
12 A. Okay.
13 Q. So this is November 25th of 2008, correct?
14 A. Yeah.
15 Q. While you were still on that Level 1 that we just
16    looked at a minute ago that was Exhibit 12, you had
17    some more absences that were not covered by family
18    leave, correct?
19 A. Yeah.
20 Q. So you bumped up to a Level 2?
21 A. Yeah.
22 Q. And this is going to stay in your record for 12
23    months, correct?
24 A. Yeah.
25 Q. And at this point, you don't recall exactly what your

Page 140

1     issue was with your attendance back then?
2  A. Missed a few days there so I got a Level 2. I guess I
3     didn't get it covered on a sick leave or family leave.
4  Q. You don't think your age had anything to do with being
5     put on these levels, do you?
6  A. I don't know.
7  Q. Well, you were absent, weren't you?
8  A. I was absent but I didn't know if my age had anything
9     to do with her putting me on a level.
10 Q. "Her" being Georgia Brumblow?
11 A. Yeah, Georgia. She retired. She was there for a
12    couple of years and she retired when I was working
13    there.
14 Q. Do you know of any younger people that were absent as
15    much as you were in 2008 that didn't get put on any
16    levels?
17 A. Not that -- no, not that you can recall for there, no.
18       MARKED FOR IDENTIFICATION:
19       DEPOSITION EXHIBIT 14
20       July 25, 2009 Level 1 Reminder
21       11:57 a.m.
22 BY MS. GROSS:
23 Q. Take a look at Exhibit 14, if you will.
24 A. All right.
25 Q. Exhibit 14 is dated July 25th, 2009?

35 (Pages 137 to 140)

Jeffrey Nicholas
August 14, 2017

Page 141

1   A. Yeah.
2   Q. Okay. And this is a Level 1 for performance, correct?
3   A. Yeah.
4   Q. Who is the customer service manager who gave you this
5   one, name down at the bottom?
6   A. Sam.
7   Q. Do you remember Sam?
8   A. Not really. Sam...
9   Q. It's okay if you don't.
10  A. Yeah, I can't remember -- a lot of guys had nicknames
11  out there. I kind of remember him. I kind of
12  remember him. They had nicknames and I didn't know
13  all the names. I didn't know this last name either.
14  Q. All right. So looking at the second paragraph of this
15  particular discipline, it says: The event leading to
16  this disciplinary interview was your failure to follow
17  directives to load flight SAN 270 at gate A56
18  resulting in unnecessary delay of 27 minutes on
19  July 25th, 2009. You need to follow the count down to
20  departure to ensure that you and your crew have
21  adequate time. Do you recall this incident?
22  A. Yeah -- no. No. I can't recall that incident. If
23  it's on my record, and they gave me a level, it
24  probably happened. I don't know.
25          This countdown to departure they are

Page 142

1   talking about, this is just something they whipped up
2   when I was working there. And now they want you to
3   follow this count down for 30, 40 minutes out from the
4   plane taking off. They want you to do steps all the
5   way along the way, at a certain time go up and check
6   for jetway bags, certain time do this, do that. The
7   work environment is a flowing environment. You can't
8   follow what they came out with. I don't have a copy
9   of their countdown to departure. They might have it
10  there. But you can't follow it exact. And if you
11  follow it exact, you can't get the plane out in time.
12  You can't do it.
13  Q. Okay. On this particular occasion, would you agree
14  with me that --
15  A. Yeah.
16  Q. -- that you got disciplined --
17  A. Yeah.
18          MR. BURG: Let her finish.
19  BY MS. GROSS:
20  Q. So you got disciplined for not --
21  A. Yeah.
22  Q. -- following the count down procedure --
23  A. Yes.
24  Q. -- and the plane was delayed by 27 minutes?
25  A. Yeah, and I don't remember the incident. That was a

Page 143

1   long time ago.
2   Q. And you were in a lead role at the time?
3   A. Yeah, when I...
4   Q. So this would have stayed on your record for another
5   nine months?
6   A. Was that Level 1? Yeah. Nine months. Right down
7   here at the bottom.
8          MR. BURG: Before you go to another
9   exhibit, I need to take another short break.
10          (Off the record at 12:00 p.m.)
11          (Back on the record at 12:12 p.m.)
12          MARKED FOR IDENTIFICATION:
13          DEPOSITION EXHIBIT 15
14          December 20, 2010 Interoffice Memo
15          12:15 p.m.
16  BY MS. GROSS:
17  Q. Okay. If you would look at what's marked as
18  Exhibit 15?
19  A. Yeah.
20  Q. Do you recognize 15?
21  A. Yeah. I mean I don't recognize it, but I was getting
22  a level. It always seems like it's for attendance.
23          MARKED FOR IDENTIFICATION:
24          DEPOSITION EXHIBIT 16
25          January 13, 2010 Interoffice Memo

Page 144

1   12:15 p.m.
2   BY MS. GROSS:
3   Q. Take a look at 16, if you would, please, I think 16
4   comes earlier than 15, marked in the wrong order.
5          So 16 is dated January 13, 2010, correct?
6   A. Yeah.
7   Q. And this is a Level 1 attendance because you again had
8   discrepancies with your absences that weren't covered
9   by sick leave and FMLA?
10  A. See, what happened on this one, I think the family
11  leave fell through for some reason. And I didn't get
12  it. I tried to get it and if you don't get it, they
13  were kind of wishy on the rules. And sometimes if you
14  didn't get it, you applied for it and tried, they
15  wouldn't give you -- they wouldn't give you a level.
16  Q. Okay. How much -- was there any time that you were
17  allowed to have time off, paid time off during the
18  year, like a vacation day or --
19  A. Yeah, you got about a month a year, I think.
20  Q. A month?
21  A. Not while I was there. What I mean, I was earning my
22  way up in the system towards the top of the pay scale.
23  I might have had two weeks. So a month would probably
24  take 10 or 15 years, I think.
25  Q. Okay. So the time you worked there, you probably had

Carroll Court Reporting and Video
586-468-2411

Jeffrey Nicholas
August 14, 2017

## Page 145

1     up to two weeks --
2  A.  I think I had two weeks, yeah.
3  Q.  -- paid time off that you could take?
4  A.  And it wasn't while I was starting the first couple of
5     years because I was part time.
6  Q.  Okay.  And other than your paid time off, everything
7     else needed to be covered somehow by a doctor's note
8     or FML, correct?
9  A.  Yeah.  Yeah.
10  Q.  There were a couple times that you exhausted your FML
11     during the course of the year, weren't there?
12  A.  I don't know about that.  How much FML can you get?
13  Q.  Twelve weeks.
14  A.  No, I don't think I stayed out that long.  I might
15     have stayed out that long -- on the last year I was
16     there, '13, I got fired '13, December, the summer of
17     '13, I had some skin surgery at U of M and it got
18     infected and I had to stay out for a while.  I don't
19     think I was out 13 weeks, though.
20  Q.  Looking again at Exhibit 16, you would agree this is
21     the Level 1 attendance you got in January 2010?
22  A.  Yeah.
23  Q.  You didn't make any complaints about age
24     discrimination or anything when you got this, correct?
25  A.  No.  I think it was just because the family leave fell

## Page 146

1     through.
2  Q.  Looking again at Exhibit 15, that first Level 1 had
3     expired in nine months and then you got another one in
4     December of 2010, correct?
5  A.  January '10, so when did that, okay, that one dropped
6     into October somewhere maybe?  And the next one there,
7     yeah, December.
8  Q.  It says nine months, so January 13th to September 13th
9     would be nine months.
10  A.  Okay.  Then I caught another one, I guess.
11  Q.  So then, because of absences that you had between
12     October and the end of the year, you caught another
13     one at the end of the year?
14  A.  Yeah.
15  Q.  And again these are for absences that are not covered
16     by FML?
17  A.  Yeah.
18  Q.  And you didn't make any complaints about getting this
19     discipline, did you?
20  A.  Sometimes, I mean, sometimes I was out for a medical
21     reason, but sometimes I just didn't even bother.  If I
22     knew I wasn't even at a Level 1 and I was only going
23     to catch a Level 1, I didn't bother to do family leave
24     because it was just such a hassle.  I just didn't even
25     put the paperwork in.  I just caught the level.

## Page 147

1  Q.  Was there some sort of number you were supposed to
2     call when you wanted to take family leave?
3  A.  Yeah, you were supposed to do everything all on time,
4     get all the paperwork in on a certain date.  Get the
5     doctor to sign it.  I think the doctor is the one that
6     ships the paperwork in from his office.
7  Q.  Do you remember Sedgwick being the provider for family
8     leave?
9  A.  Yeah, that was Sedgwick for family leave.
10  Q.  Okay.  So if you called up and said you were going to
11     take a family leave, Sedgwick would mail you forms?
12  A.  Yeah, mail you or fax you, I can't remember how they
13     did it.  I think they mailed it to you FedEx, yeah.
14  Q.  Okay.  And then you were supposed to take the forms to
15     your doctor and they were supposed to get sent back?
16  A.  Yeah, I think one time, I don't remember when it was,
17     there was one of them that the doctor didn't send them
18     in on time and I got screwed on the deal.  I ended up
19     catching a level for it.
20         MARKED FOR IDENTIFICATION:
21         DEPOSITION EXHIBIT 17
22         October 14, 2011 Level 2 - Performance
23         12:20 p.m.
24  A.  This guy didn't like me, this guy, Phillip.  Now at
25     this time --

## Page 148

1         MR. BURG:  No question on the table.
2  BY MS. GROSS:
3  Q.  Do you remember getting some kind of performance
4     discipline from Phillip, how do you say his last name,
5     is it Vieth, right?
6  A.  Yeah, I don't know his name like that.  I didn't know
7     his last name.
8  Q.  But you know who he is?
9  A.  Yeah.
10  Q.  Do you remember him giving you any kind of coaching or
11     disciplinary action for performance in 2011?
12  A.  Yeah.
13  Q.  Do you remember what it was about?
14  A.  No.
15  Q.  Okay.  The write-up says that he attempted to coach
16     you but you refused to have productive conversation
17     with him.
18         Do you remember having any kind of
19     discussion with him?
20  A.  He interrupted me while I was on the ramp working and
21     I was trying to get my plane out.  And he was giving
22     me a real hard time out there.
23  Q.  Okay.  You don't --
24  A.  That was it.  It wasn't that I wasn't being a, how did
25     he say it?  Refused?  He said I was talking over him,

Carroll Court Reporting and Video
586-468-2411

Jeffrey Nicholas
August 14, 2017

Page 149

1    and I was arguing with him about whatever the incident
2    was, and I said, lookit, I got to get this plane out.
3    He ended up writing me out.  But he didn't like me.
4    He definitely didn't like me.
5  Q.  Well, a lot of people didn't like you, it sounds like?
6  A.  He really didn't like me.  He wasn't up here for very
7    long.  He came up from Atlanta.  I don't know where he
8    went after that.  He was here for a year, I think.  He
9    came after me right when he got here.
10 Q.  Okay.  So you were arguing with him but you said you
11   couldn't, you were too busy trying to get the flight
12   out and you basically wouldn't talk to him about it?
13 A.  Mm-hmm.
14 Q.  That's a yes for the record?
15 A.  Yes.
16 Q.  So he wrote you up.  What did he do that suggested to
17   you that he didn't like you?
18 A.  He was always mean to me on the ramp.  He used to tell
19   me to use this old tug the got that's like 50 years
20   out, it's an old tug, open air tug for pushing the
21   plane out.  It's like a World War II, it's a big,
22   they called it the Big Buddha.  And it doesn't even
23   barely run.  Everybody is scared to drive it.  Nobody
24   goes near it.  It should have been retired long ago.
25   And he kept me when we were short on push-out tugs,

Page 150

1    because all the planes go out at a certain time,
2    within like 15 minutes, and everybody had a pushback
3    and he told me to use that.  And I told him I didn't
4    want to drive it.
5         Then he says, maybe you shouldn't be a
6    lead, maybe you should step down.  He was always mean
7    to me like that on the ramp.
8  Q.  Okay.
9  A.  It was cold, it was like ten below zero, and he's
10   always arguing with me out there.
11 Q.  Okay.  So --
12 A.  And saying down stuff like that to me in front of the
13   other managers.  It would be two of them in a truck
14   and he'd say it in front of the managers, too.
15 Q.  Okay.  So --
16 A.  "Maybe you need to step down, Nick.  Maybe you just
17   need to step down."
18 Q.  So he told you to use a tug that you didn't think was
19   safe?
20 A.  I didn't think it was safe.  It was a hundred years
21   old.  It's still out there probably.
22 Q.  Okay.  And so when you said, you didn't think it was
23   safe --
24 A.  "Yeah, if you can't drive that tug, maybe you
25   shouldn't be the lead."

Page 151

1  Q.  So that's how he was mean to you?
2  A.  And he's making -- belittling me.  And then, when he
3    called me in to sign this, he's saying that, now you
4    are, now this is, you are being productive, you are
5    talking normal in here.  He said that in front of
6    another manager that was in there.  I can't remember,
7    Robert or somebody.  Always talking to me down.  He
8    was always mean to me on the ramp.  Whenever I ran
9    into him, he was mean to me.
10 Q.  Besides the thing with the hundred-year-old tug, what
11   specifically do you recall him saying to you that was
12   mean to you?
13 A.  He... I can't remember.  We do a lot of work out
14   there.  He was a mean one.  He was just mean, to me,
15   especially, he didn't like me.  And I stayed away from
16   him as much as I could.
17 Q.  Okay.  This particular disciplinary action tells you
18   at the bottom of it that continued problems in this
19   area or any infraction of company policy or failure to
20   meet company standards could result in further
21   disciplinary action, including a recommendation for
22   termination of your employment.
23        See that?  Last couple of sentences from
24   the bottom.
25 A.  That's his wording, right?

Page 152

1  Q.  Right.
2  A.  All right.  Yeah.
3  Q.  So you signed this, did you not?  It's your signature?
4  A.  Yeah, he called me into the cubicle to sign it.
5  Q.  And so you signed something that told you that --
6  A.  It didn't mean -- what is he saying I did wrong?  What
7    did I do wrong on this one?  "Duties in a professional
8    manner..."
9        MR. BURG:  Don't read out loud.
10 BY MS. GROSS:
11 Q.  So, if I understand --
12 A.  I don't know what I did wrong.
13 Q.  Okay.  Well, you said you can't remember what the
14   issue was about, but you do remember that he was
15   trying to talk to you about it, and you were arguing
16   with him, but he was interrupting him while you were
17   trying to get a plane out, so that's why he didn't
18   talk to you?
19 A.  Yeah.  I don't remember why he wrote me up.
20 Q.  But, for whatever the reason was that he wrote you up,
21   you got warned at this point that if you failed to
22   meet company standards you could get further
23   disciplinary action including a recommendation for
24   termination?
25 A.  I don't know how when I was on Level 2.  He's put me

38  (Pages 149 to 152)

Jeffrey Nicholas
August 14, 2017

Page 153

1    on Level 2 right here.  But he put it in the sentence,
2    in the paragraph, so...
3  Q.  Right.  At this point, it's 2011 and you are working
4    for Delta and you don't have a union anymore, do you?
5  A.  No.  We had a union until -- wasn't there a vote in
6    2011?  December 2011 was the vote.  And then they
7    contested it through the government and they
8    challenged it, so they stuck around for another year.
9    Maybe I'm off a year, I don't know.  I don't know if
10    the election was '10 of December, or '11 of December.
11        And then they stuck around for a whole
12    'nother year on the property.  And then after a year,
13    they were ordered off the property by Delta.  I guess
14    it fell through with the government, and they were
15    trying to say the election was rigged or something,
16    the union was.
17  Q.  Yes, but if you still had a union, you could have
18    grieved this, right?
19  A.  Yeah, I don't know if the union was there or not at
20    that time.  If the union was there, I could have
21    grieved it, but I don't know if they were there.
22    Maybe I just didn't bother.
23  Q.  So if the vote was in 2010 and you were a year off, at
24    this point, you could have been strictly a Delta
25    employee?

Page 154

1  A.  No, I wasn't a Delta employee.  I was still being
2    disciplined the old way when they were still on the
3    property.  The union was still in force until -- when
4    was the vote?
5  Q.  The vote was in 2010.
6  A.  They were still on the property and enforce until
7    December of '11.  So they were there.
8  Q.  The government investigation was going on until
9    December of '11.
10  A.  And the union was still working.  They were still
11    doing stuff for people.
12  Q.  They weren't representing you under the Collective
13    Bargaining Agreement and filing grievances, were they?
14  A.  I don't know.  I'm not a hundred percent certain on
15    that.  I know they were on the property doing stuff.
16    Yeah, I think they were.  I don't know.  What are you
17    trying to get at?
18  Q.  If they were still there in October of 2011, and still
19    able to file grievances for you, you would have
20    grieved this one, right?
21  A.  Yeah, but you are saying they weren't on the property
22    then.  You are saying they weren't enforce then, so I
23    guess I couldn't.
24  Q.  What, if anything, did you ever see in writing from
25    Delta that said that you couldn't be immediately

Page 155

1    terminated depending on the offense that you
2    committed?
3  A.  The writing?  In writing?
4  Q.  Yes.
5  A.  They didn't tell me nothing in writing.  They just
6    said, if you are on the old way of doing the
7    write-ups, you are going to stay on the old way.  If
8    you are currently on the level of the old way, you are
9    going to stay on the old way.  They had meetings for a
10    year out there, all the managers did, and tried to
11    figure how to combine the systems and there was no way
12    to do it.
13  Q.  You weren't in those meetings, right?
14  A.  No, but I got involved.  Janet Manns is one of the
15    people that told me how it was going to work.  She's
16    the attendance manager.  She said you are going to
17    stay on the old way.  Because I was already on a
18    Level 1 from her for attendance.
19  Q.  You were on an attendance Level 1 most of the time you
20    worked at Delta, weren't you?
21  A.  It kind of looks like it.  I don't know.  Not most of
22    the time.  A couple times.
23  Q.  We haven't hit a year yet where you were not on either
24    a Level 1 or Level 2 for attendance?
25  A.  Whatever they got here.  One time, the lead fell

Page 156

1    through from, I think the doctor sent it in late.
2  Q.  Okay.  And this particular individual, Phillip, you
3    said he didn't stay for very long?
4  A.  Yeah.  I don't think he was here but a year, maybe a
5    year-and-a-half, and he took off back for, I think he
6    went to Atlanta.
7  Q.  He was gone before you were terminated?
8  A.  Yeah.
9  Q.  Okay.  So, as far as you know, he didn't have any role
10    in the decisions to terminate your employment?
11  A.  Yeah, but he took his stabs at me.  He gave me a
12    level.
13  Q.  Sir, answer the question.  The question is no, he
14    didn't have any role --
15  A.  He probably didn't make the final decision, you are
16    right.
17  Q.  He wasn't in your chain of command any more, was he?
18  A.  No.
19        MS. GROSS:  All right.  This might be a
20    good opportunity.
21        (Off the record at 12:29 p.m.)
22        (Back on the record at 1:30 p.m.)
23  BY MS. GROSS:
24  Q.  Okay.  Back on the record.
25        MARKED FOR IDENTIFICATION:

39  (Pages 153 to 156)

Jeffrey Nicholas
August 14, 2017

Page 157

1          DEPOSITION EXHIBIT 18
2          August 7, 2011 Level 2 - Attendance
3                    1:30 p.m.
4     BY MS. GROSS:
5     Q.  I'm going to jump back for one second.  It looks like
6          I missed one of your Level 2s.  If you take a look at
7          your Exhibit Number 18, please.
8     A.  Okay.
9     Q.  So this is dated August 7, 2011.  This is a Level 2
10         discipline that you got for attendance, correct?
11    A.  Yeah.
12    Q.  Again, this would be due to absences that were not
13         covered by FML or --
14    A.  Yeah.
15    Q.  And this one would last for 12 months until August of
16         2012?
17    A.  Oh, Level 2, yeah.  Yeah.
18    Q.  So then looking back as Exhibit 17, the one we looked
19         at before, when Mr. Phillip Vieth told you that you
20         were already on a Level 2 for attendance, at the end
21         of the first paragraph there, this is what he was
22         talking about, correct?
23    A.  Wait.  You are losing me.
24    Q.  That's okay.  Look at Exhibit 17.  First paragraph.
25         Last sentence where it says, Mr. Nicholas, you are

Page 158

1          currently on a Level 1 for performance and a Level 2
2          for attendance.
3     A.  Okay.
4     Q.  So the Level 2 for attendance that he was referring to
5          was this one you got in August, correct?
6     A.  Yeah.
7     Q.  And this one, you got from Janice -- Janet Manns, she
8          was the time and attendance person at the airport?
9     A.  Yeah, I think she's still there.
10            MARKED FOR IDENTIFICATION:
11            DEPOSITION EXHIBIT 19
12            January 12, 2012 Level 2 Reminder
13                    1:32 p.m.
14    BY MS. GROSS:
15    Q.  Take a look, if you would, at Exhibit 19,
16         Mr. Nicholas.
17    A.  Okay.
18    Q.  This is a performance discipline that you received on
19         January 12th, 2012.  It's a Level 2 reminder for a
20         work performance issue, is that correct?
21    A.  Yeah.
22    Q.  This has to do with some damage that you did to an
23         antenna when you walked underneath an aircraft?
24    A.  Yeah, it was an accident.  My head, my hoodie caught
25         the antenna.

Page 159

1     Q.  I'm sorry, you had a hoodie on, you said?
2     A.  Yeah, it caught the antenna and broke the radio
3          antenna.
4     Q.  And they had to take everyone off that plane?
5     A.  Yeah.  I was trying to help my guy up in the jetway
6          get the jetway bags and I cut underneath an aircraft.
7          They didn't have no rule that weren't allowed to cut
8          underneath there.  But after I did this, they came up
9          with some rule that said no cutting underneath the
10         aircraft.
11    Q.  Did you normally cut underneath the aircraft or was it
12         just something you did that day because you needed --
13    A.  I usually cut underneath the aircraft because there
14         was no rule and it was the fastest way.  This one sits
15         up off the ground.  It was one of them 3 -- it was an
16         airbus.  It sits up pretty high.  If I walked up to
17         it, maybe from here, the bottom of the plane would be
18         right here on me.  So I needed to duck down a little
19         bit to get underneath it.  It was raining, it was
20         dark --
21    Q.  Stop, stop for a second.
22            So when you do things like "up here," we
23         have to make the record clear.  So, when you said "up
24         here" --
25    A.  Oh, the bottom of the plane is about, it's way up,

Page 160

1          maybe one of you guys can walk right underneath it.
2          It may hit me right here.
3     Q.  Okay.  So, how tall are you?
4     A.  Six foot.
5     Q.  And you are pointing to your chest?
6     A.  Yeah.  The bottom of the plane is about
7          four-and-a-half feet off the ground.  It's way up.
8     Q.  Okay.  So you had to -- but you had to bend down to
9          get under it?
10    A.  Yeah, just a little bit.  I had to duck down a little
11         bit to get through there.
12    Q.  Well, the bottom of the plane is four-and-a-half feet
13         off the ground, and you are six foot, that sounds like
14         a bit more than a little bit?
15    A.  It might have been five feet.  I just needed to duck
16         my head a little bit.
17    Q.  Okay.
18    A.  But the gate that we were working, it was somewhere
19         down by, if I remember, Alfa 36 or something -- yeah,
20         there it is right there.  It was the middle of winter,
21         the lighting was poor down there.  The lighting wasn't
22         right at the gate for outside work.  It was real dark.
23         It was a rainy night to begin with and I just ended up
24         bumping the antenna and it broke.
25    Q.  And they had to take everybody off the flight and they

Jeffrey Nicholas
August 14, 2017

Page 161

1    complained?
2    A.  Yeah.  They put a bunch of guys on it and got -- I
3        mean, it took a few minutes.  They got a crew on of 10
4        guys, they triple stacked it, and they got everybody
5        off.  It was about a half hour to departure when it
6        happened.
7    Q.  So this resulted in a 56-minute delay for the takeoff
8        of that flight?
9    A.  Yeah.
10   Q.  So did you disagree with this Level 2 reminder that
11       you got?
12   A.  The union told me -- was the union there?
13   Q.  No, the union wasn't there.
14   A.  The union stewards were saying it was an accident,
15       they can't level you.  And I got it, so what could I
16       do?
17   Q.  So, at this point, the union is gone, and it's pretty
18       much up to Delta --
19   A.  Yeah.
20   Q.  -- how they want to discipline you?
21   A.  I guess.  But see, they were still leveling me the
22       Northwest way on the levels, and that was in '12.
23   Q.  Right.  You were already on a Level 1 --
24   A.  Right.  I'm just saying they weren't doing me the
25       Delta way, they were doing me the old way.

Page 162

1    Q.  Okay.  Well, what would the Delta way have been in
2        January of '12?
3    A.  I don't know.  I don't think I ever seen a, what do
4        you call it?  Performance -- disciplinary policy?  I
5        don't know what you would call it.  I don't think I've
6        ever seen one for Delta.
7    Q.  Right.  You keep saying it was the Northwest way, not
8        the Delta way, but you don't really know what the
9        Delta way was?
10   A.  Well, I heard it's a couple coachings and then you are
11       gone.  It's like two coachings and a write-up and you
12       are out the door.  I heard it's pretty bad.
13   Q.  "Bad" meaning you can get fired easier than you could
14       when you were at Northwest and you had the union?
15   A.  That's the way I understood it but I had never seen a
16       copy of it.
17           MARKED FOR IDENTIFICATION:
18           DEPOSITION EXHIBIT 20
19           Reported Employee Injury Statement
20           January 12, 2012
21           1:36 p.m.
22   BY MS. GROSS:
23   Q.  Take a quick look at Exhibit number 20, if you would.
24       Is that your handwriting?
25   A.  Yeah.

Page 163

1    Q.  Okay.  So this is your write-up of what happened that
2        day?
3    A.  Yeah.  See, I was trying to help with the jetway
4        bag --
5            MR. BURG:  Hold on.  Wait until the
6        question comes out.
7    BY MS. GROSS:
8    Q.  So, basically, you walked under the aircraft to help
9        the jetway, help them on the jetway with the bags, the
10       ground was slippery, you lost your footing, and you
11       hit your head?
12   A.  Yeah.
13   Q.  Okay.  At the time you received the discipline in
14       January of 2012, did you have any reason to believe
15       your age had some reason why you were getting this
16       discipline --
17   A.  No.
18   Q.  I'm sorry, I just finished the question.  Is that a
19       no?
20   A.  No.
21   Q.  So you didn't complain it anybody about this one?
22   A.  Mm-mm.
23   Q.  That's a no for the record?
24   A.  No.
25   Q.  Okay.  So you headed into 2012 on a Level 2 for

Page 164

1    attendance and now for a Level 2 for performance as
2    well, correct?
3    A.  Wait a minute.
4    Q.  If you look back at Exhibit 18 --
5    A.  But what was 2 performance coming off?  Where was...
6    Q.  If you look at Exhibit 18 for a minute, if you would.
7        Exhibit 18 is the Level 2 attendance discipline that
8        you got in August of 2011, correct?
9    A.  Okay.
10   Q.  And that would have stayed on your record for 12
11       months until August of 2012, correct?
12   A.  Yeah.
13   Q.  So when we look at Exhibit 19...
14   A.  I thought it was only on Level 1.  I didn't know I was
15       on Level 2.
16   Q.  Okay.  Well, you signed it in August of 2011, correct,
17       it's your signature at the bottom of Exhibit 18?
18   A.  Yeah.
19   Q.  It clearly says Level 2, remain in your file for 12
20       months, correct?
21   A.  Yeah.
22   Q.  And you thought this one was coming off in August of
23       2012, didn't you?
24   A.  Yeah.
25   Q.  And that was your whole argument that you made, that

41 (Pages 161 to 164)

Carroll Court Reporting and Video
586-468-2411

Jeffrey Nicholas
August 14, 2017

Page 165

1   you challenged the determination --
2   A.  I was on the phone with Janet Manns while I was off
3       for this, before they did me the last chance.  And she
4       told me, she says, you only got a month or so to go on
5       your level that I was on, this level, this Level 2
6       here that started in August.  And she says --
7   Q.  That was in 2013 -- or 2012, I'm sorry, that you were
8       on the phone with Janet?
9   A.  Yeah, before, two days before they gave me the last
10      chance.
11  Q.  Okay.
12  A.  I was on the phone with her and she says, I think I'm
13      just going to do you a new Level 1...
14  Q.  We are going to get there, sir.  I just want to
15      confirm now, you got a Level 2 in August --
16  A.  Right.
17  Q.  -- expecting it to go in 2012, correct?
18  A.  Yes.
19  Q.  And in January of 2012, you got a Level 2 reminder for
20      performance over the antenna?
21  A.  Yes.
22  Q.  So as of January 12th of 2012, you have now got two
23      Level 2 reminders, one for attendance and one for
24      performance, correct?
25  A.  I thought it was a Level 1.  I didn't know it was a

Page 166

1       Level 2.
2   Q.  You signed the document --
3   A.  I know.  I thought it was a Level 1.  Because when she
4       told me on the phone she was going to redo me on a
5       Level 1, that's what she said to me on the phone.  She
6       was going to put me on a new Level 1 for a year, or
7       nine months, or whatever Level 1 is.
8   Q.  Okay.  But you clearly signed something in August that
9       said --
10  A.  I know but on the phone she told me she was going to
11      do a Level 1.
12  Q.  But that was almost a year later in June of 2012?
13  A.  Right.  Right.  She told me, I'm going to do you a new
14      Level 1.  I will see you on Friday when you come back
15      to work.  It's okay.
16  Q.  When they handed it to you in August of 2011, it
17      clearly said Level 2 --
18  A.  Right.  Right.
19  Q.  -- and you signed it?
20  A.  Yeah.
21  Q.  If you would look back at what was marked as Exhibit
22      Number 7 at the beginning of the deposition.  It's
23      your Journal.
24          MR. BURG:  Go to 7.
25          MS. GROSS:  It looks like this.  That's it.

Page 167

1           THE WITNESS:  Right.
2   BY MS. GROSS:
3   Q.  So before we talk about Exhibit 7 for a second,
4       looking back at Exhibit 19, the Level 2 for
5       performance, you got that from Silvio Vona?
6   A.  Yeah.
7   Q.  And Silvio was your performance leader at that time,
8       your supervisor?
9   A.  Where was I?  I didn't know the name.  I mean, where
10      was my... January '12?  I'm trying to think of where I
11      was working.  I don't know who that person is, but my
12      guess, it was my performance leader.
13  Q.  Let me ask you this, Mr. Nicholas.  Your performance
14      leader has changed a fair amount?
15  A.  Yeah, I've always been in different spots.
16  Q.  That was going to be my questions.  Do they change
17      mostly because --
18  A.  No, I think they bid, too.  I don't know if the
19      manager assigns them to areas but they stick in an
20      area for a while but I didn't know this person.  I
21      didn't know them by name.  Maybe they have a nickname
22      they go by, I don't know.
23  Q.  So you can have a lot of different supervisors because
24      you are moving or they are moving?
25  A.  Yeah, you can get two different ones in a year if you

Page 168

1       move around.  Because twice a year you bid.
2   Q.  I think they called this guy Sid, does that ring a
3       bell to you?
4   A.  Mm-mm.
5           MR. BURG:  Is that no?
6   A.  No.  No.  Some of them got nicknames out there but
7       this one doesn't ring a bell at all.
8   BY MS. GROSS:
9   Q.  So would it be fair to say that you don't recall
10      having any particular quarrels or beefs with Mr. Vona?
11  A.  Yeah, I don't remember.
12  Q.  Looking back at Exhibit Number 7, your Journal?
13  A.  Yeah.
14  Q.  On the very first page, it says that on April 20th,
15      2012, you got another work performance verbal coaching
16      and you were disqualified from the ALA position?
17  A.  Yeah.
18  Q.  Do you remember that?
19  A.  Yeah.
20  Q.  Okay.  And your supervisor at the time was now Roberto
21      Ortiz?
22  A.  Yeah.
23  Q.  Do you remember that it was Mr. Ortiz that told you
24      you were being taken out of ALA?

Jeffrey Nicholas
August 14, 2017

Page 169

1   A.  Yeah, I don't think he was my supervisor but he worked
2       over in Operations but he, I can't remember who told
3       me, I thought Rogermike told me.  Oh, yeah, I think he
4       sat in with Rogermike and they both told me.  The
5       meeting was in Rogermike's office.
6   Q.  All right.
7   A.  I think actually Mohammd Suri (ph) (ph) is the one
8       that told me.  He said, you are going to step down for
9       a while.  I said, okay.  He said, I made my decision.
10      I think he was in on the decision, too.  He's one step
11      above Rogermike.
12  Q.  So was Mohammad in a meeting or he just told you that
13      separately?
14  A.  I think I went into -- I can't remember.  I think I
15      saw these guys.  And then I went over to Mohammad's
16      office to try and complain about it.  And he said, no,
17      you are going to step down for now.  I said, okay.  He
18      was just in his office.  He keeps the door open in
19      case you needed anything.  And he wasn't doing
20      nothing, so I just knocked on the door and talked real
21      quick.
22  Q.  Did you have a good relationship with him?
23  A.  He liked me.  He was all right to me.
24  Q.  And did he tell you that you were going to step down
25      for a while because of performance?

Page 170

1   A.  Yeah, he just said, you are stepping down now.  I
2       already made the decision, or we made the decision.  I
3       don't know how he said it.  I can't remember exactly.
4       He said, you're down.  You are an ESE now.  And I said
5       all right.
6   Q.  Did you have any reason to believe that your age was
7       the reason why you were being taken out of ALA and
8       back to an ESE?
9   A.  No, they just... I don't know what their decision was
10      on it.  No, I don't think it was age on that one.
11  Q.  Okay.
12  A.  But he, Mohammad let me believe that, after some time
13      off, he's going to let me go back up to that lead
14      spot.
15  Q.  Did he tell you that day --
16  A.  I don't know if it was that day.  He told me to keep
17      coming back to see him, like every three months.  And
18      he said, we're going to work on getting you back up
19      later on.
20  Q.  Okay.  So when you got the news that you were being
21      taken out of the ALA, it was in a meeting with Ortiz
22      and maybe Rogermike?
23  A.  I think it was Rogermike and Ortiz, yeah.  I think I
24      got the decision, I can't remember how it was said.  I
25      don't remember if it was Mohammad that told me or

Page 171

1       them.
2   Q.  Did you think at the time that your attendance record
3       and your performance record and your discipline record
4       was setting a good example as an ALA?
5   A.  They wanted me out of the lead spot because of the
6       damage that I did to the aircraft.  That's what my
7       take on it was.  And that's why these write-ups all of
8       a sudden happened.  There was a couple write-ups that
9       happened in January after I damaged the plane.
10          But then about a half a year later, Robert
11      Ortiz started telling me he needed me back out there.
12      I was a good lead.  I was a good worker out there.  He
13      said, I need you out there again, Nick.  I'm going to
14      use you as a lead on a temporary basis.
15  Q.  Ortiz told you that?
16  A.  Yeah, he told me that.  And he was working in Ops.  He
17      was the guy controlling everything in Ops.  I don't
18      know what his position was out there.  He said, I need
19      you out there, Nick.  I'm going to start using you.
20  Q.  But he didn't, did he?
21  A.  Yeah, because it was right at the end of my employment
22      there.  I was down to the last few months.  I bid the
23      ramp.  I was working on the ramp again.  He told me,
24      I'm going to start using you a little bit out there.
25      I need you.

Page 172

1   Q.  Let me make sure I understand.  After you had the
2       meeting with --
3   A.  See, what happened --
4          MR. BURG:  Jeff --
5   BY MS. GROSS:
6   Q.  Let me ask the question.
7   A.  Sure.
8   Q.  After you had the meeting with Ortiz and Rogermike
9       telling you that you were going to be taken out of the
10      ALA position, you went and talked to Mohammad, was it
11      the same day, do you think?
12  A.  No, it might have been later.  I don't know if it was
13      the same day or maybe a week.  I don't know.  I can't
14      remember who told me they were taking me out of the
15      spot.
16  Q.  And Mohammad's door was generally open to come in if
17      you wanted to talk to him so to speak.
18  A.  Yeah.  If he wasn't doing something, you could just go
19      knock and tell him what's going on or what you need.
20  Q.  Okay.  And he told you that he had already made up his
21      mind, but you could come back and talk to him?
22  A.  He said, well, you are stepping down for now.  We will
23      work it out later.  You are going to take some time
24      off for now.  That's okay.  This happened two years
25      after I got fired.  It happened January of '12, right?

43  (Pages 169 to 172)

Jeffrey Nicholas
August 14, 2017

---

Page 173

1  Q. Stepping down?
2  Q. Yes.
3  A. And so, what I'm saying is, like half a year, maybe
4  half a year or a year went by. And then Robert, he
5  started telling me, I would always see him in the
6  hallway and stuff, and he said, I'm going to start
7  using you again. I'm going to start using you out
8  there as a lead again.
9       And I think I told him at the time I really
10  didn't care to do it yet. Just give me some more
11  time. We will leave it alone for now. But he needed
12  me because I was a good lead. And the guys that were
13  coming up --
14  Q. Sir, we're never going to finish, okay? So let's just
15  make sure we can summarize exactly what I think I'm
16  hearing here.
17       Sometime, much later after you were taken
18  out of the ALA, you moved into, what did you say, the
19  ramp area?
20  A. Yeah. Just the regular, yes. What do they call it,
21  ESE or...
22  Q. Okay. And this is towards the end of your employment
23  I think you said a minute ago?
24  A. Last two years, I was an ESE.
25  Q. But when Mr. Ortiz came to you --

---

Page 174

1  A. He didn't come to me. We ran into each other in the
2  hallway.
3  Q. Okay.
4  A. And he said, you know what? I'm going to start using
5  you on a temporary, he said, I can sure use you out
6  there again. And I said, well... We were just kicking
7  the idea around, kind of like.
8  Q. Okay.
9  A. He wasn't going to do it for sure, I mean, I dont
10  know, but he would call me when he needed me.
11  Q. How much before your termination was that?
12  A. I think at least about a year. It might have been the
13  spring of '13.
14  Q. Okay. So in the spring of 2013, just passing in the
15  hallway, Mr. Ortiz said something to you about he was
16  thinking about using you as ALA again, and you said to
17  him you wanted to do it?
18  A. He said he would call me when he needed me. He would
19  call me in my work area and pull me if he needed me.
20  I didn't want to be circlejerked out of the area. I
21  think I told him, let's just wait until I can maybe
22  run for lead again or something. I don't even know if
23  I said that much. He was just kind of talked about it
24  real quick. He was talking to some other guy and I
25  was passing by in the hallway and just brought it up

---

Page 175

1  real quick.
2  Q. What do you mean by "circlejerked"?
3  A. I didn't want to get pulled out of my area. You know,
4  you kind of go to work and you know where you're going
5  to work. I didn't want to get pulled to just go fill
6  in for him wherever he needed me on lead.
7  Q. Okay.
8  A. And if I was going to do a lead, I wanted to go for a
9  lead spot again, maybe bid it and try and -- I don't
10  know if they interview for it or how they do it now.
11  Q. So you weren't interested in him just pulling you as a
12  lead?
13  A. I would have probably did it if he called me but we
14  didn't get down that far yet to do that.
15  Q. And you shared with him --
16  A. I said, I don't know. I don't know if I answered yes
17  or no to him in the hallway.
18  Q. Okay.
19  A. He never ended up calling me. He was busy. He didn't
20  have time to -- if he needed me, he would have called
21  me.
22  Q. Okay.
23  A. Yeah. He would have got me pulled out of my area --
24       MR. BURG: All right, Jeff.
25  BY MS. GROSS:

---

Page 176

1  Q. And you had a good working relationship with Mr. Ortiz
2  as well?
3  A. Yeah, he was a nice guy too. He treated me all
4  right.
5       MARKED FOR IDENTIFICATION:
6       DEPOSITION EXHIBIT 21
7       Final Corrective Action Notice Regarding
8       Attendance
9       1:50 p.m.
10  BY MS. GROSS:
11  Q. Okay. Mr. Nicholas, I'm going to ask you if you could
12  look at what's marked as Exhibit 21 to your
13  deposition.
14       Okay. So it is about six months later,
15  June 1st, 2012?
16  A. Yeah.
17  Q. And this is when you got put on your final Corrective
18  Action Notice for attendance, correct?
19  A. Yeah.
20  Q. You were still on a Level 2 going into 2012 that
21  wasn't going to be over until August of 2012, correct?
22  A. Yeah. But I understood from Janet Manns that she was
23  just going to put me on.
24  Q. Okay, sir.
25  A. I don't know if she was going to put me on a new

---

44  (Pages 173 to 176)

Jeffrey Nicholas
August 14, 2017

Page 177

1    **Level 1 or a new Level 2, but she wasn't going to put**
2    **me on a last chance.**
3    Q.  But you started the year 2012 on a Level 2?
4    **A.  Yeah.**
5    Q.  And you had some periods of absence between the end of
6        March and the beginning of June, correct?
7    **A.  Yeah.**
8    Q.  Now this is what I think you said earlier, you, your
9        FMLA didn't come through, is that correct?
10   **A.  Yeah, I don't remember what happened on this one.**
11   **That might have been it.**
12   Q.  Okay.  Well --
13   **A.  And I was on the phone with Janet Manns.  And she**
14   **said, Jeff, come on back to work on your next day,**
15   **when are you coming back?  I said I'd be back on**
16   **Friday and --**
17   Q.  Sir, we're not there yet, okay?
18       Do you remember getting the paperwork from
19       Sedgwick from FMLA?
20   **A.  I don't remember on that one.  I don't remember.  That**
21   **might have been the incident where they didn't turn it**
22   **in or I don't remember if I got the paperwork.  I**
23   **don't know how it played out on that one.**
24       MARKED FOR IDENTIFICATION:
25       DEPOSITION EXHIBIT 22

Page 178

1        Sedgwick CMS - March 8, 2012
2            1:51 p.m.
3    BY MS. GROSS:
4    Q.  Take a look at Exhibit 22, if you would.  Do you
5        recognize 22 as the kind of paperwork that you would
6        get from Sedgwick if you were applying for FMLA leave?
7    **A.  Yeah.**
8    Q.  And they would enclose the doctor's form for you to
9        send to your doctor with this?
10   **A.  Yeah.  Yeah.**
11   Q.  Do you remember who your doctor was that you were
12       trying to get to certify you for FMLA leave during
13       this period?
14   **A.  I don't know.  I thought it would be Raval.  What did**
15   **they say happened with it?**
16       MARKED FOR IDENTIFICATION:
17       DEPOSITION EXHIBIT 23
18       Delta Leave & Disability
19       May 30, 2012
20           1:53 p.m.
21   BY MS. GROSS:
22   Q.  I'm not really sure, Mr. Nicholas, but I know there's
23       another Sedgwick letter in May asking you again for
24       paperwork for your FMLA leave.  This time it's for a
25       call that you made to them in May.

Page 179

1        Do you see that on Exhibit 23, the letter
2        dated May 30th?
3    **A.  Yeah.  I think maybe I dropped the ball on giving the**
4    **paperwork to the doctor.  I don't know what happened.**
5    Q.  Okay.  Well, you said in your claim letter that you
6        wrote, which is Exhibit 6, if you need to take a look
7        at it, but you said I had to go out on family leave in
8        April 2012.  While out on the family leave, I was
9        disapproved by Sedgwick.  The doctor's office either
10       turned paperwork in late or didn't fill out paperwork
11       properly, dot the Is, cross the Ts.
12   **A.  That might have been the deal.**
13   Q.  Do you know which doctor's office didn't get your
14       paperwork done?
15   **A.  I don't know.  Maybe it was Raval's.  I can't**
16   **remember.**
17   Q.  Do you remember what your condition was that required
18       you to be out so much time between March and June of
19       2012?
20   **A.  I don't remember missing that many days, whatever it**
21   **says there.**
22   Q.  The letter says 62 days or 63 days?
23   **A.  I don't remember that.**
24   Q.  Well, there's 63 days exactly between March 29th and
25       June 1st, so you wouldn't have been scheduled to work

Page 180

1        all 63 days, I'm assuming?
2    **A.  Yeah, I don't remember it being that kind of time, but**
3    **if it's in there, I guess they figured it out.**
4    Q.  Do you remember what you were treating for?
5    **A.  I've never been off like two weeks.  I don't remember**
6    **no two months.  No, I don't know.  I was kind of**
7    **depressed from losing my lead spot and I don't know**
8    **why I was out.  I don't know what happened with the**
9    **paperwork.**
10   Q.  When you say "depressed", have you ever treated with a
11       mental health professional?
12   **A.  No, I was just feeling the blues, you know.  That was**
13   **it.  That might have been part of it.**
14       MARKED FOR IDENTIFICATION:
15       DEPOSITION EXHIBIT 24
16       Pennview Medical Clinic
17           1:54 p.m.
18   BY MS. GROSS:
19   Q.  Take a look at Exhibit 24, if you would.  24 is a
20       collection of doctor's notes that you ultimately
21       turned in for dates during this period?
22   **A.  Okay.  Yeah.**
23   Q.  But most of them are just like one day.  So if you
24       look at the first one, this looks like Pennview
25       Medical Clinic.  This is your regular family doctor?

45  (Pages 177 to 180)

Jeffrey Nicholas
August 14, 2017

Page 181

1   A. Yeah. Yeah.
2   Q. And he is saying he saw you on, or you were under his
3      care on April 18th ready to go back to work
4      April 22nd, correct?
5   A. Yeah. But then he kept extending it.
6   Q. Well, the next one that you turned in for this period,
7      on page 2 of Exhibit 24, is from your chiropractor.
8      And that's just for the 18th of May. Do you see that?
9   A. Yeah.
10  Q. The next page is Dr. Mahfouz again. It looks like
11     it's just on the 22nd of May?
12  A. I think that's when I thought I was going to get
13     family leave and I wasn't really worried about those
14     notes or nothing.
15  Q. Well, these notes were just covering odd days here and
16     there?
17  A. Yeah. I think, yeah. I was just waiting to get the
18     family leave done. I don't know. I think maybe I
19     just took my eye off the ball and it fell through.
20  Q. So, would you agree it wasn't the company's fault that
21     you didn't get Family Medical Leave between end of
22     March --
23  A. Yeah, I think it was either me or the doctor.
24     Somebody did something wrong out there, yeah.
25  Q. So when you returned to work, you got put on a

Page 182

1      Level 2, or a final Corrective Action Notice for
2      attendance, correct?
3   A. Yeah, but Janet was attendance manager and she told
4      me, the way I heard it from her, it was Level 1, but
5      it must have been Level 2 because I was already on
6      Level -- she said, oh, you only have a month or so to
7      go on your Level 2. But I heard on the phone it's
8      Level 1. But if it's -- because Level 2 goes a year.
9      She says, I do remember her saying, I'm going to put
10     you on a new Level 1 for a year. But looking at it, I
11     guess she meant to say Level 2.
12  Q. Okay.
13  A. And she said, it was on a Tuesday or Wednesday and I
14     was going to come back to work after a couple days
15     off, Wednesday, Thursday. And I was coming back on a
16     Friday.
17  Q. How did you find out you weren't getting FMLA, do you
18     remember?
19  A. No. I think we -- I think I called Sedgwick and I
20     think they said the paperwork didn't come in on time
21     or something.
22  Q. Did you come back to work the very next day after you
23     found out you didn't have FMLA?
24  A. No, I talked to Janet on the phone. And she said,
25     after your two days off, my two days off were a

Page 183

1      Wednesday and Thursday, I think it was, I came back to
2      work on a Friday -- what day was that? I can't
3      remember the day. Whatever -- when I talked to Janet,
4      I came back to work on my next scheduled workday.
5   Q. Okay.
6   A. She said, I will see you on Friday. I said, okay. I
7      think it was Friday, my next workday.
8   Q. Did you get the Final Correction Action Notice on the
9      first day you were back, do you remember?
10  A. Yeah, I went to see her and she says, my boss wants to
11     see you.
12  Q. So looking at Exhibit 21, the final Corrective Action
13     Notice that we looked at a couple minutes ago. This
14     comes from Domingo De La Torre?
15  A. Yeah.
16  Q. Do you know what Domingo's job was?
17  A. He was the same level as Rogermike; one above Stacy
18     and those guys, the lowest managers.
19  Q. So, he was a manager --
20  A. Yeah, I never really had dealings with him. Some kind
21     of ramp manager. One level below Mohammad.
22  Q. And before you got the Final Corrective Action Notice,
23     you had never really --
24  A. Oh, no, no. I guess he was the attendance manager
25     above Janet.

Page 184

1   Q. Okay. Are you guessing now?
2   A. Yeah, I'm kind of guessing. I think maybe he was in
3      charge of attendance or something. But I didn't have
4      no dealings with him on attendance. I always dealt
5      with Janet.
6   Q. You hadn't had any dealings with him pretty much at
7      all before this?
8   A. I won't say that. I think, years ago, I had dealings
9      with him on the ramp. But I don't know if that was
10     the same guy or not. I think he went to, and then he
11     went to Laguardia, he went to JFK, and then he came
12     back. I was kind of had a run-in with him way back
13     when, like the first two years I was out there.
14  Q. When it was still Northwest?
15  A. Yeah.
16  Q. Run-in about what?
17  A. I don't know. He was just real mean. I asked the
18     guys, what happened to the guy? And they said he went
19     over to JFK. And I guess they said he was happier
20     there. And, all of a sudden, he was back. And I
21     said, is that the same Domingo as before? They said
22     yeah.
23  Q. Okay. So where are you getting --
24  A. I didn't really know his name. I asked the guys I
25     worked with, what's that guy's name? They said,

Carroll Court Reporting and Video
586-468-2411

Jeffrey Nicholas
August 14, 2017

Page 185

1      Domingo.  And then he was --
2   Q.  My question, sir, do you remember what you had a
3      run-in about him with; if you know, that's fine?
4   A.  He was just really mean.  I was helping out with the
5      widebody jets, 747s, and he was real mean.
6   Q.  How?
7   A.  I don't remember.  He was just ordering people around,
8      or me, especially because I was new.  I had only been
9      there a year or two.  He was real mean in the work
10     area.  I asked, who was that guy?  Roberto.  Don't
11     play around with him.  I said okay.
12  Q.  Domingo?
13  A.  Roberto, isn't it Roberto?
14  Q.  No, it's Domingo.  That's why I'm asking.  Is it
15     Roberto?
16  A.  Maybe I got them mixed up.  I thought it was Roberto.
17     And I told him that Janet was going to do me a new
18     Level 1, I thought it was Level 1, and I guess it was
19     a Level 2.  And he said no, he's putting me on last
20     chance.
21  Q.  Well, since you are not a hundred percent sure whether
22     it was Roberto or Domingo, would it be fair to say,
23     sir?
24  A.  No, it was Domingo on this one.  He wrote me up.
25  Q.  Okay.  The person you had a run-in with?

Page 186

1   A.  Yeah, that was like five years earlier.
2   Q.  Okay.  So it didn't have anything to do with --
3   A.  It might not have been him.  I'm not for sure it was
4      right.
5   Q.  So it probably didn't really have anything to do with
6      you getting this attendance --
7   A.  Maybe not.  Maybe not.
8   Q.  -- Corrective Action?
9          MR. BURG:  Excuse me.  Jeff, you keep
10     starting your answer before the last word --
11         THE WITNESS:  All right.
12         MR. BURG:  -- is spoken by the attorneys.
13     Try to wait until the end of the question.  Thank you.
14  BY MS. GROSS:
15  Q.  Okay.  And although it wasn't a total of 63 days,
16     would you agree with me, sir, that, between March 29th
17     of 2012 and June 1st of 2012, you had a number of
18     absences that were not covered by FMLA ultimately?
19  A.  Oh, yeah.
20  Q.  Because either you or your doctor dropped the ball?
21  A.  Yeah.  Yeah.
22  Q.  That's a yes?
23  A.  Yeah.
24  Q.  So when you told him that you talked to Janet and you
25     thought you were only going to get another year of

Page 187

1      Level 1 or Level 2, whichever it was, what did he say?
2   A.  He didn't.  He said, this is where we are at right
3      now.  He pushed it across the table to me to sign it.
4      He said, this is where we are at.
5   Q.  Okay.
6   A.  I was scared to death.  I thought he was going to fire
7      me or something because the union wasn't there no more
8      or nothing and I just didn't know what to do so I
9      signed it.  And I just left the room and that was it.
10  Q.  Did you read it before you signed it?
11  A.  Basically.  I just kind of glanced over it.  He told
12     me it was the last chance.
13  Q.  He did tell you it was the last chance?
14  A.  Level 3.
15  Q.  So did you come away from signing this understanding
16     that, if you had any more performance issues or
17     attendance issues, you had a good chance of being
18     fired?
19  A.  No, because they usually give you a couple coachings
20     and they -- before you go up to the next level and
21     Delta, Northwest, and the union had --
22  Q.  Sir, the union is gone in 2012.
23  A.  Yeah, I know.  I didn't think that.
24  Q.  And there is no level beyond Delta beyond a Final
25     Correction Action Notice, is there?

Page 188

1   A.  Yeah, there was some kind of, they had some name for
2      it; where they send you home for a couple days.
3   Q.  That was a decision-making leave, what they call a
4      DML, right?
5   A.  Yeah.
6   Q.  The DML was with Northwest when the union was still in
7      place?
8   A.  Yeah, but I was still on the union way.
9   Q.  Did you ever get anything from Delta that told you
10     that you were going to get a DML before you got fired?
11  A.  No.
12  Q.  Okay.  And you understood this Final Corrective Action
13     Notice was going to be on your record until
14     June of 2015, correct?
15  A.  Yeah.  And I went and complained about it to Mohammad
16     because he's one higher than the guy that wrote me up.
17  Q.  Okay.  What did you say to Mohammad?
18  A.  I didn't go right away.  I waited a couple months.  I
19     said well, I will give him a few months and show him
20     I'm doing good.
21         So I waited a few months and I went and saw
22     Mohammad, and I said, you know, I thought now looking
23     at it, she had me on Level 2.  I guess she was going
24     to give me a Level 2.  I thought she had me on
25     a Level 1.  I said, so and so, I said, he screwed me,

Jeffrey Nicholas
August 14, 2017

Page 189

1  excuse my French, I said, Mohammad, he screwed me.
2  Can we take care of this and you can help me get down
3  off this level 3 they had me on?  He said, it was in,
4  I saw him in January of '13.  And he said, Nick, you
5  keep your attendance tight for the year.  He said,
6  stay tight in your attendance, because he knew I
7  always, I was getting the write-ups on attendance.  He
8  said, you keep it tight for a year, we'll look at it
9  at the end of the year, and we will work on taking you
10  off there.  Because it was going to run until May
11  of '15, the Level 3.
12  Q.  June 1st of '15, correct?
13  A.  Yeah.
14  Q.  Okay.
15  A.  And he said, we will look at it at the end of the
16  year.
17  Q.  And he told you January of 2013 that if you --
18  A.  And he told me to --
19  Q.  Sir.
20  A.  -- come see him every three months.
21  Q.  So he told you in January of 2013, if you were tight
22  on your attendance throughout 2013, at the end of 2013
23  he would look at whether or not he could lift it any
24  sooner than June of 2015?
25  A.  Right.  To me, he gave me the impression that he was

Page 190

1  going to lift it at the end of the year if I kept my
2  attendance tight and just kept on track.
3  Q.  Okay.  Well, a minute ago, sir, you said if you kept
4  your attendance tight and on track, and you came to
5  him at the end of the year, he would talk about
6  whether he was going to lift it, not that he promised
7  to lift it?
8  A.  He gave me the impression that we were going to do it,
9  but he didn't flat out say, we'll remove it.
10  Q.  Okay.
11  A.  But he said, we are going to sit down and look at it.
12  He said, we will sit down at the end of the year.  He
13  said, you need to serve some time on it first because
14  he knew it was a three-year deal.
15  Q.  So he did tell you that you were going to have to
16  serve time on it first before --
17  A.  He gave me the impression that you got to show me you
18  are doing good.
19  Q.  Fine.
20  A.  He didn't say "serve some time".  He didn't put it in
21  those words."
22  Q.  Well, but if you had an excellent performance record
23  and an excellent attendance record for the rest of
24  that year, you thought he was going to --
25  A.  Right.  I think he would have did it.  And I did.  I

Page 191

1  didn't have no -- I kept the performance --
2  Q.  Okay.  Well, let's take a look at --
3  A.  -- I kept the attendance tight.
4  Q.  Let's take a look at Exhibit 7, if you would, please,
5  your Journal.
6  A.  That's the one I didn't know about.  Where we going?
7  Q.  If you turn to the second page, top of the page, the
8  very first entry is, in your Journal, is the final
9  Corrective Action that you got on June 1st.
10  Do you see that?
11  A.  Okay.
12  Q.  The very next thing that happened in your Journal is
13  that some performance leader by the name of Squire
14  gave you a commendation in July, correct?
15  A.  What happened in this?  Oh, yeah.  Remember I told you
16  about those?  Yeah.  I had to think what
17  "commendation" meant.  Yeah, that was... yeah, okay.
18  Q.  So what did you do that you were getting a
19  commendation for?
20  A.  Oh, I was in the, I was working, I think I was working
21  in the bag room and came out of an area and helped a
22  guy.  We had some downtime where I was, so I was
23  helping the guy park it.
24  Q.  Okay.  So he put in the system just sort of a --
25  A.  Yeah.

Page 192

1  Q.  -- for lack of a better word, this kind of an
2  "attaboy" thing they did for you?
3  A.  Yeah, I had some more, but I don't think they are in
4  here anywhere.  Same week they would write me up on
5  Level 1s, they give me awards.
6  Q.  Well, this is July 27th --
7  A.  The same month that they were kicking me out of my
8  lead spot in January of '12, the same week, I was
9  getting a commendation from a ramp manager that I
10  saved an airplane.  Because I was a lead, when I was
11  trying to park this plane, and it was sliding on the
12  ice, and I can't remember what gate it was at, it was
13  at the end of the terminal there.  And he gave me a
14  commendation for saving an aircraft.  Because the
15  plane came in, the whole plane shifted to the side and
16  it almost hit another airplane.  I had hooked it up to
17  the tug, got him to stop --
18  Q.  Back it up for a minute.
19  A.  But they don't put that in my record.
20  Q.  You got taken off your ALA on April 20th of 2012.  Are
21  you telling me there was ice in April?
22  A.  It was that January.  It was January when I had that
23  problem.  Remember the thing that I hit?
24  Q.  The antenna?
25  A.  It was right around there, January or February, I got

48 (Pages 189 to 192)

Jeffrey Nicholas
August 14, 2017

Page 193

1    a commendation from another manager.  The same week
2    they write me up for this, I get a commendation, but
3    they didn't put it in there.
4    Q.  Who was it?
5    A.  I'm starting to think, now, shaking my memory, I
6    think -- I will look at it.  Do you remember that guy
7    I told you I didn't recognize his name?  Wait a
8    minute.  I can't remember on that.
9         It was at the end of the terminal, the
10   plane was sliding sideways and I stopped the plane.
11   The managers just got together a couple days later and
12   handed me some kind of a plaque you hang on a wall.  I
13   said, make sure that gets into my file.  It didn't
14   make it.
15   Q.  Do you still have what he gave me?
16   A.  I'm trying to find it.  I told him.  It's at home
17   somewhere.  I got two or three of those at home for
18   different stuff while I was lead.  And they don't put
19   those in your file.  I don't know how this got in
20   there.
21   Q.  Who is Mr. Squire, do you remember?
22   A.  He was one of the guys like Stacy at Stacy's level.  A
23   performance lead, I think.
24   Q.  Supervisor type?
25   A.  He was just a manager.

Page 194

1    Q.  Okay.  So the same performance lead ramp manager
2    coached you, according to your records, in August of
3    2012, for not wearing the uniform.
4         Do you see that?
5    A.  This, this, this Squire guy?
6    Q.  Yes.  Very next entry.  August 3rd, 2012, verbal
7    coaching, uniform compliance, spoke to Jeff tonight
8    regarding the need to, it says "by" in, but I think
9    it's supposed to "be" in compliance with the DL
10   uniform policy.  He says he's waiting for the uniform
11   to be delivered.  He assures me he will be in uniform
12   the next time he works.
13   A.  Yeah, okay.
14   Q.  Do you remember that?
15   A.  No, I don't remember it but it says it in here.
16   Q.  You didn't have any particular issues with Mr. Squire,
17   did you?
18   A.  I don't think so.  I can't vaguely remember him.
19   Q.  Then you had some absences in August, in October and
20   December and you brought in documentation to Janet to
21   cover those, correct?
22   A.  Yeah, I guess.
23   Q.  Well, Mr. Nicholas, if we look at your past history,
24   for all the years that you worked for Northwest and
25   all the years you worked for Delta, you had a lot of

Page 195

1    attendance, Level 1s or Level 2s, because you didn't
2    cover all your absences with some kind of paperwork,
3    correct?
4    A.  Sometimes I did and sometimes I didn't cover it, yeah.
5    Q.  Okay.  Now, at this point in time, you are covering
6    all your absences because you are on a final
7    Corrective Action Notice and you know that you if you
8    don't --
9    A.  No.  No.
10   Q.  Let me finish the question, sir.
11        Is it true that you are doing a better job
12   of bringing in documentation to cover your absences in
13   August, and October and December of 2012 than you had
14   at any point in your history at Northwest --
15   A.  No, I wouldn't say that.
16   Q.  Sir, let me finish the question, please.
17        You are bringing in proofs at this point in
18   time because you are already on a final Corrective
19   Action Notice.  Isn't that true?
20   A.  No.  Sometimes they wanted notes.  Sometimes they
21   didn't.  It just depended who was working, I guess.
22   And sometimes they didn't even care if you brought in
23   notes.
24   Q.  Okay.  So you --
25   A.  And the note, and the note didn't save you, the note

Page 196

1    did not save you from catching another level.  I
2    learned that, too.  The note did not save you from
3    catching, going up a level.
4    Q.  Okay.  In January of 2013, so this is, you are still
5    on a final Corrective Action Notice, since the
6    beginning of 2013, and you got a verbal coaching for
7    attendance from somebody named John Fairclough.
8         Do you recall John Fairclough?
9    A.  Performance leader... He, he, I mean, Janet was the
10   manager, but I think he was filling in for her.  Maybe
11   she was off on -- maybe she was on vacation or
12   something.  I think I knew who he was.
13   Q.  Okay.  Well, his title says "performance leader below
14   the wing".  Janet wasn't a performance leader, was
15   she?
16   A.  Oh, oh, I thought I was talking about attendance.
17   See, it says "attendance".
18   Q.  But you were coached on attendance by people who your
19   supervisors, weren't you?  It wasn't always Janet who
20   was coaching you?
21   A.  No, it was Janet.
22   Q.  Sir, we can pull them out.  There were exhibits --
23   A.  This guy, he may have been filling in for her.  If
24   you got attendance issues, you had to go to Janet.
25   She is attendance manager.

Jeffrey Nicholas
August 14, 2017

Page 197

1   Q. Sir, the other level disciplines that we've seen that
2       you got for attendance had performance leader's
3       signatures on them, many of them?
4   A. Well, I can't remember this incident right here.
5   Q. Do you remember ever working for a supervisor named
6       John Fairclough?
7   A. Very vaguely, yeah.
8   Q. Do you remember having any particular issues with John
9       Fairclough?
10  A. No.
11  Q. Now, according to this, you were coached in January of
12      2013 because you had missed 12 days or seven
13      occurrences since August of 2012. You had doctors
14      notes for seven of the days and three of the
15      occurrences, but five of the days and four of the
16      occurrences were not covered with doctors' notes?
17  A. Okay.
18  Q. Do you remember that you got this coaching in January?
19  A. No.
20  Q. You just don't have any present memory of it one way
21      or the other?
22  A. Yeah, I don't remember that incident. I don't
23      remember sitting with him about it.
24  Q. But you are not saying it didn't happen, you just
25      can't remember?

Page 198

1   A. Well, I guess if it's down here, I guess it happened.
2   Q. Well, if it happened, it means that while you were on
3       a final Corrective Action Notice you were getting
4       coached one more time about your attendance, correct?
5   A. Yeah, if it's down there and I actually missed the
6       days, yeah.
7   Q. Then the next entry in your Journal is the March 7th
8       verbal coaching about your seatbelt that we talked
9       about before.
10          Do you see that?
11  A. Yeah, that -- I didn't realize anything about that
12      one.
13  Q. But again, I think you told me that you can't say one
14      way or the other if it happened or not?
15  A. No, I said that he never made me sign nothing. Yeah,
16      I don't think it happened. I don't know where he got
17      this from. And I never went and signed anything.
18      They are supposed to pull you in and bring you to sign
19      it.
20  Q. These are verbal coachings, sir, there's no paperwork
21      that goes with --
22  A. I don't know why they were doing verbal coachings when
23      I was on the old way of discipline.
24  Q. Do you agree with me that, if they had done more than
25      a verbal coaching when you were on a Final Corrective

Page 199

1   Action Notice that the next step would be you would
2   have been fired?
3   A. No, I don't agree with that. You get two or three
4       coachings between levels.
5   Q. And these are these two or three coachings, aren't
6       they?
7   A. No. Delta had -- I mean, on the old write-up system
8       this was four levels.
9   Q. This is Delta now.
10  A. But we weren't on -- I wasn't on Delta's disciplinary
11      way of doing things. I was on the old way.
12  Q. Okay. What do you have that suggests to you that you
13      were on some different discipline system than Delta
14      has?
15  A. Because I was already on a level when they started it.
16      I was already on a level when they started it, you
17      will --
18  Q. And that --
19  A. And they said if you are on the old levels, you will
20      continue to be on them until you come off them.
21  Q. And that level expired and you got three more levels
22      after that on your Delta, didn't you?
23  A. It didn't expire. I stayed on those levels. I was
24      always continuing up the levels. I was on the old way
25      of leveling.

Page 200

1   Q. What was the last step in the discipline process under
2       Northwest in the Collective Bargaining Agreement, if
3       you remember?
4   A. It was Level 4. I think it was Level 4.
5   Q. You never saw anything called Level 4 under Delta, did
6       you?
7   A. No, I never knew what Delta's deal was. I never knew
8       about what it took to get leveled out.
9   Q. So you just didn't know what Delta's deal was?
10  A. I heard about the verbal coachings but I didn't know
11      about what all. I didn't know if he -- I don't
12      remember this one at all. I don't remember him coming
13      up to me. He said he came up to me on the ramp. What
14      is he saying?
15  Q. He is saying that you ought to be wearing your
16      seatbelt and you told me earlier that you didn't
17      remember because you weren't saying for sure that it
18      didn't happen?
19  A. I didn't say for sure it didn't happen. I just said I
20      don't recall it.
21  Q. Okay. Did -- the last thing under Northwest under the
22      Collective Bargaining Agreement was that DML, wasn't
23      it?
24  A. No. DML is the last chance, right?
25  Q. DML is a decision-making leave where you get sent

Carroll Court Reporting and Video
586-468-2411

Jeffrey Nicholas
August 14, 2017

Page 201

1    home.
2    A.  Yeah, that was Level 4.  They send you home for a
3        couple days and they bring you back.
4    Q.  It's one day, isn't it?
5    A.  I think it's a couple days.  They say, do you want
6        your job back or not?  You come back.  This is what I
7        heard.  I never got on there but this is what I heard.
8    Q.  So the last step with Northwest was the
9        decision-making leave where you would be told to go
10       home and think about whether you really wanted the
11       job?
12   A.  Yeah.  And it was a couple days off.  And then you
13       came back and said, yeah, I want my job back and it
14       went from there and then.  Then if you sneezed or anything,
15       you would be gone.
16   Q.  You never saw anything from Delta that said that they
17       had that DML process, did you?
18   A.  I didn't know what Delta's system was.
19   Q.  You never saw any of your co-workers, once it became
20       Delta and didn't have a union anymore, getting put on
21       a DML, did you?
22   A.  No, everybody keeps things quiet.  I don't know when
23       they got put on levels.
24   Q.  Back when you were, when it was Northwest and you
25       still had a union, the union contract at Northwest

Page 202

1        didn't have something called a Final Corrective Action
2        in it, did it?
3    A.  I don't know.  I just knew they had four levels.  And
4        I guess they were calling Level 3 last chance.  And
5        then they had that level beyond it.  It was a Level 4.
6    Q.  Looking again at Exhibit 7 which is your coaching
7        document.
8    A.  Which one?
9    Q.  Exhibit 7.  This one.  I think it's in your hand.
10   A.  Oh.
11   Q.  Okay.  Look at the last page, if you would.  Okay.
12           So it looks like on March 26th, April 23rd,
13       April 30th, you brought in doctor's notes again to
14       Janet Mann?
15   A.  Yes.
16   Q.  Now I understood you to say earlier, and I think some
17       of your paperwork that you sent in after your
18       termination said that you had time off in 2013 for
19       skin cancer, correct?
20   A.  Oh, yeah, the family leave.
21   Q.  You did get family leave approved for that, did you
22       not?
23   A.  Yeah, and then I got it infected and I had to stay out
24       a couple extra weeks.  The doctors all signed out on
25       that.

Page 203

1    Q.  That was in the summer of 2013?
2    A.  Yeah.  I don't know how long I was out.  Maybe about
3        two months or something.
4    Q.  But none of those absences were counted against you,
5        were they?
6    A.  No.
7    Q.  Then, on May 11th of 2013, according to your Journal,
8        you got another coaching, job performance coaching
9        from Stacy Parris.  This is the one where Stacy said
10       that you should have been running the bags tail to
11       tail and you were following the work order and you
12       didn't do that?
13   A.  Where do you see that?  Oh, wait.  There it is.  Yeah,
14       I guess I put them on the T-belt when I shouldn't
15       have.  I don't know what happened there.
16   Q.  Your letter that you wrote appealing your termination
17       says, in May 2013, I got my work order running online.
18       I ran it the way the work order said, a hundred bags
19       to bag room.  I ran about 70 days to bag room.
20       The guys with me ran the rest.  I left the aircraft
21       first because the aircraft arrived about seven minutes
22       late at gate.  We received a coaching because they
23       said we should have run some of the bags tail to tail.
24       I ran my bags like the work order said.
25   A.  Yeah, I ran it like the work order told me.

Page 204

1    Q.  Okay.  And you said this coaching was unjust?
2    A.  Yeah.
3    Q.  So, you knew you got a coaching, even though there was
4        no paperwork to go along with that, because you
5        remembered it and put it in your letter challenging
6        your termination, right?
7    A.  Right.
8    Q.  Okay.  So you disagree that you should not have been
9        coached on May 11th for not running those bags tail to
10       tail?
11   A.  Yeah, I hear you.  I did what the work order told me
12       to do.
13   Q.  And that's why you think it's unjust, because you
14       followed the work order?
15   A.  Sometimes I know how to run it the right way but I
16       guess it was following the work order.  I got to
17       really study this to figure this one out.
18   Q.  Well, you said in your letter to the company
19       challenging your termination or appealing your
20       termination, this particular coaching --
21   A.  The word order tells us how to run the baggage.
22   Q.  All I'm asking you, sir, is the reason you thought
23       this particular coaching was unjust is because you
24       were following the work order and that's what you
25       thought you were supposed to be doing?

Carroll Court Reporting and Video
586-468-2411

Jeffrey Nicholas
August 14, 2017

Page 205

1  A. Yeah.
2  Q. And management thought that, under the circumstances,
3     you needed to run them tail to tail?
4  A. Yeah.
5  Q. And just so the record is clear, tail to tail means
6     plane to plane?
7  A. Yeah.
8  Q. As opposed to going into the bag room and coming back
9     out?
10  A. Yeah. Instead of running bags to a bag room, yes, so
11     they can be brought out with the regular load. You
12     got to run them straight to the plane.
13  Q. This says you were running the flight with Ronnie
14     McCoy and Chris Lecassie. Those were co-workers of
15     those?
16  A. Yeah, I don't remember the names, but I guess they
17     were running the flight with me. Yeah, the guys were
18     running different destinations, you know?
19  Q. Your letter to the company appealing your termination
20     says "we received a coaching". Do you remember that
21     Mr. McCoy and Mr. Lecassie were also coached for this?
22  A. Yes, they were, if I said it on there.
23  Q. Do you think your age had anything to do with the
24     three of you guys getting coached for not running the
25     bags tail to tail?

Page 206

1  A. It might have.
2  Q. How so?
3  A. The one guy was older for me, for sure, I know. I
4     don't remember which name it was.
5  Q. Which guy?
6  A. I think it was Ron McCoy. I don't remember which one.
7     It could have. It might have not. I don't know.
8  Q. Age might or might have not played a role in this?
9  A. Wait. Did I say it did in my statement?
10  Q. No, you didn't. I'm just asking you now.
11  A. I don't know if it did or not.
12  Q. Looking at the next entry, November 2nd, 2013, you are
13     still on a Final Corrective Action Notice at this
14     point, correct?
15  A. Level 3.
16  Q. Well, Delta calls it a Final Corrective Action Notice.
17     The paperwork says Final Corrective Action Notice.
18  A. Well, I was on Level 3 for the old way of writing me
19     up. They called it a last chance.
20  Q. You signed a piece of paper called a Final Corrective
21     Action Notice?
22  A. He didn't give me a choice. He acted like I would get
23     fired right then and there if I didn't sign it.
24  Q. Whether you had a choice or not, you understood that
25     you had been given by Delta, a disciplinary action

Page 207

1     called a Final Corrective Action Notice, correct?
2  A. Yeah. It said "final" -- what did it say?
3  Q. Final Corrective Action Notice.
4  A. Yeah, I was given that in '12.
5  Q. Correct. And you were still on it because it wasn't
6     going to expire until 2015, correct?
7  A. Right. But there is also a level beyond that.
8  Q. Sir, we're going to keep having this discussion all
9     afternoon.
10     You have no documentation from Delta that
11     suggests that there is a level beyond Final Corrective
12     Action Notice in Delta, do you?
13  A. I didn't understand that I was on Delta's way of doing
14     things. I was on the old way.
15  Q. Even though it wasn't Northwest anymore and even
16     though you didn't have a bargaining agreement or a
17     union?
18  A. That's right. That's --
19  Q. Sir, that's all, okay? Just wait for the next
20     question if you wouldn't mind, please.
21     Very next entry, November 2nd, 2013, verbal
22     coaching for attendance, performance leader, Daryl, is
23     it Joffrian (ph)?
24  A. Yeah, I think that's it.
25  Q. Do you know who Daryl Joffrian (ph) is?

Page 208

1  A. Now that's the guy, it says in attendance, I think he
2     was thrown in for Janet.
3  Q. Well, it says he was a performance leader. Do you
4     remember there being a performance leader named Daryl?
5  A. I don't remember if that was a guy that worked with
6     Stacy in online.
7     MR. BURG: Were you about to move on?
8     MS. GROSS: I was going to wrap up this
9     one...
10  A. I don't know what you want me to answer on that.
11  BY MS. GROSS:
12  Q. You don't remember a performance leader named Daryl
13     one way or the other?
14  A. Vaguely. I think it was the guy who ran online. Ran
15     online underneath Stacy. Stacy was the more senior
16     guy, so he was running it. I think he ran south and
17     Stacy ran north.
18  Q. And that is Stacy Parris we're talking about?
19  A. Yeah. I think Darryl was the new guy that ran south.
20  Q. Was this the younger guy than Stacy you were talking
21     about earlier?
22  A. Yeah, I think that's him. I think Darryl. I
23     recognize the name Darryl. I'm not for sure, though.
24  Q. Do you remember Darryl coaching you on attendance in
25     November 2013?

52  (Pages 205 to 208)

Carroll Court Reporting and Video
586-468-2411

Jeffrey Nicholas
August 14, 2017

Page 209

1    A.  Not really.
2    Q.  It's in your Journal.  Do you have reason to believe
3        that he didn't coach you or are you just not
4        remembering it?
5    A.  I just can't remember it.  He put verbal on there.  I
6        don't remember it.
7    Q.  These were all verbal coachings, sir.  You didn't get
8        any paperwork for the verbal coaching for the tail to
9        tail either, but you remember that one, right?
10       Because you wrote about it in your letter to the
11       company and you said you were coached.
12   A.  Right.  That's because Mohammad told me to challenge
13       everything I remembered.
14   Q.  But you knew, even though you didn't get paperwork for
15       it, that that was coaching that you got from Stacy
16       Parris about the issue with the tail to tail, correct?
17   A.  I didn't know what they were doing.  You never knew
18       what they were doing.
19   Q.  You said in your letter "we received a coaching,"  you
20       said that back in 2014?
21   A.  The coaching didn't scare me.  The coaching didn't
22       scare me.
23   Q.  Well, maybe it should have.  Let's take a break now.
24   A.  You have to catch two or three or four of these before
25       you get to the next level.

Page 210

1    Q.  And this was your third one in 2013, as of this point,
2        was it not?  Since the time that you were put on a
3        Final Corrective Action Notice, in June of 2012, you
4        were coached --
5    A.  So, I should have been --
6    Q.  Sir, let me finish the question.  You were put on a
7        Final Corrective Action Notice from June of 2012.  You
8        were coached for attendance verbally in January of
9        2013.  You were coached for the seatbelt issue by
10       Mr. Walter verbally in March of 2013.  You were
11       coached again by Stacy Parris for job performance for
12       the tail to tail issue in May of 2013, and then again
13       for attendance in May of 2013 by Darryl.  Those are
14       four coachings while you were on a Final Corrective
15       Action, correct?
16   A.  And the next level should be the one, decision-making
17       leave.
18   Q.  Okay.  Which existed under the Collective Bargaining
19       Agreement back when you worked for Northwestern?
20   A.  Which system I was under.
21   Q.  Even though you had no bargaining agreement and no
22       union?
23   A.  Yeah, and that's the decision they made.  The managers
24       made that decision.
25           MS. GROSS:  You can have your break now.

Page 211

1            (Off the record at 2:29 p.m.)
2            (Back on the record at 2:37 p.m.)
3    BY MS. GROSS:
4    Q.  All right.  So just finishing up with the coaching you
5        got from Darryl.
6            Do you recall that you had some absences
7        which weren't accounted for and that's why you got
8        coached again in November?
9    A.  No.  I don't recall it.  I don't remember Darryl
10       talking to -- vaguely, vaguely, vaguely remember it.
11   Q.  You vaguely remember that the subject was attendance?
12   A.  Yeah.  I think I would remember it.  That's, you know,
13       I don't know what the subject was, but I remember
14       Darryl talking to me about something vaguely.  I don't
15       remember.  It was something like that in a ramp or
16       something.  I can barely remember it.  That's why I
17       think it's that younger guy who worked down in south
18       online.
19   Q.  And then, the next thing that happened was in
20       December, when you were observed, according to the
21       company, not wearing your seatbelt, correct?
22   A.  Yeah.
23   Q.  Why don't we do this?  Can you look one more time,
24       sir, at Exhibit Number 6, which was your appeal, your
25       handwritten appeal of your termination, your letter?

Page 212

1    A.  Yeah.
2    Q.  Looking at the bottom of page 2 of that letter, you
3        read the part earlier about the Family Medical Leave.
4        And through the part where it says dot the Is and
5        cross the Ts.  Continuing on in that paragraph, it
6        says, after hearing of disapproval, I was scared of
7        getting put on another level.
8            Why were you scared of getting put on
9        another level?
10   A.  Wait... I don't know.  Then I explained, I called
11       Janet.
12   Q.  Okay.  My question is, when you found out that your
13       FMLA paperwork never went through, why were you scared
14       of getting put on another level?
15   A.  Because they are level happy out there.
16   Q.  You were already on a Level 2 --
17   A.  They are level happy.  Huh?
18   Q.  You were already on a Level 2 --
19   A.  I thought I was on Level I, but anyway...
20   Q.  Well, look at the bottom, it says, I called attendance
21       manager, Janet Mann.  She said she would leave me on
22       the Level 2 I was currently on.
23   A.  Okay.  Yeah, she said she was going to leave me on a
24       level and renew it for another year.
25   Q.  Sir, looking at the bottom of page 2, does that

Jeffrey Nicholas
August 14, 2017

Page 213

1   refresh your recollection that you were on a Level 2?
2   A. Yes, I thought we were talking about Level 1 but it
3       must have been Level 2. She said she was going to do
4       a new whole year -- she said you only got
5       a month or so to go on this Level 2. I'm just going
6       to put you on a new one for another year. I said,
7       okay. And she said, I will see you Friday. I said,
8       okay.
9   Q. So she was going to put you on a new one for another
10      year, so this one would have gone from June '12 to
11      June '13?
12  A. Yeah, it would have been Level 2.
13  Q. Would it be fair to say, sir, that you were scared to
14      be put on another Level 2 because you knew that as you
15      go up levels, you get closer to termination?
16  A. I didn't want to catch -- I didn't want to catch a
17      level for the Family Leave fall-through. But that's
18      why I called Janet. And she said, I will just redo
19      you a new, a new -- and while I was out, Janet called
20      me, I think Janet called me on this, and she said that
21      Mohammad wanted to know how I was doing. Mohammad
22      Suri (ph) (ph). That's why she called me.
23  Q. As I understood your previous testimony, sir, there
24      really, I mean other than just, as I think you said,
25      having the blues or being depressed about losing your

Page 214

1       ALA --
2   A. I can't remember why I was out for that.
3           MR. BURG: Let her ask.
4   BY MS. GROSS:
5   Q. So, you don't remember having a serious medical
6       condition during that time?
7   A. No, I don't remember why I was out. I don't remember
8       what happened.
9   Q. Do you think the fact that you didn't have a serious
10      medical condition might be why your paperwork fell
11      through? Doctor wasn't able to --
12  A. No, I think I got it in late to the doctor and they
13      didn't send it in.
14  Q. Which doctor?
15  A. I don't know. It fell through and I caught a level.
16      I couldn't do nothing about it.
17  Q. Turning to the next page, you said, she said she
18      wouldn't -- she would leave me on the Level 2 that I
19      was currently on for attendance which ran until
20      August of 2012 because it wasn't my fault that it was
21      disapproved.
22  A. Okay.
23  Q. I would just serve my Level 2, and then when I
24      returned a couple days later the manager above her
25      wanted to see me. He put me on a last chance.

Page 215

1           And that was Domingo?
2   A. Yeah.
3   Q. And you didn't think this was fair because you didn't
4       think it was your fault that your FMLA never got
5       covered?
6   A. I don't know. Let me think...
7   Q. Okay. Well, looking at the documents.
8   A. I thought I was on Level 1.
9   Q. Well, would you agree with me, sir, that your memory
10      about whether you were on Level 1 or Level 2 was
11      probably better in 2014 than it is today?
12  A. No, because --
13  Q. You wrote this letter less than a month after you were
14      fired?
15  A. What are you trying to say, though? What are you
16      saying here? I didn't feel...
17  Q. Reading the rest of that page, it says "I didn't feel
18      this was fair. I would have been off my Level 2 in
19      three months, August 2012, for attendance. This is my
20      biggest argument, that I was on the wrong level since
21      June 1, 2012, which didn't stay to Level 2 until
22      August 2012.
23          Do you mean by that, sir, did you mean at
24      the time that you wrote this letter, that your biggest
25      argument of why your termination was wrongful was

Page 216

1       because you were on a Final Corrective Action Notice
2       and you thought you should have been on a lower level?
3   A. You lost me.
4   Q. Okay. Well, it says, I didn't feel this was fair. I
5       would have been off my Level 2 in three months.
6   A. I thought they were going to give me a new Level 2. I
7       thought it was Level 1, but I guess it was Level 2.
8   Q. That's not what this letter says. This letter says
9       your biggest argument is that you would have been off
10      level all together in August.
11  A. So I don't understand what you are saying.
12  Q. Well, I'm trying to understand what you were saying in
13      the letter.
14  A. I was confused on which level I was on, I think.
15  Q. Okay.
16  A. But she had told me on the phone, she was going to do
17      me a new Level 2. I thought she said Level 1 for
18      another year. She did say the word "year". That's
19      what confused me on the phone. I knew a Level 1 was
20      nine months. She said Level 1 and she said a year. I
21      heard her say the word "year".
22  Q. You wrote in this letter, within 30 days of your
23      termination, that you thought you were coming off of
24      your Level 2 in August of 2012.
25          Now you are telling me that Janet told you

54 (Pages 213 to 216)

Jeffrey Nicholas
August 14, 2017

Page 217

1    that she was going to extend you for a whole other
2    year on Level 2 it, or 1, whichever it might be?
3  A.  I might have wrote the letter wrong.  I might have
4    been confused.
5  Q.  That's why I'm asking you, do you think it's more
6    likely that you had it straight in 2014 after you got
7    fired than you do sitting here today?
8  A.  I don't know.  I was confused by what she told me --
9    she told me she was going to do me a new Level 1 and
10   Roberto called me in and put me on last chance.
11 Q.  But you wrote here that she was going to let you serve
12   out your Level 2?
13 A.  Right.  That's what she told me on the phone.  No, she
14   didn't say she was going to let me serve it out.  She
15   said, you only have a couple months left on your level
16   so I'm just going to give you the new level.  The new
17   level.  I thought I was on a Level 1 at the time.  I
18   guess I was Level 2.  She said she was going to give
19   me a new Level 2.
20 Q.  When you told the company?
21 A.  For a year, she said one year.
22 Q.  When you told the company in January of 2014, after
23   your employment had been terminated, this is my
24   biggest argument, that I was on the wrong level, did
25   you mean --

Page 218

1  A.  I meant, oh, I meant because Roberto put me on Level 3
2    and I should have been on Level 2.  I thought I was
3    on -- now you are confusing me.
4  Q.  Okay.  Forget whether it was Level 1 or Level 2.  Your
5    statement that, my biggest argument is that I was on
6    the wrong level, that means that you believe the Final
7    Corrective Action Notice was the wrong level, right?
8    It was too high?
9  A.  Right.  I --
10 Q.  Right.  And the reason why that's your biggest
11   argument, that your termination is wrongful, is
12   because, if you had only been on a Level 1 or a
13   Level 2 when you got dinged for the seatbelt issue,
14   you might not have been fired, correct?
15 A.  No, I -- I didn't want to climb no more levels.  I
16   knew there was another level, but I didn't want to
17   keep climbing levels.
18 Q.  Is it your belief that if you had been on a lower
19   level when the seatbelt incident happened, that you
20   might have just gotten disciplined for the seatbelt
21   incident and not fired?
22 A.  Yeah.
23 Q.  Yeah.  And that's why you said your biggest argument
24   is that you were on the wrong level, right?
25 A.  My biggest argument is because Roberto, they told me

Page 219

1    they were going to put me on a Level 2.
2  Q.  Right.
3  A.  And they put me on a Level 3.
4  Q.  Right.  Which put you that much closer to termination
5    when the seatbelt thing came around, right?
6  A.  No, because you got to fight the levels every time you
7    get them.  You got to keep fighting them.  So I fought
8    them as much as I could.
9  Q.  But when you said this was your biggest argument, you
10   meant that, had you been on a Level 2, you would have
11   gotten a discipline for that seatbelt and not a
12   termination?
13 A.  You are losing me again.  I am getting lost here.
14 Q.  Well, you tell me, sir.  What did you mean when you
15   said, my biggest argument is that I was on the wrong
16   level?
17 A.  Because I thought she had me on level --
18 Q.  What does that have to do with your termination a year
19   later for seatbelts?
20 A.  I don't know.  Maybe I was confused writing the
21   letter.  I don't know.
22 Q.  So you don't even know if that's your biggest argument
23   anymore?
24 A.  I didn't agree with the level.  I didn't agree with
25   the level he put me on, the last chance, the Level 3.

Page 220

1  Q.  But you didn't make an issue of it at the time,
2    correct?
3  A.  Yeah, I did, but he wouldn't listen.
4  Q.  But you didn't complain to anybody about age
5    discrimination, did you?
6  A.  I don't know.  I don't know.
7  Q.  Well, you told me earlier that it wasn't until after
8    your employment that you raised age discrimination,
9    you never raised it --
10 A.  No, I felt they got rid of me because of age.
11 Q.  But you never complained internally --
12 A.  No.
13 Q.  -- to anybody in management --
14 A.  Yeah.
15 Q.  -- at Delta about age discrimination while you still
16   worked there, did you?
17 A.  No, I didn't.
18        MARKED FOR IDENTIFICATION:
19        DEPOSITION EXHIBIT 25
20        Complaint for Jury Demand
21        2:49 p.m.
22 BY MS. GROSS:
23 Q.  Okay.  Take a look at 25, if you will.  It's a copy of
24   the Complaint that you filed in this case, or that
25   your lawyer filed on your behalf.

55 (Pages 217 to 220)

Jeffrey Nicholas
August 14, 2017

Page 221

1          Have you read this before, sir?
2   A.   Yeah.
3   Q.   Okay.  I direct your attention to paragraph number 8.
4   A.   Yeah.
5   Q.   Paragraph number 8 says, at all times pertinent to
6        this Complaint, you performed your job duties
7        competently and conducted yourself properly according
8        to defendants' employment policies.
9             See that?
10  A.   Yeah.
11  Q.   Do you believe that your attendance record and your
12       performance record at Delta was completely consistent
13       with Delta's employment policies?
14  A.   Yeah.
15  Q.   Even though you had Level 1s, level 2s and the final
16       Corrective Action Notice?
17  A.   You are always going to get a level if you take time
18       off.
19  Q.   You also had performance levels, did you not?
20  A.   Yeah, it's a fast-paced work environment out there.
21       You can't help but catch levels out there.  I was on
22       the front lines.  And everybody bids to get inside to
23       get away from getting ramp, to get away from getting
24       levels, when they get time and they get seniority out
25       there.

Page 222

1   Q.   And you got pulled out of the ALA job because of your
2        performance, correct?
3   A.   Yeah, that's what they said.  It had to do with
4        bumping the airplane.  They wanted me off because they
5        thought -- Rogermike said he thought I needed some
6        time off.  He thought I was being careless.  I don't
7        know what he thought.  I never had no incidents four
8        years being a lead but they just wanted me to step out
9        for a while.
10  Q.   Okay.  Well, you did get levels in those four years as
11       an ALA, did you not?
12  A.   You are going to catch levels out there on the ramp.
13  Q.   And those are incidents, aren't they?
14  A.   Yes.
15  Q.   Paragraph 9 says, in the course of plaintiff's
16       employment with defendants, plaintiff was subjected to
17       disparate treatment when compared to the treatment of
18       other similarly-situated but substantially younger
19       employees of defendant company including but not
20       limited to being treated differently in relation to
21       the issuance of discipline.
22            What substantially younger employees of
23       Delta do you know that got different discipline than
24       you did for doing the same things that you did?
25  A.   I thought Al, I thought Al was younger than me.  And

Page 223

1        he got a seatbelt.  And nothing happened to him.
2   Q.   And that's who you had in mind?
3   A.   That was one of the people.  I can't think right now
4        of another.  I never heard of anybody getting in
5        trouble for a seatbelt the whole time I was out there.
6   Q.   So it's the seatbelt discipline that you had in mind
7        with respect to paragraph number 9?
8   A.   The new-hires.  They treated the new-hires better than
9        they do me.  They give them preferential job treatment
10       in good work areas.  We bid out there by your
11       seniority.  You bid your work area by seniority.  And
12       they give them the best area in the airport.
13  Q.   How does somebody with lower seniority get a better
14       bid?
15  A.   They -- she took it and cut it in half and said they
16       get the bid in there only.  That's their spot.  So
17       people with 15 years seniority were in there for a
18       while, 12 to 15 year range.  Now they can't even hold
19       it.  They have to have like 20 years to bid in there
20       now.
21  Q.   Okay.  You didn't have 15 years seniority, did you?
22  A.   I had -- I had eight years and I could hold it when I
23       was in there, but when she started putting those
24       new-hires in, I couldn't hold it no more.
25  Q.   Who is "she"?

Page 224

1   A.   The lady that does the bid.  Let me think for a
2        second.  Vicky Orlib (ph).
3   Q.   And what area are you talking about when you say she
4        put them in there?
5   A.   Online, south online, north online.  She puts them all
6        in there now.
7   Q.   What is online?
8   A.   That's running the bags, like you said, going to get
9        the bags off the plane, running them from tail to
10       tail, running to the bag room or...
11  Q.   What were you doing in 2013 --
12  A.   I was in online, in south online.  Remember I told you
13       I thought Darryl was the supervisor.
14  Q.   So you didn't get pushed out of online by some younger
15       person, correct?
16  A.   Yeah, I did.  When the bid came, I couldn't bid it no
17       more.  When the fall bid came, I couldn't bid it
18       because she had so many new-hires coming in there.
19  Q.   You were working online when you got terminated, I
20       thought you said?
21  A.   No, I was -- we just switched over to the new bid, and
22       I got bumped out of there.  I was a couple days on the
23       ramp.
24            When the incident happened, that was my
25       last day.  Remember the 6th, they accused me of not

56 (Pages 221 to 224)

Jeffrey Nicholas
August 14, 2017

Page 225

1  wearing the seatbelt? That was my last day in online.
2  Then the next day I came to work, Saturday -- that was
3  on a Friday -- I came to work on Saturday and now I am
4  on the ramp. I was on the ramp that whole week
5  because I couldn't hold online anymore.
6  Q. Why were you on the ramp?
7  A. You get in the bin. There's guys out there with 50
8  years in the bin and they used to hold online. And
9  there's new-hires sitting over there. I mean, they
10  are out there in the bin now.
11  Q. Give me names.
12  A. Get the seniority list. People that 15, you have to
13  have 20 years now to get into online as a full-timer.
14  Q. But you didn't have 20 years then, did you?
15  A. But I could hold it. Okay. There's people with 10
16  years that are on the ramp now. I could hold it. And
17  then, all of a sudden, boom, she switched it all up
18  and put the new-hires in there.
19  Q. I'm confused, sir. You told me on one hand the
20  new-hires were in online, and then you told me on the
21  other hand, you had to have 20 years to hold online;
22  which is it?
23  A. No, there's some spots in there for some senior, real
24  senior full-time employees. She gave them half, all
25  the new-hires are in online.

Page 226

1  Q. The new-hires are part-time people?
2  A. They are regular reserve, yeah.
3  Q. We are talking about regular reserve people?
4  A. They get preferential treatment. They don't have to
5  work the ramp.
6  Q. They don't get paid as much as you do?
7  A. Yeah, but I worked, I got six dollars an hour when I
8  got hired and I was on the ramp. It goes by
9  seniority.
10  Q. You were part time, when you got hired, too?
11  A. I was on the ramp.
12  Q. As are they.
13  A. And they don't work on the ramp. And they pumped all
14  the senior workers out onto the ramp.
15  Q. The regular reserve people don't have regular
16  assignments do they?
17  A. Yeah, they do. They have work areas. They bid, too.
18  They got to bid, too. You know, by their own
19  seniority.
20  And so you had people that were in online
21  for a few years, maybe they got 12, 13, 14, 15 years.
22  Now they are getting bumped back to the ramp and one
23  guy told me that some people ended up quitting. Some
24  of the women just couldn't handle it back on the ramp
25  again.

Page 227

1  Q. But your last day when you got observed not wearing
2  your seatbelt, you were in online?
3  A. That was a week before my last day. I was on Friday
4  the 6th, Friday, December of 6th, was my last day
5  running online. And the new bid was starting
6  Saturday, the next day, which we had bid on a couple
7  weeks prior. We bid where we were going to go, right?
8  Q. And you had off a couple days --
9  A. No, I think I was working that day. I get the bad
10  days off, like Wednesday, Thursday, something like
11  that. I think I was off Wednesday, Thursday, and I
12  came back on Friday and then Stacy approached me then.
13  Q. So it wasn't --
14  A. So I worked about five days on the ramp. I worked the
15  whole week on the ramp, Saturday, Sunday, Monday,
16  Tuesday --
17  MR. BURG: Let her pose the question.
18  A. -- about four days. And the new bid.
19  BY MS. GROSS:
20  Q. And it wasn't on the ramp that you got spotted not
21  wearing your seatbelt, was it?
22  A. He claimed, yeah, that's where he made the accusation.
23  I was driving down the ramp on the zipper road,
24  running the bags for online.
25  Q. Yeah. So you were working online when he saw you not

Page 228

1  wearing your seatbelt, correct?
2  A. He accused me of not wearing my seatbelt.
3  Q. Okay. But when he says he saw you not wearing your
4  seatbelt, you were still working online?
5  A. Yeah.
6  Q. Okay. Your complaint says that younger people got
7  better treatment in terms of discipline and
8  termination.
9  Do you know of any younger people that had
10  the same kind of track record that you did and didn't
11  get disciplined or terminated other than Al who, as it
12  turns out, is not younger than you?
13  A. Yeah, I couldn't believe that. I just think they give
14  preferential treatment to the new-hires, all the
15  new-hires.
16  Q. That doesn't have anything to do with discipline and
17  termination, does it?
18  A. Yeah, maybe. I don't know if that, that holds true on
19  that paragraph. But the next paragraph says there,
20  about my age, see? Number 10.
21  Q. Okay. But --
22  A. And so they are giving preferential treatment to the
23  younger employees.
24  Q. It didn't change how much money you earned, did it?
25  A. No. I earned the same amount of money.

57 (Pages 225 to 228)

Jeffrey Nicholas
August 14, 2017

Page 229

1   Q.  Okay.  When is the last time they hired people in
2       2013, do you know?
3   A.  No, they were bringing them in whenever they needed a
4       class.  So they would bring a whole class in, 20
5       employees maybe at the time.
6   Q.  So, they hired them in waves didn't they?
7   A.  Yeah, they hired them in waves.
8   Q.  Because they have to go through training?
9   A.  Yeah, they wouldn't bring just one or two.  They
10      would bring in a whole class.  I think they had to
11      call Atlanta to get approval.
12  Q.  So if somebody quits or gets fired, they don't just
13      immediately go out and hire another person, they
14      wait --
15  A.  I don't know.  I can't speak for it a hundred percent
16      on that.
17  Q.  Well, you just did a minute ago.
18  A.  That's the way I believe it.  They bring a class in.
19  Q.  So, the best of your belief, in the time that you were
20      there, the hiring pattern that you saw was,
21      periodically, they bring in a whole class of people?
22  A.  Yeah, yeah.  You will see a few months go by and then,
23      boom, here comes another class.
24  Q.  And how many people in a new class of rehires roughly?
25  A.  Probably like 25 when I got hired.

Page 230

1   Q.  How about in the last year or so, did you even know
2       how many new-hires were coming in?
3   A.  I wasn't paying attention how many there were.  I just
4       heard rumbling on the ramp that we had new classes
5       coming in.  And you just hear about it.
6   Q.  So, the paragraph 14, where it says, after discharging
7       plaintiff, defendants replaced plaintiff upon
8       information and belief with a substantially younger
9       person.
10          Is your belief that you were replaced by a
11      younger person just because you know they brought in
12      new-hires from these classes and that those people
13      tended to be younger?
14  A.  Yeah.  There you go right there.  Yeah.
15  Q.  You don't know anybody specific who got hired to
16      replace you?
17  A.  No, I don't know their names.
18  Q.  And you don't know when the next wave of hiring was
19      after you left?
20  A.  It wasn't too long.  They always --
21  Q.  Sir, I'm not asking you to speculate.  Do you know --
22  A.  I'm not speculating.  They always hired every couple
23      of months, they'd bring another class in.  Sometimes
24      they'd bring a bunch of classes in.  They'd hire 50 or
25      100 people.  And there was a couple different classes,

Page 231

1       I think they brought two classes at once.
2   Q.  How many times in 2013, your last year of employment,
3       do you think they brought in hiring classes of 15 --
4   A.  I don't know.  We'd have to get the seniority list.  I
5       would have to get the seniority list to say that.  It
6       will show who they hired.
7   Q.  You think in the year 2013, the last year you were
8       there, they brought in multiple classes of 50 people?
9   A.  I don't know how many they brought in.  It could have
10      happened in '12, too.
11  Q.  In the year 2014, after you left, they would have
12      brought in the same as they did in '12 and '13?
13  A.  You don't know.  I don't know what their staffing
14      requirement is.  It goes by when they need, when
15      people get fired and when people retire.  And they got
16      to call Atlanta to get approval to maintain a certain
17      level on the ramp.
18  Q.  And if that level drops, they wait until --
19  A.  I mean, that's the way I understand it.  I don't run
20      that office, you understand?  I just know they try to
21      stay at a certain level.
22  Q.  So your basis for believing that somebody younger
23      replaced you is just based on what you've seen over
24      the years while you were there?
25  A.  Yeah.

Page 232

1           MARKED FOR IDENTIFICATION:
2           DEPOSITION EXHIBIT 26
3           Plaintiff's Response to Defendant's
4           First Interrogatories to Plaintiff
5           3:01 p.m.
6   BY MS. GROSS:
7   Q.  Okay.  If you would take a look at Exhibit 26, please.
8       These are your responses to the Interrogatories that
9       we sent you.  These are unsigned but I understand from
10      Mr. Burg that you are prepared to sign them today if I
11      can bring in a notary?
12  A.  Yeah, okay.
13  Q.  You are familiar with these.  You have provided
14      information to help answer these?
15  A.  Yeah.
16  Q.  Looking at the response to question number 2, at the
17      top of page 3, list all of the people that you think
18      might have information about your case.  I just want
19      to check a couple of names, Ray Painter is the former
20      committeeman you told me about, correct?
21  A.  Yeah.
22  Q.  And you had one conversation with him sometime in the
23      year after you, or sometime when you called out there
24      to try to find a friend of yours and he's the one that
25      told you that it was the, he might not have said

Jeffrey Nicholas
August 14, 2017

Page 233

1  "poster child" but he gave you information that led
2  you to believe that you were the poster child for
3  seatbelts?
4  A.  Yeah.
5  Q.  Top of page 4, John Fairclough.  Is there anything in
6  particular that you think John Fairclough knows about
7  your situation?
8  A.  What's the question on that one?
9  Q.  Is there anything that you know that John Fairclough
10  can say about your circumstances or is his name just
11  there because he was one of the management people at
12  Delta, if you know?
13  A.  I'm not sure on that one.
14  Q.  Okay.  Is there anybody that you are aware of that you
15  intend to call as a witness that you think can
16  substantiate that you were discriminated against based
17  upon your age?
18  A.  Maybe Painter.
19  Q.  How is Painter going to be able to say whether or not
20  your age was a factor?
21  A.  More knowledgeable out there than me about the
22  goings-on out there.
23  Q.  Did you ever talk to Painter about the disciplines
24  that you got once you were working on, for Delta after
25  the union went away?

Page 234

1  A.  No, I don't know.  But he was involved in the ones
2  from -- he was the union steward.
3  Q.  Right, but once the union went away, there wasn't
4  really a role for him to play was there?
5  A.  Yeah, he still did, but I don't think he dealt with me
6  a lot on that.  I don't know.
7  Q.  If you would look at your answer to question number 7,
8  which is on page 6.
9  A.  All right.
10  Q.  Okay.  This was a question, I asked you if you had
11  spoken to anybody about your claims and you said you
12  had spoken to Al Martin in the summer of 2016,
13  correct?
14  A.  Wait a minute.  What do you mean "claim"?  I didn't
15  tell him I was suing anybody.  He asked me why I was
16  let go and I told him --
17  Q.  Yeah, that's fine.  The question was pretty broad.
18  Anything related to your claims.
19  You spoke to him in the summer of 2016?
20  A.  I can't say exactly when it was.  Maybe a year ago.
21  Q.  That would be about a year ago.
22  A.  All right.
23  Q.  And he asked you what happened and you told him about
24  the seatbelt and he said he got one of those, too, and
25  he was coached?

Page 235

1  A.  I said I was accused of not wearing a seatbelt and I
2  said I don't really know why they fired me.  And he
3  said, I got one of those, yeah.  A seatbelt ticket.
4  That's what he called it.  They didn't call it that
5  when I worked there.
6  Q.  Delta's records indicate that Al Martin is 57 years
7  old.
8  A.  Right.
9  Q.  And if Al Martin is 57 and Delta has a problem with
10  people's ages, why do you think he didn't get fired
11  and you did?
12  A.  He's probably got less write-ups than me on there.  He
13  was not on the level that I was on.
14  Q.  Okay.  As I understand it, Mr. Nicholas, at least of
15  the stuff that you have been able to find, you've
16  produced all of the documentation that you think is
17  relevant to your case; you are still looking for those
18  awards you got?
19  A.  Yeah, I'm looking for stuff.
20  Q.  Anything else you are looking for besides the awards?
21  A.  I don't know.  I don't know what all.
22  Q.  Do you remember what your last day --
23  A.  We had a -- they sent a thing in the mail, it was a
24  few years they were merging.  It was like four years.
25  And they sent us a graph of it showing all the stuff

Page 236

1  they are going to do along the way, merge the
2  different departments.
3  Q.  Is that just informational?
4  A.  Just showing how we didn't merge in one single day or
5  month.  It happened gradually over time.
6  Q.  Do you remember what your last rate of pay was at
7  Delta?
8  A.  As a lead, I made it up to, I was like 22 or 23 an
9  hour.
10  Q.  You were not a lead from 2012 on?
11  A.  Yeah, I stepped out.  So I was down to like 20 an
12  hour.
13  Q.  According to your last paychecks in December -- well,
14  actually, that's not right.
15  A.  I had it.
16  THE WITNESS:  Didn't you just have it?  How
17  old is that one?
18  A.  I got one -- I got one somewhere here.  I lost 1.50 an
19  hour.
20  BY MS. GROSS:
21  Q.  I'm showing 19-and-some-change, is that right?
22  A.  That sound close.  It was in here.  It might be over
23  there.  I don't know if it covers -- you want to know
24  all the way at the end there?
25  Q.  I just want to know what your hourly rate was, if you

59  (Pages 233 to 236)

Jeffrey Nicholas
August 14, 2017

Page 237

1    remember.  If you don't remember that's fine, I can
2    get it from the company.
3    A.  Here.  That's '12.  There you go.  Is that good?
4    Q.  Okay.
5    A.  That's 19.94 an hour, which is what I am showing, too.
6    Q.  Okay.
7    A.  Do you need a copy of that?
8    Q.  No, that's fine.  Thank you, though.
9              MARKED FOR IDENTIFICATION:
10             DEPOSITION EXHIBIT 27
11             W-2s
12             3:08 p.m.
13   BY MS. GROSS:
14   Q.  Now, as I understand it, Mr. Nicholas, according to
15   the Request for Production of Documents, you don't
16   have tax returns for --
17   A.  Yeah, I can't find it.  I gave her one of the W-2s
18   that I found.
19   Q.  Did you file tax returns in 2011, '12 and '13?
20   A.  Yeah, I think I did, but I can't remember.
21   Q.  Did you file them yourself?
22   A.  Yes.
23   Q.  Have you ever used a tax preparer?
24   A.  No.
25   Q.  Do you file it online or on paper?

Page 238

1    A.  I would do it -- I used to do it the old way.  But I
2    would do it the new way now, probably online.  I don't
3    remember if I filed those years.
4    Q.  Do you remember when the last time was that you filed
5    a tax return?
6    A.  I don't know if I filed or not.  I can't say if I did
7    or not.  I ran out of money.  So if I figured out that
8    I owed money from '13, I wasn't going to file right
9    away anyway, until I got a letter from the IRS.
10   Q.  What about '12 or '11, you were working then; did you
11   file that?
12   A.  I probably did if I was working.  If I could pay the
13   bills -- sometimes I was getting a check, sometimes I
14   wasn't.
15   Q.  Let's talk about that.  Take a look at Exhibit 27, if
16   you will.
17   A.  Is this the one I gave you guys?
18   Q.  No, these actually came from Delta.
19   A.  All right.
20   Q.  Okay.  According to the first page of Exhibit 27, this
21   is your W-2 for the year 2011.  According to this,
22   your total earnings from Delta that year, wages, tips,
23   were $27,629.69.
24            Do you see that?
25   A.  Yeah.

Page 239

1    Q.  Box 1?
2    A.  Yeah.
3    Q.  Okay.
4    Q.  Where are we at?  All the way at the top?
5    Q.  Yeah.  Wages tips, box 1.
6    A.  Yeah.
7    Q.  Next page, 2012, W-2, same box, wages tips, number 1,
8    your earnings in 2012 were $33,830.51.
9    A.  All right.
10   Q.  Does that sound about right to you?
11   A.  Yeah.
12   Q.  2013 --
13   A.  Yeah, I missed those months of family leave there,
14   see?
15   Q.  You missed some time in 2011, too, didn't you, sir?
16   A.  Yeah, I was still climbing the pay scale there.  I
17   don't know where I was at.  I might have only been
18   making like at that time 15 an hour because I was --
19   Q.  As an ALA, you were only making 15 an hour?
20   A.  Yeah.  It's a long story.  I was on the -- in the
21   Northwest way, it was a five-year topout.  Delta was a
22   10-year topout.  And I was -- I was grandfathered in
23   to the five-year topout.  But I got up to like, in
24   Northwest, topout was 20.20 an hour.  And then they
25   went into bankruptcy '08/'09 period right there.  And

Page 240

1    then they dropped it, the pay went down to 16 an hour,
2    the topout pay was.  They had to give back some money
3    to help out with the bankruptcy.  But anyway, I wasn't
4    up that high then.  That's why you are seeing 27
5    there.
6    Q.  Well, you are back down to 22 in 2013; is that from
7    the FMLA leave, do you think?
8    A.  Yeah, that's what hurt there.  Because I was up to, I
9    was at 24 an hour.
10   Q.  1994, almost 20 an hour, okay.
11            And you still only had two weeks vacation?
12   A.  Yeah, I can't say a hundred percent on that.  I think
13   the topout -- once you got ten years, I think you got
14   four weeks.  I think I only got two weeks.  I might
15   have got three, but I think it was just two.  It
16   seemed like, once you got to ten years, you were
17   topped out on that.
18   Q.  So, you were making almost 20 dollars an hours.  If
19   you worked a full schedule, you were working 80 hours
20   every two weeks and you only got --
21   A.  Yeah, I was in the 40 grand range for the year.  You
22   know what I'm saying?  Just pay.  Just pay.
23   Q.  If you actually worked all the days you were supposed
24   to work, I agree with you, you should have made 40
25   grand a year.

Jeffrey Nicholas
August 14, 2017

Page 241

1   A.  Yeah.
2   Q.  But you never made close to 40 grand, did you, because
3       of all the days you missed?
4   A.  That doesn't mean that I was going to be missing any
5       time in '14.  It doesn't mean in the future, that I
6       would be missing time.
7   Q.  So your attendance was going to get better than it had
8       been --
9   A.  Yeah.  You can't say how much time I was going to miss
10      the next year.
11  Q.  Okay.  But I can say, in eight years, you hadn't
12      worked a full year without having an attendance
13      problem, can I?
14  A.  A few weeks here and there, you know.
15  Q.  Every single year --
16  A.  I work in all kinds of weather.  I get the flu a lot
17      when I'm out on the ramp.  You catch colds and you
18      have to be off a little bit.
19                  MARKED FOR IDENTIFICATION:
20                  DEPOSITION EXHIBIT 28
21                  Fidelity Investments
22                  3:13 p.m.
23  BY MS. GROSS:
24  Q.  Take a look at Exhibit 28, if you would.  You provided
25      this document in your document production.  I just

Page 242

1       wanted to ask you what it was, if you know.  It looks
2       like it has something to do with the 401(k) maybe or
3       Family Care Plan, I'm not sure.
4   A.  Yeah, it must have been something with Fidelity.  I
5       don't know why I provided this.  Let's see.  Maybe
6       somebody put it in by accident.
7   Q.  It came with your production and I'm just curious as
8       to what it was.
9   A.  Fidelity.  It says "distribution".
10  Q.  Yes.
11  A.  Maybe they were giving me money out of my 401(k).
12  Q.  It says Family Care Savings Plan, did you have that --
13  A.  Yeah, I was on the 401(k).  And Delta matches it, you
14      know, they have a match thing and they have a thing
15      where they give a couple more.  They give like eight
16      percent.
17  Q.  Okay.  Where is the last place that you looked for a
18      job?
19  A.  Right now?
20  Q.  Yes.
21  A.  Oh, I did -- there's some more I want to add there.
22      Where are you at?  Which page are you on?
23  Q.  I'm just asking a question.
24  A.  I kept doing the airlines.  I did some more airlines
25      than what are listed there.  Are there airlines down

Page 243

1       there?
2   Q.  Well your Answers to Interrogatories, I think,
3       identified one airline, I think, if I'm not mistaken.
4   A.  No, I had a bunch of airlines.  I had more to add.
5   Q.  Okay.  So it's question number 10, page 8 that you are
6       looking at the answer to.  The question was to detail
7       your efforts to obtain --
8   A.  I want to add some more on there.
9   Q.  Let's start with what's there.  You registered with
10      MichiganWorks!  That's something you have to do with
11      unemployment compensation, correct?
12  A.  Yes.
13  Q.  That was what we talked about earlier, you have to
14      keep calling in and saying you were ready and
15      available for work?
16  A.  Yeah.  But you get a list of jobs to work, too.
17  Q.  Did you get any --
18  A.  No.
19  Q.  -- off that list?
20  A.  No.
21  Q.  You applied to Yellow Freight?
22  A.  Yes.
23  Q.  Wasn't that the place that you told me you used to
24      work at?
25  A.  No, they did the name wrong.  It was supposed to be

Page 244

1       Overnight.  It was called Overnight.  It was over on,
2       it was in Romulus on, I think it's on Beech Daley.  I
3       can't remember the road.
4   Q.  So the place --
5   A.  I might have said it wrong to her.
6   Q.  So Yellow Freight is the place that you worked at long
7       ago?
8   A.  Yeah, long ago.
9   Q.  The place you applied to was?
10  A.  It was called Overnight or something like that.  It
11      was over in Romulus.
12  Q.  How did you apply?  Did you go there?
13  A.  I can't remember.  Yeah, I think I went there.
14  Q.  Did you fill out an application?
15  A.  Yeah.  It was a couple years ago.
16  Q.  When?
17  A.  So since I've been off.  Maybe the first two years.
18  Q.  2014?
19  A.  '14 or '15 maybe.
20  Q.  Did -- is Yellow Freight still in existence?
21  A.  I don't know.  They changed names.  I think the
22      building's still there, they changed names and got
23      bought out.
24  Q.  Have you checked out whether there is any work for
25      you?

61  (Pages 241 to 244)

Jeffrey Nicholas
August 14, 2017

Page 245

1   A.   I haven't been by there.
2   Q.   Did you apply to United?
3   A.   Yeah, United, Sprint.  I did a lot of these on the
4        Internet.
5   Q.   You applied to United on the Internet for a job like
6        you had at Delta?
7   A.   Yeah.  And American Airlines.  And I had a couple
8        more.
9   Q.   Do you have documentation to show that you did this?
10  A.   No, I just went on their Web site and applied.
11  Q.   You didn't print off any confirmation?
12  A.   No.
13  Q.   Usually, when you apply on the Internet, you receive
14       an e-mail back saying that they received your
15       application.  Do you have those e-mails?
16  A.   I didn't pay attention to that, yeah.
17  Q.   Do you have an e-mail address?
18  A.   I didn't know that they were going to respond back,
19       no.  I changed my, my e-mail.  I don't know what I
20       would list for that.
21  Q.   It's pretty hard to apply online without an e-mail
22       address.  Do you have one or not?
23  A.   I got a new one but I don't think it was the same -- I
24       didn't have one back then.
25  Q.   Back then being 2014 or '15?

Page 246

1   A.   I probably made one up just to get in there to do it.
2        Now I got one called 5pointsgang.
3   Q.   What's your current e-mail address?
4   A.   5pointsgang, five, number 5, points,
5        P-O-I-N-T-S-G-A-N-G at gmail.com.
6   Q.   When did you get that e-mail address?
7   A.   Maybe a year, maybe a year.  I haven't had that too
8        long.
9   Q.   And before that, you would have made something up when
10       you were applying?
11  A.   Yeah, because I didn't really understand e-mail that
12       much.
13  Q.   So, if they got back to you, you would have never
14       gotten a response anyway?
15  A.   You leave your phone number on there, and your address
16       is in there.
17  Q.   Any place else that you applied in paper or besides
18       this Romulus Overnight company?
19  A.   No.  But on the airlines, though, I did Frontier and
20       American and, I can't think of any -- it's already on
21       here.
22  Q.   United?
23  A.   Didn't I list that?  That's already on here.
24  Q.   Yeah.
25  A.   Frontier, American, I tried to go -- I went on the Web

Page 247

1        site to look for the different ones that were at the
2        North Terminal.
3   Q.   When is the last time that you applied to any airline
4        at the Detroit airport?
5   A.   Maybe a year-and-a-half, two years.  I did them mostly
6        back when I got fired, you know, I did a year or two
7        there.
8   Q.   Right away?
9   A.   In the first -- '14 or '15.
10  Q.   And that would have been when you didn't have an
11       e-mail address?
12  A.   Yeah, I think I made it up.  I didn't know they were
13       going to contact me by e-mail.  I thought they were
14       going to call me or write a letter.  I don't know.
15       Maybe I did it wrong.  I don't know.
16  Q.   Do you, when you applied online, did you have to
17       answer a series of questions, your name, address, that
18       sort of thing?
19  A.   Your name, address, yeah.
20  Q.   Did you have to say where your last employment was?
21  A.   Some of them are different.  Some of them are
22       different.  Some of them don't ask a lot of questions.
23       Some do.
24  Q.   Have you, in any application that you have made for
25       employment, since you were terminated from Delta, been

Page 248

1        asked the reason why you are no longer employed by
2        Delta?
3   A.   I didn't put that on there, that I got fired.  I
4        didn't say that I got fired.
5   Q.   What did you say?
6   A.   I just didn't say nothing.
7   Q.   You didn't answer the question at all?
8   A.   Yeah, I just left it blank, figured I would tell them
9        about it later.
10  Q.   And you were able to successfully apply online even
11       though you left the question blank?
12  A.   I might have made something up.  I might have said I
13       moved on to a different job or something.  I didn't
14       want to put on there that I got fired because I
15       figured they wouldn't call.
16           And when I was applying for these jobs in
17       '14, '15, I didn't know I was going to be suing.  I
18       didn't know I had to keep a log of everything I did.
19       I didn't know this lawsuit was going to come up a
20       couple of years later.  So I didn't have a log on
21       everything I did.
22  Q.   That may be true of '14/'15, but you filed this
23       lawsuit, I mean, you said earlier in your deposition
24       that you talked to your attorney about a year ago.
25  A.   No, I -- yeah.  So what was last year, '16?

Jeffrey Nicholas
August 14, 2017

Page 249

1    Q.  Yeah.  So what did you apply to in '16?  And do you
2        have any proof of that?
3    A.  I can't think right now.
4    Q.  So we've got the Romulus Overnight freight company,
5        we've got United, American, Frontier, and Sprint.
6        What kind of job did you apply to at Sprint?
7    A.  Oh, that's supposed to say Spirit Airlines.  They
8        might have printed that wrong.
9    Q.  Okay.
10   A.  Those were all ramp jobs.
11   Q.  So those were all ramp jobs.
12              Have you applied anywhere else beside those
13       airlines and the freight company in Romulus?
14   A.  I never kept track.  Mostly, I did the applying in the
15       first couple years, you know what I mean?  I kind of
16       slowed down now.  I didn't keep track because I didn't
17       know I was going to sue.
18   Q.  Has it pretty much stopped now?
19   A.  No, I didn't have to keep a log, a running log.
20   Q.  That's fine, sir.  But when is the last time you got
21       online and applied for a job?  If you did it in the
22       last month or two, I think you would remember sitting
23       here, no?
24   A.  I haven't applied in a couple months.  But anyway,
25       I've been focusing on this.  I'm dealing with this

Page 250

1        right now.
2    Q.  "This" being the lawsuit?
3    A.  Yeah, focusing on this and what happens here.
4    Q.  So until you figure out what happens here, you are not
5        going to be applying for jobs online anymore?
6    A.  No, I didn't say that.
7    Q.  But you haven't done so in at least a couple months?
8    A.  Yeah.
9    Q.  The e-mail address that you gave me, is there some
10       significance to 5pointsgang?
11   A.  Yeah, there was a gang, it's an area of New York City
12       and it was called Five Points.  And I just called
13       myself 5pointsgang.  It's just a funny name I made up.
14       It was a gang back in the early 19 -- it was 150 years
15       ago, mid 1800s, there was a big gang over there called
16       Five Points.
17   Q.  Do you remember applying any place besides the freight
18       place and the four or five airlines that you
19       mentioned?
20   A.  No.  But I hit most of the airlines, I know that.
21   Q.  Have you considered any kind of job other than
22       airlines?
23   A.  I thought about going back to moving, the van lines.
24   Q.  But you haven't applied to anything other than that
25       one company in Romulus?

Page 251

1    A.  That's hard work.  I don't know if I can do that.
2        It's even worse than working at the airport.
3    Q.  Physical work, you mean?
4    A.  That's hard work, yeah, running up and down the
5        stairs, carrying boxes.
6    Q.  Not something you are interested in doing at this
7        stage in life?
8    A.  I mean, I might look into it, but I have to see how
9        things go.
10   Q.  Turn to page 9, if you would.
11              Pennview Medical is Dr. Raval, your regular
12       family doctor?
13   A.  Yeah.
14   Q.  Jerome Switch is a cataract --
15   A.  Yeah, I had a cataract surgery at Jerome Switch's
16       office.  Not there.  He had to do it in the hospital.
17   Q.  In 2011 and again in 2016?
18   A.  Yeah, they did one eye there and one eye over there.
19   Q.  When you had it in 2011, did you get FML coverage for
20       that, or was it not that long?
21   A.  It wasn't that long.  You are only out, I think we did
22       it over my weekend.  I can't remember how that went.
23   Q.  How did you pay for the other eye in 2016?
24   A.  I told you, I got on Medicaid.
25   Q.  And Dr. Grakin is your dermatologist?

Page 252

1    A.  No, that guy is a crook.  I was there one time and he
2        told me I had the skin cancer.  And I never went back
3        after that.  But he, they referred me out to U of M.
4        My sister is an RN.  She went in with me and said she
5        wanted a referral to U of M.
6    Q.  You have only seen are Dr. Grakin once?
7    A.  Yeah, and he slapped me with a $200 bill just for
8        coming in the door.
9    Q.  Any other doctors that you've seen besides the surgery
10       at U of M in the past 10 years other than the ones
11       you've listed here?
12   A.  No.  No.
13   Q.  So you've never seen a psychiatrist, psychologist?
14   A.  No.
15   Q.  Any kind of social workers that you have counselled
16       with since your employment was terminated?
17   A.  No.
18   Q.  Do you counsel with any sort of religious leaders,
19       pastor, anybody like that?
20   A.  No.
21   Q.  And you are getting financial help from your mother,
22       as I understand it?
23   A.  I'm living under her roof, you know.
24   Q.  What kind of relationship do you have with her?
25   A.  Good one.

63  (Pages 249 to 252)

Jeffrey Nicholas
August 14, 2017

Page 253

1  Q. How about with your sister?
2  A. All right. I don't get along with her husband. But I
3     get along with my sister.
4  Q. Okay.
5  A. Wait. Why was she brought into this? Why was she in
6     this?
7  Q. Well, you are claiming, just to briefly explain why
8     I'm asking some of the questions I'm asking and will
9     continue to ask for the next couple of minutes, you
10    are claiming emotional damages in this case,
11    as I understand it?
12 A. Yeah.
13 Q. So, once you make a claim for emotional distress
14    damages, that kind of opens the door for me to
15    understand what else is going on in your life, what --
16 A. Oh.
17 Q. -- might be causing the stress in your life, that sort
18    of thing?
19 A. My doctor had to put me on two blood pressures, in the
20    last two or three years here, Raval, I got the names
21    here if you need those, the names of the medication.
22 Q. We will ask you to sign a release for that. You have
23    them with you?
24 A. Yeah. I picked some of them up yesterday.
25 Q. Can you put them on the record just so that we have

Page 254

1     them.
2  A. Yeah, it's right here. You just have to open it up.
3     There is one there and one here. It tells you inside
4     there. Those are two different blood pressures.
5  Q. All right. For the record, the first one is
6     A-M-L-O-D-I-P-I-N-E, B-E-S-Y-A-L-T-E, five milligrams?
7  A. Since then, I just was there -- what day was I there?
8     A few days ago. It said this is keeping me normal
9     blood pressure.
10 Q. Okay. Second one is L-O-S-R-A-T-R-A-N, H-C-T-Z, it
11    looks like 50/12.5 milligrams. Okay. And your doctor
12    said these are taking care of your blood pressure?
13 A. Yeah, I'm perfect. I was just there two days ago
14    getting a refill. They usually do three months at a
15    time.
16 Q. Other than the blood pressure medication, there is
17    nothing else wrong with you?
18 A. Yeah, I had to take a multi-vitamin at home.
19 Q. You are not treating for any other kind of ailments or
20    anything?
21 A. No. My eyes are all right. The doctor said my eyes
22    are okay.
23 Q. Who does the housework around your home?
24 A. Me. You know, mom's getting older, you know what I
25    mean? She's in her mid 70s.

Page 255

1  Q. Were you also helping with the housework when you were
2     still working at Delta?
3  A. Yeah, I do all her laundry because it's way down in
4     the basement. I don't fold it for her but I just kind
5     of spread it for her out on her bed upstairs. She's
6     real happy with that. Dishes, I do all that stuff.
7  Q. Cook?
8  A. Usually, the kids, the grandkids come over from my
9     sister's house to cut the grass, because they have a
10    rider lawnmower. And they try to milk grandma for 20
11    bucks to do that. Grandma, can I have 20 bucks? I
12    said, it's grandma. You are supposed to cut it for
13    free. Oh, no way. Grandma, come on, you promised me
14    20 or 30, whatever she...
15       Then there is an older lady that lives
16    between us, they do her lawn, too. So they try to
17    make some money.
18 Q. So you don't have to cut the grass?
19 A. I mean, I try to get out there. But we let the
20    lawnmower rot away, you know, since the kids were
21    doing it. Actually, now, a couple times, my sister's
22    husband rode over on the lawnmower and does it. She
23    will just say something to him and he will come over
24    and do it.
25 Q. Did I hear, what was the answer to the question, are

Page 256

1     you doing the cooking?
2  A. Yeah.
3  Q. Shopping?
4  A. We don't do -- mom doesn't eat a lot anymore. Seems
5     like she's eating less and less.
6  Q. Shopping? Grocery shopping?
7  A. Yeah, I handle all that. But I share a car with mom
8     because I got rid of the car I used to have. So I
9     share her car.
10 Q. Is she still driving?
11 A. Yeah, she's in mid 70s and we share the car. But
12    mostly it's her driving it because it's her car. But
13    I don't get in it anymore unless I'm driving. I
14    learned that with her. A couple of scary -- I told my
15    sister, no way, I'm not getting into a car no more
16    with mom without me being behind the wheel.
17 Q. You don't think she's safe behind the wheel?
18 A. Yeah, she was yelling at me one time. You know, how
19    moms are. You son of a gun, you know. She took off
20    so fast down the street. She wanted to get home and
21    drop me off or something, I don't know what it was. A
22    hundred miles an hour. I thought, oh, my God, I'm
23    never going to get behind there again.
24 Q. When is the last time you went out with friends?
25 A. Maybe a month.

Carroll Court Reporting and Video
586-468-2411

Jeffrey Nicholas
August 14, 2017

Page 257

1  Q.  Where did you go?
2  A.  Just hanging out over their houses, stuff like that.
3      I don't do a lot because I don't have a lot of money,
4      you know.  Sometimes mom, mom's been helping me with
5      the phone bill.  I've got Metro, 30 bucks a month.
6  Q.  For a cell phone, you mean?
7  A.  Yeah.  I want to keep that going in case anybody calls
8      about a job.  So I've at least got that on.
9  Q.  But as I understood it, you haven't applied for a job
10     in the last couple of months, right?
11 A.  Well, I want to keep my number in case I get a call,
12     an important call.  Maybe you're going to call me and
13     tell me, here's your return-to-work date, Jeff.  And I
14     would say, okay.  I'm good.  So she doesn't want me to
15     lose my number.
16 Q.  Any hobbies?
17 A.  Not as I'm getting older, no.
18 Q.  Do you think you are getting older?
19 A.  Yeah, I'm getting older.  I work out.  I've been going
20     to a track, walking.  Sometimes I go to Grosse Ile,
21     sometimes Riverview, you know, the track in the high
22     school.  Nobody's there in the summer.  So I go out
23     there and walk ten laps.  I try to do that every other
24     day.  I've been trying to do every day.
25          And I got the loose weights in the living

Page 258

1      room.  When I watch TV, I've got the barbell.  So I
2      try to stay in shape.  I know I'm gaining weight.  I
3      was drinking too much Gatorade lately.  I'm going cold
4      turkey on that now and trying to lose the weight.
5  Q.  You are able to get in exercise?
6  A.  Yeah, you know, I could handle going back to work, I
7      know that.  It would be tough the first couple days,
8      I'd be sore for sure.
9  Q.  Any plans to treat with a psychiatrist or
10     psychologist?
11 A.  No, I don't have nothing wrong with me.
12 Q.  I'm sorry?
13 A.  I don't have nothing wrong like that.
14 Q.  And you think your mom is pretty supportive of your
15     situation right now?
16 A.  Yeah, she's upset that I got fired for a seatbelt.
17     She didn't think it was fair.  She's pretty upset
18     a couple months.
19 Q.  Does she have an opinion on whether or not you should
20     be looking for a job harder than you are?
21 A.  She is trying to see this thing play out, to see what
22     happens here with this first.  She's giving me a
23     little leeway.  Yeah, you are right, maybe she hasn't
24     pushed me that hard yet.  She felt sorry for me.
25          When that happened, I went home and cried,

Page 259

1      I will be honest with you.  I went home and cried for
2      about three months, just sitting teary-eyed in the
3      chair.  That's when it first happened.  You know,
4      until about March.
5          And she goes, remember how hard that was
6      when you went through that?  I said, yeah.  I get kind
7      of teary-eyed thinking about it.  I was devastated
8      when it happened.  You know, I didn't see it coming.
9  Q.  Well, we saw in your own handwriting, Mr. Nicholas,
10     that you called when you found out your FMLA paper
11     went because you were scared of being put on a next
12     level, right?
13 A.  I knew it's not good going on the next level.  You
14     don't want to keep going up levels.  It ain't good.
15 Q.  When is the last time you cried about this situation?
16 A.  I just started crying right now talking about it.  I
17     think about it from time to time and I get worked up
18     about it.  I yelled at him a couple times.  I told him
19     I didn't mean to take it out on him.
20 Q.  "Him" being your lawyer?
21 A.  Yeah.  You know, I got mad a couple times at him.
22 Q.  And other than you don't like your sister's husband
23     all that much, is she supportive of your situation,
24     too?
25 A.  Yeah, she's an RN.  When I first got fired, they were

Page 260

1      mad at me.  They were mad at me.  Then six months
2      later, she got fired from her job.  Ha.  Then I said,
3      hey, you know, but she's an RN, she can jump right to
4      a different hospital.
5          You know that show?  Extreme Makeover
6      Weight Loss?  She was on there.  And she lost too much
7      time from work.  And she was on there in the summer, I
8      think it was '13.  She was on it.  She had her own
9      show.
10         And she went and they exercised down in
11     Phoenix.  The guy worked her out and she lost like 150
12     pounds.  She went from 300 to 150.  You can look it up
13     on YouTube and you will see her on there, Trina is the
14     name of the episode.  Trina.  T-R-I-N-A.  She's my
15     sister.
16         They filmed her for like a year, they came
17     and did her house, put all the weights in there, fixed
18     up a couple rooms, the kitchen, put a deck on back,
19     surprised her when she came back to the house from
20     being gone for a while and so...
21 Q.  So she got another job pretty easily?
22 A.  Yeah, she's making like 45 an hour.  She's got it
23     made.  She cries about how broke she is.
24 Q.  Have you thought about going back to school?
25 A.  I just want to go back to Delta and just do a few

Jeffrey Nicholas
August 14, 2017

Page 261

1    years and retire.  It's not like there is a pension
2    there.  There's a 401(k).  I'm grandfathered into, a
3    couple years I had -- Northwest, I was, what do they
4    call it?  Vested.  You know, I had five years in when
5    they merged.  So I just had enough to get in.  It's
6    hardly nothing.  It's like 200 a month.  You have to
7    be 57, and you get a less amount.  But when you turn
8    65, you get more.
9  Q.  You got a vested pension from Northwest?
10 A.  Yeah.  For five years.  Every ten years you worked
11   there, you got four dollars.
12 Q.  You said you wanted to work a few more years until you
13   retire.  How many --
14 A.  I'm not talking a few.
15 Q.  You said a few.
16 A.  I actually planned to work until I'm 70.  That's 15
17   more years.  You can't get Social Security until you
18   are 67 or 68, topped out, a hundred percent.  And then
19   once you work three more years, you get eight (sic)
20   percent more for three more years.
21 Q.  Would you be a baggage handler at age 70?
22 A.  No, I would be inside.  My sister and mom already told
23   me that.  They said, would you go on the lead spot?  I
24   said, I like the lead spot.  I'd take on the
25   challenge.  I would probably try it for a couple more

Page 262

1    years.  I would like to go to lead spot again.
2          And then, once I got too old, aged out, I
3    would probably step inside like that Al guy.  He's
4    inside answering phones.  I worked inside, though,
5    doing the online, and I was assigned there for, you
6    know, I had a lead.  It was a lead spot.  I think
7    I was filling in for people on vacation or something.
8    And it just got to be too boring, sitting inside all
9    the time, sitting like that too long.
10         MARKED FOR IDENTIFICATION:
11         DEPOSITION EXHIBIT 29
12         Work Rule Comparison
13         3:38 p.m.
14 BY MS. GROSS:
15 Q.  If you would take a look at what's been marked as
16   Exhibit 29, please.  This is the document that you
17   provided in your discovery responses.
18 A.  Oh.
19 Q.  Do you recall getting this sometime around the merger
20   in between --
21 A.  Yeah, this is the type of stuff they send.  They send
22   all kinds of stuff.
23 Q.  These were things that we're sort of comparing how the
24   way things were under Northwest and how they were
25   going to be under Delta, is that right?

Page 263

1  A.  Yeah, I didn't really -- I had -- trust me.  There's
2    stacks of this stuff around my house there on the side
3    of my room.
4  Q.  So you saved it all these years but you are not really
5    sure if you read it or not?
6  A.  Yeah, when I was working, it was work, sleep, work,
7    sleep, work, sleep.  I didn't have time to go over all
8    of this.  That's all I was doing, working and
9    sleeping.
10         So which part do you want me to look at
11   now?
12 Q.  Well, if you would look --
13 A.  But it doesn't tell you when I got it.
14 Q.  No, it doesn't.  That was going to be my question to
15   you.  Do you remember about when you got it?  It says
16   at the top that the intent of this document is to
17   provide employees with a high level overview of the
18   work rules in place, at the airport customer service
19   and cargo effective 3-1-09.
20         So this would have been before the union
21   vote, I think?
22 A.  Yeah, they did -- Delta sent a lot of stuff before the
23   vote.
24 Q.  Trying to tell people what the difference was between
25   Delta and Northwest?

Page 264

1  A.  Yeah, trying to smear the waters, too.
2  Q.  And this was something you got at home in the mail?
3  A.  Yeah, they just bombarded you.  I was getting stuff
4    every week.
5  Q.  Look at the page, the numbers at the bottom, what we
6    call Bates stamp numbers, the 000 numbers, if you
7    would turn to the one that says 000161, please?  It's
8    towards the back.
9  A.  Yeah, I don't think I ever looked at this.
10 Q.  So you didn't look at the comparison of the
11   disciplinary process for Delta versus the disciplinary
12   process for Northwest?
13 A.  Yeah, I mean on the ramp, I just heard about
14   coachings, I heard about verbal and a write-up, I
15   didn't know.  I just heard it through the grapevine on
16   the ramp.
17 Q.  Were you unhappy about the merger with Delta?
18 A.  I didn't have a feeling, one way or the other.  To
19   tell you the truth, I voted against the union, I
20   probably shouldn't tell that to nobody but I did.
21 Q.  Why did you vote against the union?
22 A.  Because they didn't help me like they should have and
23   I was tired of the union dues going up.  Every time we
24   turned around, we were paying more and more union
25   dues.  And then they raised it like six months before

66  (Pages 261 to 264)

Jeffrey Nicholas
August 14, 2017

Page 265

1    the vote.  Everybody said they were just trying to
2    soak it out to the end.
3           I started there, I only paid 25, maybe 30 a
4    month.  And when I ended there, we were like $75 a
5    month, I think it was, 65 or 75, somewhere in there.
6  Q.  What were they not doing for you that you thought they
7    should be doing?
8  A.  Some of the guys, the union guys were giving me a hard
9    time.  I didn't like -- Painter was a good guy but he
10   was one of the main union stewards down there.  But
11   this guy Coalpepper, I didn't like him, I didn't like.
12   One time I walked in the union office --
13 Q.  The question was, it was just that they weren't nice
14   to you, is that the issue?
15 A.  I just got discouraged with the union because I didn't
16   think I really needed them.
17 Q.  Okay.
18 A.  But it came back to haunt me.
19 Q.  Fair enough.
20 A.  One time I walked in the union office --
21 Q.  You can't talk while she's doing the stickers.  Just
22   hang on.
23          MARKED FOR IDENTIFICATION:
24          DEPOSITION EXHIBIT 30
25          April 1, 2010 Delta Memo

Page 266

1           3:42 p.m.
2  BY MS. GROSS:
3  Q.  Okay.  I want to try and do this real quick,
4    Mr. Nicholas.  This is what has been marked as
5    Exhibit 30 to your deposition.  This is a collection
6    of letters that you also produced which I'm guessing
7    were letters that Delta was sending all that time, I
8    think as you said, to try to lobby you guys?
9  A.  Maybe, yeah.
10 Q.  Do these have anything to do with your claim of age
11   discrimination or are they just documents that you
12   saved over the years that you included in your
13   response?
14          I mean, I put them all together in one
15   exhibit because they all looked like they were letters
16   about the IAM and what was going on and not going on?
17 A.  I don't know.  I took a bunch of stuff to the lawyer's
18   office and...
19 Q.  Some of the letters are from Delta --
20 A.  I thought maybe this had something to do with
21   something.  See where it's underlined?
22 Q.  Okay.  So page, for the record, it's Bates stamp --
23 A.  I read it real fast and I wasn't paying attention when
24   I was reading.
25 Q.  It's Bates stamp 00127.

Page 267

1  A.  I thought what it said was something like, we're going
2    to get rid of everybody's, from whenever this date was
3    of this thing...
4  Q.  So the record is clear, what you are referring to on
5    Bates stamp page 127 is a section that you have
6    underlined of a memo dated November 19th, 2010 to all
7    ACS domestic fleet --
8  A.  Actually, my mom underlined it.  She was sitting
9    there, talking to me, and she says, I'm going to
10   underline something.  We thought it was something --
11 Q.  Can I get it on the record first, please?
12          We are looking at is a memo, November 19th,
13   2010, to all ATF domestic fleet service employees,
14   subject: Fleet service transition plans.  It's from
15   Delta.  It says, directed to team.
16          So you would have been part of the ATF
17   domestic fleet service employee group in 2010?
18 A.  Yes, if they mailed it to me, I guess I was.
19 Q.  That's how you got this, they mailed it to you?
20 A.  ACS --
21 Q.  It's Airport Customer Service?
22 A.  Yeah, that's the one I was.  That's the basic worker,
23   yes?
24 Q.  Right.
25 A.  It's the whole ramp combined.  I'm starting to forget

Page 268

1    the terminology, see?
2  Q.  You wouldn't have this unless they sent it to you at
3    home?
4  A.  Right.  This is stuff they just kept sending.  See,
5    now, this is before the vote, right?
6  Q.  Right.
7  A.  And they just bombarded us with stuff.
8  Q.  Sure.  And that's why I put all this together
9    because this is all just stuff you got around the vote
10   time, right?
11 A.  Yeah.  And I thought they were giving you a promise
12   here that they weren't going to hold none of your old
13   stuff, you know, my file.  I thought they were going
14   to erase my file going back.  And I read it real fast
15   and I just underlined it and I gave it to the
16   attorney.
17 Q.  You told me a second ago your mother underlined it.
18 A.  Yeah, she, she -- I read it real quick, and then I
19   gave it to her.  And she says, oh, I'd better
20   underline this.
21 Q.  So the part that got underlined for the record says, I
22   want to personally address IAM messages -- IAM was the
23   union, right?
24 A.  Yeah.
25 Q.  It says, I want to personally address IAM messages and

67  (Pages 265 to 268)

Jeffrey Nicholas
August 14, 2017

Page 269

1     rumors that we will outsource your jobs, terminate
2     your employment for no good reason, cut your pay,
3     reduce your hours or otherwise treat you unfairly in
4     any way.  Some employees have even asked to see their
5     personnel files in fear that we will not keep them
6     employed at Delta because of something in their file.
7     These claims are completely false and misleading.  I
8     am setting the record straight.  You have a leadership
9     team who cares about you and we will never deviate
10    from the way we have always treated our Delta family
11    with dignity and respect.
12 A.  I thought it was something to do -- I think my mom
13    read it to me, is what it was, and she underlined it.
14    And I thought it was something that was going to help
15    me in my case so I threw it in the box to give it to
16    the attorney.  I think that's how it got there.
17 Q.  Looking at it now, do you think it has anything to do
18    with your case?
19 A.  I don't think so.  This was all attached, right?  So
20    nothing really here in this whole packet.
21 Q.  So, is there anything that you got in this whole union
22    time frame that you think has anything to do with your
23    case or you are just including those because you got
24    asked to produce everything you had?
25 A.  Yeah, I was just trying to bring, I mean, I got to go

Page 270

1     through each one, but I am trying to bring everything
2     I had to the attorneys' office.
3  Q.  Fair enough, sir.  I am just trying to eliminate stuff
4     that might not be relevant.
5  A.  Maybe there is something in there, but I don't think I
6     went through every page, you know.
7  Q.  But that part that you had underlined --
8  A.  Yeah, that's nothing.
9              MARKED FOR IDENTIFICATION:
10             DEPOSITION EXHIBIT 31
11             How to Access Benefits Direct for
12             Health and Insurance Transactions
13             3:47 p.m.
14 A.  You know, I just want to go --
15             COURT REPORTER:  Uh-uh.
16             THE WITNESS:  Can I talk?
17             COURT REPORTER:  Sorry, I don't mean to be
18    rude.  I am just marking an exhibit.  Now you can
19    talk.
20 A.  You know, I just want to go back to work and become a
21    productive member again of society and take care of my
22    mom.  I was a good employee.  I know you don't believe
23    me.  I was a good employee.  I was an asset to the
24    company.  I was good out there as a lead.  I don't
25    know if I would take the lead spot again.  I invested

Page 271

1     eight years with them.
2  BY MS. GROSS:
3  Q.  Okay.  If you look at Exhibit 31 is, this is another
4     document that you've produced.  This looks to me like
5     it's just information about how to access your health
6     care information, that sort of thing, it looks like
7     enrollment information to me.
8              Did you get one of these so you could
9     enroll for benefits every year?
10 A.  Yeah, maybe.
11 Q.  Do you remember what benefits you got from Delta, if
12    you know?
13 A.  The 401(k) match.
14 Q.  Yeah.
15 A.  I don't know, was it five or six percent?  And they
16    give you three percent, so it comes up eight or nine.
17             At the end there, the last year or two I
18    was there, I was putting 19, so I was covering the
19    match.  I was just -- I don't know why.  I never put a
20    lot in before and then I just signed up the last few
21    years for it, about four years I was there, and I was
22    cranking it up.  I got to up 19 percent.  It was
23    killing me, though, when I was doing it.
24 Q.  So you were putting in 19 percent --
25 A.  Of my check.

Page 272

1  Q.  -- of your check?
2  A.  Because I had it kind of easy at home with mom, so I
3     was able to tuck away some money really quick, but
4     it's not a lot of money.
5  Q.  We saw from your W-2 that you weren't, the biggest
6     year you had in the last few years you were there was
7     33,000?
8  A.  Yeah.
9  Q.  And you were putting away 19 percent of that?
10 A.  Yeah.
11 Q.  So you were getting help from your mom even then?
12 A.  I was under her roof.  My plan was to take over her
13    payments once I got closer to top out.  I wasn't
14    topped out yet.
15 Q.  You weren't paying her rent or anything?
16 A.  No, but I'm helping out.  Trust me, she was spending
17    about half my paycheck.  I was always giving her money
18    to go to the casino and all kinds of stuff.
19 Q.  Okay.
20 A.  It's like being married.
21             MARKED FOR IDENTIFICATION:
22             DEPOSITION EXHIBIT 32
23             Andy Zarras Memo
24             3:49 p.m.
25             MARKED FOR IDENTIFICATION:

68  (Pages 269 to 272)

Jeffrey Nicholas
August 14, 2017

Page 273

1     DEPOSITION EXHIBIT 33
2         Congratulations and Thank You Memo
3             3:49 p.m.
4   A.  But now it's become a financial hardship on her.
5         MS. GROSS: Hold on. Hold on.
6         MR. BURG: Jeff...
7   BY MS. GROSS:
8   Q.  Here is Exhibit 32, another document, it looks like a
9       memo that went to everybody saying that a good job had
10      been done on a particular event, is that correct?
11  A.  What date is this?
12  Q.  I don't know. You provided it, sir. I'm just asking
13      what it is. It doesn't look like it's anything
14      particular to you.
15          Are you saying that's some award that you
16      got or was it just something that you saved?
17  A.  I don't know. Let's see... no. No. This ain't no
18      award that I got. I'm going to try and find, you said
19      you want to see if I can find a copy. I will give
20      them to the lawyer. I will keep digging.
21  Q.  That would be great.
22          Exhibit 33, this one says, congratulations
23      and thank you. And this is a addressed to you. It
24      says that you are formally requested to attend the
25      celebration on June 28th for below-the-wing employee

Page 274

1       recognition and it's recognizing people that either
2       have an anniversary or a safety success or have
3       operational excellence.
4           Do you remember, in your case, was this
5       because this was your five-year anniversary?
6   A.  Let's go with operational excellence.
7   Q.  Do you remember being operationally excellent?
8   A.  Yeah, I do. I was on top of my game there.
9   Q.  Yeah. Who gave you an award for being operationally
10      excellent?
11  A.  I don't know. I can't say.
12  Q.  Did you provide this for any particular reason related
13      to the lawsuit?
14  A.  No, I think that was just in the box. Maybe he threw
15      it in there thinking it may help or something.
16  Q.  Fair enough, sir. Do you remember, Mr. Nicholas, in
17      the last --
18  A.  Let's go with safety success.
19  Q.  Well, we saw a couple of disciplines, so safety
20      success is probably not the way to go, don't you agree
21      with me?
22  A.  All right. But safety success would help my case.
23  Q.  Well, if it were true, it would, I agree with you.
24  A.  No, actually, it was my performance on the ramp. One
25      time, I saved the airplane. There was another time.

Page 275

1       You got a certain amount of time you have to get stuff
2       hooked up to a plane --
3   Q.  This is 2012.
4   A.  No, I'm talking about stuff I have at home. That is
5       all to do with performance on the ramp.
6   Q.  If you find those, I will be happy to take a look at
7       those.
8           In the last, let's say three years, you
9       were employed by Delta, so we are talking 2013, 2014,
10      it's Delta, no more Northwest, no more union, do you
11      remember any of your colleagues getting fired for any
12      particular reasons in those years? Do you know
13      anybody that got fired?
14  Q.  In '12 or '13? Before I left?
15  A.  I know you said you don't know of anybody getting
16      fired for seatbelts or needing discipline for
17      seatbelts but any other reasons that you are familiar
18      with people getting fired?
19  A.  I know this one guy, I don't know if he got fired for
20      it or not, he left 5,000 pounds of freight in the
21      plane in the wide body area. And it was coming from
22      Frisco to here. It was supposed to come off the
23      airplane. And I think he was on last chance, I don't
24      know what he was on.
25          But I heard, some people told me he got

Page 276

1       fired and some people told me he didn't. And it ended
2       up going all the way to Amsterdam without being took
3       off the plane. He never took it off the plane. And
4       the pilot didn't even know it was on there. So that
5       cost Delta a bundle. You know, it cost so much per
6       mile in the air or something like that, or per pound.
7   Q.  But you don't know who it was exactly?
8   A.  No, I just heard -- it was a true story.
9   Q.  Anything that you haven't already told me that causes
10      you to believe that your age is the reason that your
11      employment was terminated?
12  A.  Seems like they only go after the guys, we used to
13      make a joke, you got an X on you. We used to wear
14      these reflector jackets and there was actually an X on
15      the back of it. So we used to make a joke, we're
16      walking around with Xs on the back.
17  Q.  "We" being who?
18  A.  The guys that are higher in seniority and higher in
19      pay.
20  Q.  Most of whom are all still there, as far as you know?
21  A.  We sat around online one time --
22  Q.  Sir, you have to answer my question.
23  A.  Go ahead.
24  Q.  You are talking about people that you knew when you
25      worked there, and those people still work there,

69 (Pages 273 to 276)

Jeffrey Nicholas
August 14, 2017

Page 277

1　except for the guy who you told me about in the
2　beginning who is on a medical retirement?
3　A. I don't know if they are there.
4　Q. You called in and talked to Al?
5　A. Yeah, but I got a lot of people out there I was
6　talking to. I don't have the numbers. I got Al, and
7　I tried to talk to somebody -- I didn't have their
8　numbers. The social part of the job has actually hurt
9　me more than losing the job, I think, is the friends I
10　had out there.
11　Q. Back to my question. Other than people saying, we all
12　have Xs on our back, any specific information --
13　A. We just said --
14　Q. -- that you haven't already told me about that you
15　think substantiates that age was a reason?
16　A. We couldn't believe how always, when somebody gets
17　fired, it's somebody older and topped out on,
18　seniority too, on the pay scale.
19　Q. Sir, I asked you a minute ago who --
20　A. I don't know, I can't place names right now. But
21　every time somebody got fired, it was always somebody
22　older. I just can't place the names. It's been a
23　while. I just heard of one the other day, but I can't
24　think --
25　Q. How did you hear of one the other day?

Page 278

1　A. Who did I say I talked to? Cecil? Who did I talk to?
2　Q. So far, as I understand it, you talked to Cecil, you
3　talked to Ray Painter, and you talked to Al Martin.
4　A. I think Cecil told me; somebody got fired for, they
5　did something bad. They did some damage to an
6　aircraft or something.
7　Q. So you, why do you think that age is the reason they
8　got fired then, if they did some damage to the
9　aircraft?
10　A. I don't know. Because he's older. It ain't got
11　nothing to do with my case because he's there now. I
12　wasn't there then. This happened in the last couple
13　months, I guess.
14　　　　MS. GROSS: All right. I'm going to take a
15　quick break.
16　　　　(Off the record at 3:56 p.m.)
17　　　　(Back on the record at 4:07 p.m.)
18　　　　MARKED FOR IDENTIFICATION:
19　　　　DEPOSITION EXHIBIT 34
20　　　　Color Photograph
21　　　　4:07 p.m.
22　BY MS. GROSS:
23　Q. Just for the record, Mr. Nicholas, what we've marked
24　as Exhibit 34 is a color copy of the actual photograph
25　that your attorney brought with you today, of the tug,

Page 279

1　that you previously saw as Exhibit Number 1.
2　A. Yeah.
3　Q. As I understand it, you took this photograph?
4　A. Yeah.
5　Q. You took it while you were still employed at Delta?
6　A. Yeah.
7　Q. You saved it all these years?
8　A. Yeah, I had it on my phone for a little while. I
9　don't know why I took it. I was working in the bag
10　room and I just took a picture.
11　Q. Do you have any other pictures of when you worked at
12　Delta?
13　A. No. I sent that over to I think, the guy in New York
14　that used to work here. Now he's at Laguardia.
15　Q. Why would you send a guy at Laguardia --
16　A. I don't know. Just to give him old memories of here.
17　They got the same tugs over there, I think. And he
18　just laughed when he saw it.
19　Q. You didn't get that from somebody for your lawsuit?
20　A. No. I took that. I might have it on my phone, but I
21　don't think so.
22　Q. Were there any rules about taking pictures on your
23　cell phone when you were working at the airport?
24　A. No, not that I know of. Maybe on the ramp, but I was
25　inside the bag room right there.

Page 280

1　　　　MARKED FOR IDENTIFICATION:
2　　　　DEPOSITION EXHIBIT 35
3　　　　ACS's 7 Safety Absolutes
4　　　　4:08 p.m.
5　BY MS. GROSS:
6　Q. Did they have any kind of bulletin boards in any of
7　the rooms, break rooms or anything that you have?
8　A. No.
9　Q. No place where they put up signs? So signs about like
10　Equal Employment Opportunity, all those kinds of --
11　A. Oh, yeah, I saw something like that. Sometimes, I get
12　dropped off at work by my mom, would drop me off, at
13　departures upstairs. And you are above Human
14　Resources. There's a time clock up there. So I
15　wanted to get to that time clock real quick. It's
16　behind where people check in for their flights at the
17　main departures.
18　Q. Why would your mom be dropping you off at work when
19　you worked at Delta?
20　A. I shared rides with her a lot. She was just bored
21　when she was retired. So she just wanted something to
22　do.
23　Q. Did you not have a car when you worked at Delta
24　either?
25　A. For the last two years, I didn't. And she was just

70 (Pages 277 to 280)

Jeffrey Nicholas
August 14, 2017

Page 281

1   bored and she said, I'll take you.  I said okay.
2   She'd come back and pick me up.  A lot more times, I
3   just took her car.  But she didn't want to get stuck
4   at home, so she would take me.  She'd go to bingo and
5   come back at the end of the day and get me.  But I was
6   working afternoons.
7   Q.  When is the last time you owned a car?
8   A.  Probably two years before the end, maybe a year before
9   the end.
10  Q.  What happened to that car?
11  A.  Just worn out.
12  Q.  Did you sell it?
13  A.  Yeah, I got rid of it.  It was a junker.  Time to go.
14  Too much fixing, fixing, fixing.
15  Q.  You didn't buy another one because you had access to
16  your mom's car?
17  A.  Yeah.  And I was trying to save, I was going to get an
18  old BMW.  And I saved and saved, and I needed five or
19  ten grand to get a good enough one.  Never got there.
20  It seemed like the money always got spent.
21  Q.  Even when you were working?
22  A.  Yes.
23  Q.  Where were you saving your money?
24  A.  I was just saving it.
25  Q.  What kind of financial institution?

Page 282

1   A.  I would just save it at home.
2   Q.  In cash?
3   A.  Yeah.  I would save maybe a grand up and it would get
4   spent and I would think, damn, got to start all over
5   again.  I didn't want to have a car payment.  I just
6   wanted to try and buy a Bimmer free and clear.
7   Q.  Take a look at what's been marked Exhibit 35, if you
8   would.  Did you see posters that look like that
9   anywhere in the airport when you worked there?
10  A.  I kept hearing a word, a name, 7 Safety Absolutes,
11  like the last month or two I was there.  But I didn't
12  really know what they were talking about.  And I don't
13  ever recall seeing this one.  But I kept hearing
14  people saying, 7 Absolutes.  Some people were making
15  jokes, and I said, what are they talking about?
16  Q.  Well, had you read Exhibit 4 that we looked at earlier
17  before you signed it, you would have known what we
18  were talking about, right?
19  A.  That was the one where the guy shoved it in my face
20  where I was running out the door.
21  Q.  What guy was it, you don't remember?
22  A.  It was the guy who -- he used to be a lead spot, but
23  now, now, I don't know if it was lead spot or not when
24  I was there at the end.  He was in online, north
25  online.  He hands out the work assignments.

Page 283

1   Q.  Okay.
2   A.  He just shoved it at me, I need you to sign this.  I
3   got my work assignment, went and sat down, looked it
4   over, and sometimes you got to make adjustments on
5   there, so when I was going out the door to catch my
6   flight, an inbound, and he goes, Nick, I need you to
7   sign it.
8   Q.  When you heard other people talking about 7 Safety
9   Absolutes, and you didn't know what it was, did you
10  ask any of your fellow workers what it was all about?
11  A.  No, I didn't bother anybody about that.  I just heard
12  people joking about it.
13  Q.  You are not sure if you saw the poster?
14  A.  Yeah, I don't think I seen that.  If I seen it, I
15  would have said, hmm, what is this?
16  Q.  But you didn't say, hmm, what is this, when you were
17  asked to sign something that said 7 Safety Absolutes?
18  A.  There was no time.  I had to go.  I think he said
19  something about the word seatbelts but he didn't tell
20  me what it was.
21  Q.  Other than this piece of paper that is Exhibit 4 that
22  you signed, you don't have anything in writing from
23  Delta, do you, that talks about when you are supposed
24  to wear seatbelts or not wear seatbelts?
25  A.  I don't know.  I don't know.  I don't know if I do or

Page 284

1   not.
2   Q.  Okay.  Well, if you do, wouldn't you have provided it
3   as part of your documentation?
4   A.  Yeah.  I guess.
5   Q.  Okay.  So odds are, you don't?
6   A.  Yeah.
7   Q.  The person that you said came in as the big director
8   that you heard was really tough on safety, was his
9   name, was he somebody that they call Feush?
10  A.  Yeah, that sounds familiar.  He came there like the
11  last few months I was there.
12  Q.  John Feuhushak or something like that?
13  A.  Yeah.  I never met him.  I didn't know who he was.
14  Q.  That's who you were talking about?
15  A.  Yeah.
16  Q.  Did you ever get any specific instructions from any
17  member of management about seatbelt usage when you
18  were supposed to wear them, not supposed to wear them,
19  anything like that?
20  A.  No, they just said, we're going to start putting
21  seatbelts in the tugs and you might start seeing
22  seatbelts in tugs, when they would hold a quick
23  meeting at online.
24  Q.  For what reason would they put them in there if they
25  didn't want you to wear them?

71  (Pages 281 to 284)

Jeffrey Nicholas
August 14, 2017

Page 285

1    A. No. No. I wore them. If I saw a seatbelt in the
2       tug, it was on. I had it on. Then they said, we're
3       going to phase in seatbelts. And then everybody
4       started crying about it saying, look, we go from gate
5       to gate --
6    Q. You weren't one of the people who was crying about it?
7    A. Oh, I mean, probably I jumped on board and said, yeah,
8       this crazy, because we were seven years working
9       without seatbelts. And I was fine. I didn't get
10      hurt.
11   Q. Right. And it's kind of a pain in the neck to put a
12      seatbelt on and off --
13   A. No. No. I put it on. If I saw it, I put it on.
14      Like you said, I don't need no more trouble, levels or
15      nothing.
16   Q. I didn't say that. You said it.
17   A. You said it. You said I said it. Can I say something
18      about Rogermike --
19   Q. Sure.
20   A. -- since we're on the record.
21         He called me in, when they kind of pushed
22      me out of my lead spot, and he noticed the guys were
23      coming after me, because they, I hit the plane, okay,
24      with my head, and the old union steward, Ken Bowman
25      told me, I can't, he said, I don't think they'll fire

Page 286

1       you because it was an accident. But a month later,
2       here I am out of my lead spot. So, he said,
3       basically, they pushed you out of your lead spot. But
4       I think Rogermike noticed that they were coming after
5       me in January --
6    Q. "They" being your co-workers?
7    A. What?
8    Q. Who is "they" coming after you?
9    A. The managers, the low level managers that were writing
10      me up, for my write-ups I had in January, when the
11      accident happened, it was in June -- January of --
12   Q. 2012.
13   A. My sister's birthday, is what I remember, January 11th
14      of '12. And at the end of that month, they hit me
15      with a couple levels or write-ups. So he called me
16      in, talked to me, he said he told me, I think he
17      wondered about that.
18         So he called me in, he said, you know what,
19      Nick? I called, I think he told me eight
20      managers (sic) he called in. He had seen me over the
21      years working outside. I said, how do you know? He
22      goes, I'm the ramp manager, I keep an eye on things.
23      He always told me I'm a good worker. He said, Nick,
24      you're a hell of a worker. He would see me outside
25      working in ten below.

Page 287

1         COURT REPORTER: You have to slow down. I
2       just can't. There is no way.
3    A. He would see me outside working in ten below. And
4       even the bus driver made a comment to me one time. He
5       said, Nick, you are the only one I see working out
6       here --
7         COURT REPORTER: You need to slow down.
8       I'm recording you now because my hands cannot keep up
9       with you.
10        THE WITNESS: No, I'm slow.
11        MR. BURG: Slow down.
12   A. Anyway, so Rogermike says --
13        MR. BURG: Slow down.
14   A. -- I think he told -- he called in the guys at
15      Stacy's level, the lowest management. He said, I
16      talked to them all. Half of them love you and half of
17      them can't stand you. He said, you are right down the
18      middle of the road -- my personality, I guess.
19        And so, he thought that's why they were
20      coming after me. But then he says, he filed, he says,
21      you know what, Nick? He says, it blows my mind -- and
22      they keep records on all this stuff out there, the
23      plane, how my performance is on the ramp as a lead,
24      when the planes went out on time or whatever, and
25      there was -- there might be 800 regular workers on the

Page 288

1       ramp --
2         MR. BURG: Slow down.
3    A. -- and there's like 150 leads. I think there was
4       maybe 180 when I was in there, in the ALA spot. And
5       he says, Nick, you know, you are in the top five
6       percent for on-time performance for getting the plane
7       out of the gate. It blew my mind that he looked that
8       up. He looked that up in his computer. I didn't ask
9       him to do it. He called me in his office and told me
10      that.
11        And so, over the last year or two that I
12      was at ESE, I used to make comments to him when I saw
13      him in the hallway. He says, yeah, I remember that.
14      I remember looking that up. He said, I couldn't
15      believe it.
16        So what I'm saying is, I was an asset to
17      the company. I was a good employee. Some people
18      don't like me and they all called me Nervous Nick, and
19      I couldn't help that.
20   BY MS. GROSS:
21   Q. So the point of all this is just that you are an asset
22      to the company?
23   A. Yeah, I'm trying to say that some of the managers
24      don't like me, some do, some love me.
25        The one guy, Mohammad, his nickname was

72  (Pages 285 to 288)

Jeffrey Nicholas
August 14, 2017

Page 289

1      "Medieval". When all these write-ups were coming, he
2 was down at zone 1, I can't remember, they all call
3 themselves Mohammad, all these guys. Through the
4 grapevine, I could probably get his last name. His
5 nickname was "Medieval".
6      He said, Nick, I don't know why they are
7 doing this to you. Come work down in my area. His
8 area was down zone 1. And zone 1 was really, really
9 hard. And so, I told him no, I'm not interested in
10 coming down there for right now. And that was when I
11 was still leading.
12 Q. Okay.
13 A. And Moe, there's a guy named Moe. He loved me, too.
14 That was when I was still lead. He said, Nick, you
15 are a hell of a worker.
16 Q. So some of the supervisors liked you, and some didn't,
17 and you said, from what I understand, you think it
18 might have been your personality?
19 A. It was your personality. Some just thought I was a
20 little kooky, I guess.
21      MS. GROSS: I have no further questions.
22      MR. BURG: I have no questions.
23      (The deposition was concluded at 4:18 p.m.
24 Signature of the witness was not requested by
25 counsel for the respective parties hereto.)

Page 290

1          CERTIFICATE
2
3 STATE OF MICHIGAN
4 COUNTY OF OAKLAND
5      I, LORI ANN BALDWIN, a Notary Public in and
6 for the above county and state, do hereby certify that
7 this deposition was taken before me at the time and
8 place hereinbefore set forth; that the witness was by
9 me first duly sworn to testify to the truth; that this
10 is a true, full and correct transcript of my
11 stenographic notes so taken; and that I am not
12 related, nor of counsel to either party, nor
13 interested in the event of this cause.
14
15
16
17
18
19
20 Lori Ann Baldwin, CSR-5207, RPR, CRR
21 Lori Ann Baldwin, CSR-5207, RPR, CRR
22 Notary Public
23 Oakland County, Michigan
24 My commission expires: December 21, 2019
25

73 (Pages 289 to 290)