# PLAINTIFF'S EXHIBIT 1

BARBARA FRANZ
12/7/2017

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JEFFREY NICHOLAS,

    Plaintiff,

vs.

    Case No: 2:17-cv-10481

    Hon.  David M. Lawson

DELTA AIR LINES, INC.

    Defendants.

_____/

DEPOSITION OF BARBARA FRANZ

December 7, 2017, at 11:16 a.m.

Birmingham, Michigan

Reported by:

  Anne Vosburgh, CSR-6804, RPR, CRR

Tri-County Court Reporters
248-608-9250

BARBARA FRANZ
12/7/2017

Page 1

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JEFFREY NICHOLAS,
    Plaintiff,
vs.                    Case No: 2:17-cv-10481
                       Hon. David M. Lawson
DELTA AIR LINES, INC.
    Defendants.
_____/

DEPOSITION OF BARBARA FRANZ
December 7, 2017, at 11:16 a.m.
Birmingham, Michigan

Reported by:
Anne Vosburgh, CSR-6804, RPR, CRR

Page 2

December 7, 2017
Birmingham, Michigan

The following is a transcript of the testimony of BARBARA FRANZ, taken via telephone from Ogletree, Deakins, Nash, Smoak & Stewart, 34977 Woodward Avenue, Suite 300, Birmingham, Michigan, and stenographically reported by Anne E. Vosburgh, Certified Shorthand Reporter, Registered Professional Reporter, Certified shorthand Reporter, and Notary Public.

Page 3

APPEARANCES:

FOR THE PLAINTIFF:
    Law Offices of Jeffrey S. Burg, Esq.
    Jeffrey S. Burg, Esq.
    30700 Telegraph Road, Suite 1675
    Bingham Farms, Michigan 48025
    (248) 856-1258/fax
    jburg@comcast.net

FOR THE DEFENDANT:
    Ogletree, Deakins, Nash, Smoak & Stewart
    Sharon Rae Gross, Esq.
    34977 Woodward Avenue, Suite 300
    Birmingham, Michigan 48009
    (248) 593-6400
    rae.gross@ogletree.com
and
    Delta Airlines
    Andrea L. Bowman, Esq. (via telephone)
    Hartsfield Atlanta International Airport
    P.O. Box 20574
    Atlanta, Georgia 30320-2574

Page 4

INDEX

Deponent: Barbara Franz

EXAMINATIONS

| | |
|---|---|
| Examination by Mr. Burg | 5 |
| Examination by Ms. Gross | 42 |
| Re-Examination by Mr. Burg | 50 |
| Re-Examination by Ms. Gross | 53 |

EXHIBITS

| NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| (Marked Exhibits) | | |
| Exhibit 1 | Responses to interrogatories and document requests | 8 |
| Exhibit 2 | 12/16/13, Memo, Franz to Gray, Bates 000061 | 9 |

(Scanned copies attached.)

1 (Pages 1 to 4)

BARBARA FRANZ
12/7/2017

Page 5

1  Birmingham Michigan
2  December 7, 2017, 11:16 a.m.
3  ---------------
4        PROCEEDINGS
5  ---------------
6  BARBARA FRANZ,
7    was called as a witness, and having
8    been duly sworn to testify to the
9    truth, was examined and testified as
10   follows.
11   ---
12        EXAMINATION
13  BY MR. BURG:
14   Q.  State your name, please.
15   A.  Barbara Franz.
16   Q.  Ms. Franz, I am Jeff Burg. I'm
17  Jeff Nicholas' attorney. Do you understand
18  that?
19   A.  Yes.
20   Q.  Have you given testimony before in
21  a deposition?
22   A.  Yes.
23   Q.  How often? How many times?
24   A.  Once.
25   Q.  When was it?

Page 6

1   A.  I don't remember the exact date.
2   Q.  Within a year, two years?
3   A.  It was within the last two years.
4   Q.  Was it a matter involving
5  litigation against Delta?
6   A.  It was Delta, yes.
7   Q.  Were you named as a defendant in
8  the case?
9   A.  I'm not sure.
10  Q.  Your name, was it on the caption
11 of the lawsuit or not?
12  A.  I never saw the lawsuit.
13  Q.  And was it a matter involving a
14 claim of discrimination?
15  A.  Yes.
16  Q.  And do you recall the name of the
17 person who filed the lawsuit?
18     MS. GROSS: Object to relevance.
19  You can answer.
20     THE WITNESS: No.
21 BY MR. BURG:
22  Q.  Where was the deposition that you
23 gave? What state?
24  A.  Georgia.
25  Q.  Was age discrimination involved in

Page 7

1  that suit?
2   A.  No.
3   Q.  What's your date of birth, please?
4   A.  7/18/79.
5   Q.  Are you currently employed by
6  Delta?
7   A.  Yes.
8   Q.  When were you hired?
9   A.  April of 2005.
10  Q.  Were you hired into Delta or into
11 Northwest?
12  A.  Into Northwest.
13  Q.  What's your current job title?
14  A.  General manager, human resources.
15  Q.  In 2013, what was your job title?
16  A.  HR generalist.
17     MR. BURG: Andrea, did I send
18 over -- I think I did -- the Defendants'
19 responses to Plaintiff's
20 interrogatories?
21     MS. BOWMAN: You did.
22     MR. BURG: I'm going to mark that
23 as Exhibit 1. If you could hand that to
24 Ms. Franz.
25     MS. BOWMAN: Okay. She has it.

Page 8

1     (Responses to interrogatories and
2      document requests, marked as
3      Exhibit 1.)
4  BY MR. BURG:
5   Q.  Ms. Franz, do you see the document
6  that I've marked as Exhibit 1?
7   A.  Yes.
8   Q.  If you go to the back page,
9  page 12, that's your name and signature on
10 there, correct?
11  A.  Correct.
12  Q.  So you participated in the
13 development of the responses to these
14 interrogatories and document requests, right?
15  A.  Yes.
16  Q.  Besides the lawyers and their
17 staff, who else from Delta worked on these
18 responses, if you know?
19  A.  I don't know.
20     MR. BURG: Andrea, I sent over an
21 internal memorandum, Bates
22 Number 000061. it's got to Tyesha Gray
23 from Barbara Franz at the top.
24     MS. BOWMAN: I don't know, Jeff --
25 I know what document you're talking

2 (Pages 5 to 8)

Tri-County Court Reporters
248-608-9250

BARBARA FRANZ
12/7/2017

Page 9

```
 1    about, but it wasn't in the ones that I
 2    printed out.
 3            MR. BURG: It's possible I didn't
 4    give it to Rae to print out. It's
 5    possible.
 6            (Discussion held.)
 7            MR. BURG: It's dated December 16,
 8    2013.
 9            MS. BOWMAN: Yes. I have it.
10            MR. BURG: Okay. Thank you.
11    Please hand that to Ms. Franz.
12    And that's Exhibit 2.
13            (12/16/13, Memo, Franz to Gray,
14            Bates 000061, marked as
15            Exhibit 2.)
16            MS. BOWMAN: She has it now.
17    BY MR. BURG:
18       Q.   Ms. Franz, are you looking at
19    Exhibit 2?
20       A.   I am.
21       Q.   And this is a memo that you wrote
22    to Tyesha Gray dated December 16, 2013?
23       A.   Yes.
24       Q.   And at this time you were a human
25    resources generalist, correct?
```

Page 10

```
 1       A.   Correct.
 2       Q.   The upshot of this memo is that
 3    you are recommending that Mr. Nicholas'
 4    employment be terminated?
 5            MS. GROSS: Is that a question?
 6            MR. BURG: Correct.
 7            THE WITNESS: No.
 8    BY MR. BURG:
 9       Q.   Well, under the Recommendation
10    section near the bottom, it says you agree
11    that Mr. Nicholas should be asked to resign.
12    And if he refuses, his employment should be
13    terminated. Right?
14       A.   Yes.
15       Q.   So he was using the term
16    "terminate" to mean "end."
17            So one way or the other, you were
18    recommending or suggesting that Mr. Nicholas
19    be separated from Delta?
20       A.   No. My statement is "I agree."
21       Q.   And the memo has a subject line
22    that says "Recommendation for Termination of
23    Employment."
24       A.   Correct.
25       Q.   And so are you saying you didn't
```

Page 11

```
 1    recommend that Mr. Nicholas be terminated,
 2    you just agreed with someone else's
 3    recommendation?
 4       A.   That is correct.
 5       Q.   I would like to understand the way
 6    Delta's disciplinary system works, so I'm
 7    going to ask you a few questions.
 8            Are you familiar with Delta's
 9    disciplinary process?
10       A.   Yes.
11       Q.   So what I want to know is this.
12    Let's say a person violates the attendance
13    policy and begins to be disciplined for it,
14    okay?
15       A.   Okay.
16       Q.   Now, the steps for an attendance
17    problem would be what? What are the stages
18    of discipline, all for attendance?
19            MS. GROSS: Presuming that the
20    person is not already on a stage? Is
21    that the question?
22            MR. BURG: Well, no. Okay.
23    BY MR. BURG:
24       Q.   Assuming somebody starts the
25    disciplinary process for attendance and then
```

Page 12

```
 1    continues to have just attendance problems,
 2    and goes from one step to another until
 3    termination. What are those steps?
 4       A.   So those steps would include a
 5    verbal coaching, a written coaching, a
 6    corrective action notice, and a final
 7    corrective action notice, and then
 8    termination.
 9       Q.   Let's talk about a verbal
10    coaching. Do you consider a verbal coaching
11    to be discipline?
12       A.   No.
13       Q.   It's not a punishment?
14       A.   No.
15       Q.   It's a form of managing an
16    employee to help them do better in whatever
17    they're being coached upon?
18       A.   Can you repeat that?
19       Q.   A verbal coaching is a method of
20    managing an employee to improve their conduct
21    or performance?
22       A.   Yes.
23       Q.   Now, a written coaching, is that
24    something -- that's different than a verbal
25    coaching, right?
```

BARBARA FRANZ
12/7/2017

Page 13

1  A. Yes.
2  Q. And does that have any flavor of
3  punishment, or not yet?
4  A. Well, I don't think any of it has
5  punishment attached to it. So I'm not sure I
6  understand your question.
7  Q. Well, let's use the term
8  "discipline."
9  A verbal coaching is not a
10  discipline, correct?
11  A. That's correct. I mean, we
12  wouldn't consider it part of our -- we call
13  it performance development. We wouldn't
14  consider it a part of the performance
15  development -- formal performance development
16  process.
17  Q. Well, performance development. Is
18  that part of the disciplinary process?
19  A. No. Performance development is
20  the process you're referring to that has
21  those steps I just described. That's what we
22  call it.
23  Q. Okay. But I want to be clear on
24  the terms. Performance development -- to me,
25  that phrase, sounds like it is -- it refers

Page 14

1  to doing better in the performance of one's
2  job, right?
3  A. Correct.
4  Q. So performance development, unless
5  you're using it as a euphemism, is not a
6  discipline, true?
7  A. I'm not sure how to answer that.
8  I feel like we're mincing words.
9  Q. We are, and I'm trying to get to
10  the bottom of it so I can use the language.
11  A. Yeah. I don't use the word
12  "discipline" at all. I use the word
13  "performance development."
14  So if you're calling it
15  discipline, that's just different than the
16  terminology I'm used to.
17  Q. Let's just take a hypothetical. A
18  Delta employee punches another Delta employee
19  in the face and they receive something in
20  their journal or their personnel file.
21  Is it a performance development
22  that they receive, or do they receive a
23  discipline or a punishment?
24  A. They receive performance
25  development.

Page 15

1  Q. So what many companies call
2  discipline, you're calling it a performance
3  development? Yes?
4  A. Yes.
5  Q. Now, how does a written coaching
6  differ in level from a verbal coaching?
7  A. It's the next step in the process.
8  Q. Does it imply that the situation
9  has graduated to a more serious level?
10  A. I'm not sure I understand what
11  you're asking.
12  Q. Is it up the ladder from a verbal?
13  A. Yes.
14  Q. And then the corrective action
15  notices, that's up the level from a written
16  coaching?
17  A. Correct.
18  Q. Is a corrective action notice in
19  the form of a punishment or a discipline, or
20  do you still call that a performance
21  development?
22  A. Still performance development.
23  Q. Now, does each level that you just
24  told me about, the written, the verbal, the
25  corrective action, the final corrective

Page 16

1  action, and the termination, does each one of
2  those get triggered by one more event than
3  the previous one?
4  Do you understand the question?
5  A. No.
6  Q. So let's say there's an attendance
7  problem and an employee receives a verbal
8  coaching. Does the very next attendance
9  problem trigger a written coaching, or could
10  there be another verbal coaching?
11  A. There could be another verbal
12  coaching.
13  Q. Is that in the discretion of the
14  supervisor?
15  A. Yes.
16  Q. Now, this is what I want to
17  understand. I want to understand how Delta
18  deals with different kinds of policy
19  infractions.
20  For example, you and I just talked
21  about attendance and the various levels of
22  performance development. Now, what about,
23  you know, failure to do one's job? Let's say
24  job performance issues, okay?
25  Is the first intervention by a

4 (Pages 13 to 16)

BARBARA FRANZ
12/7/2017

Page 17

1  supervisor in performance development, is
2  that still a verbal coaching for a
3  performance issue?
4     A. It can be.
5     Q. And likewise, going up the ladder,
6  as you described, for attendance, is there a
7  verbal coaching, a written coaching,
8  corrective action notice, final corrective
9  action notice, and a termination? Does that
10 also apply to performance issues?
11    A. There are all those steps, yes.
12    Q. Now, at Delta -- let's go back to
13 the hypothetical. On an employee's first
14 attendance infraction, can they be issued,
15 under Delta's policy, immediately a final
16 corrective action notice, or is it
17 recommended that the steps you outlined be
18 gone in sequential order?
19    A. For attendance, they would go in
20 sequential order?
21    Q. What about in performance issues?
22 Are the steps also required to be in
23 sequential order?
24    A. No.
25    Q. Does a supervisor have discretion

Page 18

1  in the situation of performance failure to
2  choose which step the employee gets as the
3  first performance development?
4     A. Yes.
5     Q. And that's within the discretion
6  of the supervisor?
7     A. Yes.
8     Q. So attendance is one area where
9  employees receive performance development
10 actions. And performance is an area where
11 employees receive performance development
12 actions.
13       What's another category that an
14 employee would receive a performance
15 development?
16    A. Safety, conduct. I think those
17 are the four main ones.
18    Q. Sure.
19       And as to safety and conduct, is
20 the same sequential -- no, let's just put
21 it --
22       Is the same system of performance
23 developments followed as you told me about
24 when we talked about attendance and
25 performance?

Page 19

1     A. Those four steps, yes.
2     Q. And in the area of safety, are the
3  steps required to be followed sequentially or
4  not?
5     A. No.
6     Q. And in the area of conduct, are
7  the steps required to be followed
8  sequentially or not?
9     A. No.
10    Q. I'm going to ask you a question.
11 I'm not sure how to phrase it. But let's
12 keep working together, question and answer,
13 so I understand Delta's policy, okay?
14    A. Okay.
15    Q. So assume that an employee
16 receives a performance development for
17 attendance at the first level, a verbal.
18 Then the employee is said to have committed a
19 performance infraction. Does the performance
20 infraction receive its own first-level
21 performance development, or is there in place
22 now the sequence that the attendance
23 infraction started?
24    A. So it -- we would look at the
25 record. So the attendance coaching would be

Page 20

1  taken into consideration with the job
2  performance infraction.
3     Q. So let's say a supervisor observed
4  a performance failure or infraction and
5  believed that that infraction warranted a
6  verbal coaching, but looked in the journal
7  and saw that the employee also had a verbal
8  coaching on attendance.
9        Are you saying that a written
10 coaching might then be entered by the
11 supervisor on the -- because of the
12 performance infraction, because the
13 attendance infraction had been considered?
14    A. It could be.
15    Q. And that's within the discretion
16 of the supervisor?
17    A. Correct.
18    Q. Do you remember when the seven
19 safety absolutes came out?
20    A. I remember them coming out, yes.
21    Q. And a violation of the seven
22 safety absolutes doesn't automatically lead
23 to termination, right?
24    A. Correct.
25    Q. And, in fact, they might lead to

5 (Pages 17 to 20)

BARBARA FRANZ
12/7/2017

Page 21

1  something as simple as a verbal coaching, a
2  violation of the seven safety absolutes?
3      A. It could.
4      Q. And do you recall the issue where
5  the tugs -- the tug vehicles that Delta ramp
6  agents were driving, it was determined that
7  they should now be outfitted with seatbelts?
8  Do you recall that?
9      A. Yes.
10     Q. Do you recall they didn't -- the
11 tugs didn't used to have seatbelts, and then
12 it was determined that they should all have
13 them, so they went about putting the
14 seatbelts in?
15     Do you recall that?
16     A. Can you say that again?
17     Q. Sure. Do you recall for years
18 tugs didn't have seatbelts?
19     A. Well, some did and some didn't. I
20 don't know that I can say how many did and
21 how many didn't.
22     Q. Have you ever worked in Detroit?
23     A. Yes.
24     Q. Did you work on the ramp in
25 Detroit?

Page 22

1      A. No.
2      Q. Did you know that in Detroit for
3  many years the tugs didn't have seatbelts?
4      A. Yes.
5      Q. When you were in Detroit, what was
6  your -- what job were you doing?
7      A. I was the human resource
8  generalist.
9      Q. And where are you now?
10     A. Atlanta, Georgia.
11     Q. As a human resource generalist in
12 Detroit, did you have exposure to information
13 about employees being disciplined because of
14 seatbelt violations with the tugs?
15     A. I'm not sure what you mean by
16 "exposure."
17     Q. Well, would it come to your
18 awareness, as an HR generalist, that people
19 were being disciplined because of seatbelt
20 violations?
21     A. Yes.
22     Q. And do you recall that during the
23 time frame of the tugs being newly outfitted
24 with seatbelts, there were a number of
25 employees who were used to not wearing them

Page 23

1  and, therefore, they violated the new policy
2  of wearing the seatbelts? Do you remember
3  that?
4          MS. GROSS: I'm just going to
5      object to the form of the question
6      because I think there were about three
7      questions in there. But if you can
8      answer it, go ahead.
9  BY MR. BURG:
10     Q. Can you answer it, or did you want
11 me to ask it differently?
12     A. Can you ask it differently,
13 please?
14     Q. Sure.
15     Do you recall the general time
16 frame of when the tugs were transitioning
17 from no seatbelt to seatbelt?
18     A. Yes.
19     Q. And during that time, drivers of
20 the tugs had to get used to now wearing
21 seatbelts, right?
22     A. Yes.
23     Q. And did you ever hear that that
24 was something of a culture change for them,
25 and some of them had difficulty changing

Page 24

1  their ways that they had been -- that they
2  had established over the years? Do you
3  recall hearing that?
4      A. No.
5      Q. Do you recall seeing or becoming
6  aware of people being disciplined for
7  seatbelt violations?
8      A. Yes.
9      Q. Were you in Detroit at the time
10 Mr. Nicholas got fired?
11     A. Yes.
12     Q. And during that time, did you hear
13 of any other seatbelt violations that you
14 recall? And I know it's four years ago.
15     A. Not that I recall.
16     Q. I'm sorry. No?
17     A. No, not that I recall.
18     Q. Ms. Franz, did you review any
19 papers to prepare yourself for testimony?
20     A. Yes.
21     Q. What did you review, please?
22     A. The recommendation for termination
23 document that you put in front of me,
24 Exhibit 2. I reviewed the other
25 documentation related to the termination, the

6 (Pages 21 to 24)

Page 25

1  memo written by Stacy Parris to Rogermike,
2  the journal and previous development for the
3  employee. And I think that's it.
4      Q. How about the Jeff Lane memo where
5  he says he saw Jeff Nicholas not wearing his
6  seatbelt?
7      A. My apologies. I did see that, and
8  I also have seen Jeffrey's statement.
9      Q. Jeff Nicholas' statement?
10     A. Correct.
11     Q. One moment, Ms. Franz.
12         Ms. Franz, were you part of the
13 team -- scratch that. Let me ask it
14 differently.
15         Do you recall that as a result of
16 the merger between Northwest and Delta, there
17 was a time period where there was some
18 difficulty with employees not understanding
19 which employee rules -- discipline rules they
20 were covered, as between Northwest and Delta?
21 Do you recall that?
22     A. Can you rephrase the question?
23     Q. When the merger happened --
24     A. Yeah.
25     Q. -- the two companies' work rules

Page 26

1  had to be melded in some fashion. Do you
2  agree?
3      A. Correct.
4      Q. And as far as you recall, was
5  there a significant difference between the
6  disciplinary processes of the two companies?
7      A. I wouldn't say significant.
8      Q. Was there any sense that the
9  Northwest employees could be given what you
10 might call a clean slate for their work
11 record when transitioning to Delta?
12     A. No.
13         MR. BURG: Andrea, have you got
14 the Jeff Lane memo to look at?
15         MS. BOWMAN: From Stacy Parris'
16 deposition?
17         MR. BURG: Yeah. That would be
18 Exhibit --
19         MS. BOWMAN: Three.
20         MR. BURG: -- 3, correct.
21         Would you please show that to
22 Ms. Franz?
23         MS. BOWMAN: She has it.
24 BY MR. BURG:
25     Q. Ms. Franz, you're looking at

Page 27

1  Exhibit 3 from the Parris deposition. Do you
2  see that?
3      A. Yes.
4      Q. And you said you reviewed this
5  before today?
6      A. Yes.
7      Q. Did you see this memo back at the
8  time of the events back in 2013?
9      A. Yes.
10     Q. Mr. Lane does not describe the
11 time of day he made these observations of
12 Mr. Nicholas. Do you agree?
13     A. Yeah. I don't see that here.
14     Q. And he doesn't describe what the
15 lighting conditions were of the environment
16 or the weather. Do you agree?
17     A. Correct. I don't see that here.
18     Q. And although Mr. Lane describes
19 his location as being, "As I positioned my
20 truck at the gate to park, I observed an
21 employee" -- et cetera. He doesn't specify
22 in terms of feet or exact position, where his
23 truck was when he made his observations. Do
24 you agree?
25     A. Yes.

Page 28

1      Q. From an HR perspective, wouldn't
2  you have wanted a supervisor who was writing
3  up a memo which might lead to the termination
4  of a person's employment -- wouldn't you have
5  wanted him to give details, such as time of
6  day and weather conditions and visibility and
7  distances, because a person's employment was
8  at stake?
9      A. No. I mean, not based on -- no.
10     Q. All Mr. Lane said in the memo is
11 Mr. Nicholas clearly was not wearing a
12 seatbelt, but he gave no details.
13         Do you see that?
14     A. Yes.
15     Q. Ms. Franz, if Mr. Lane were
16 500 feet away, then the assertion that he
17 could see Mr. Nicholas clearly not wearing
18 his seatbelt would be dubious, wouldn't it?
19         MS. GROSS: Object to the form of
20 the question, hypothetical and
21 speculative.
22         You can answer.
23         THE WITNESS: No. That's not
24 what's in here though.
25

Electronically signed by Anne Vosburgh (101-198-978-5140)

da5c3500-9361-4a3b-a800-75fdf53...e28

BARBARA FRANZ
12/7/2017

Page 29

1  BY MR. BURG:
2    Q. That's right. I'm saying to you,
3  by not putting in a detail such as distance,
4  one would not know how far away Mr. Lane was
5  when he says he saw Mr. Nicholas, and one
6  would not know how credible or reliable this
7  memo is. Do you agree?
8       MS. GROSS: Object to the form of
9  the question. That's two questions.
10  It's a compound question. How far away
11  he was, and how credible he was.
12       THE WITNESS: Can you rephrase?
13  BY MR. BURG:
14    Q. Right. By not putting in distance
15  here, one does not know how reliable this
16  observation by Mr. Lane is. Do you agree?
17    A. No.
18    Q. Do you know where Mr. Lane's truck
19  was positioned when he made this observation?
20    A. No.
21    Q. You don't know if it was 100 feet
22  or 10 feet away, do you?
23    A. No.
24    Q. Do you know how dark it was at the
25  time Mr. Lane said he saw Mr. Nicholas not

Page 30

1  wearing his seatbelt?
2    A. No.
3    Q. Would you agree that on December
4  6th in Detroit, it's dark at 5:00?
5    A. I don't know that.
6    Q. Well, you live in Atlanta,
7  correct?
8    A. Correct.
9    Q. And is that Eastern Standard Time?
10    A. Yes.
11    Q. So what time does it get dark
12  nowadays in Atlanta, 5:00?
13    A. 6:00-ish.
14    Q. Mr. Lane's memo does not mention
15  that the conditions in the environment were
16  clear for visibility, does he?
17    A. No.
18    Q. And Mr. Lane does not speak --
19  does not write out any details that help us
20  understand why he believed that Mr. Nicholas
21  was not wearing a seatbelt, do you agree?
22    A. No.
23    Q. You don't agree with me?
24    A. No.
25    Q. What details in here help us

Page 31

1  understand how it was that Mr. Lane saw
2  Mr. Nicholas not wearing his seatbelt,
3  besides the expression "I observed"?
4    A. Yeah. That is -- "I observed
5  clearly not wearing his seatbelt."
6    Q. Well, does it say here that the
7  seatbelt was flapping in the wind?
8    A. No.
9    Q. Does it say in here whether the
10  door to the tug was zipped up or not zipped
11  up?
12    A. It says -- yes, it does.
13    Q. What does it say?
14    A. Oh, I'm sorry. It just says "the
15  zip-up door." My mistake.
16       MS. GROSS: No. It does say. It
17  says, "The zip-up door was open."
18       MR. BURG: Okay, it does. I'm
19  sorry.
20       THE WITNESS: I got that right.
21  BY MR. BURG:
22    Q. Have you ever driven a tug,
23  Ms. Franz?
24    A. No, sir.
25    Q. Does this memo actually say that

Page 32

1  there was a seatbelt in this tug?
2    A. I'm sorry, I'm just reading
3  through it. It does not say that.
4    Q. And it doesn't say that Mr. Lane
5  got up into the tug and saw a seatbelt in
6  there, does it?
7    A. No.
8    Q. Did you, yourself, interview
9  Mr. Nicholas before you agreed with the
10  recommendation for termination?
11    A. Not that I recall.
12       MR. BURG: Andrea, would you
13  please give Ms. Franz the journal?
14       MS. BOWMAN: This is Parris
15  Exhibit 1?
16       MR. BURG: Yeah.
17  BY MR. BURG:
18    Q. Ms. Franz, do you see Exhibit 1
19  from the Parris deposition?
20    A. Yes.
21    Q. And this is Jeff Nicholas'
22  journal. This is his journal?
23    A. I'm sorry, who is he?
24    Q. Jeff Nicholas.
25    A. Yes.

8 (Pages 29 to 32)

Electronically signed by Anne Vosburgh (101-198-978-5140)
da5c3500-9361-4a3b-a800-15fdf53a5e28

BARBARA FRANZ
12/7/2017

Page 33

1  Q. And according to your memo to
2  Tyesha Gray, you -- actually, let me correct
3  that.
4       Did you look at Mr. Nicholas'
5  journal before you wrote this agreement that
6  Mr. Nicholas should be terminated?
7  A. Yes.
8  Q. And what you're holding now, the
9  Parris Exhibit 1, that's the journal that you
10 looked at?
11 A. Correct.
12 Q. Would you agree, Ms. Franz, that
13 all of the entries in this journal -- before
14 the December alleged seatbelt infraction, all
15 of the entries in this journal did not amount
16 to a recommendation for Mr. Nicholas to be
17 fired?
18 A. Yes.
19 Q. And on the second page of the
20 journal, Bates 000054 at the bottom, the
21 March 7, 2013, entry for safety by Jerry
22 Walter. That was a verbal coaching, right?
23 A. Yes.
24 Q. According to Mr. Walter, Jeff
25 Nicholas had not worn a seatbelt while

Page 34

1  driving his tug, and that warranted a verbal
2  coaching, right?
3  A. Yes.
4  Q. And were the seven safety
5  absolutes in effect as of March 2013?
6  A. I don't recall the exact date.
7  Q. But you would agree, wouldn't you,
8  that a seatbelt violation might properly
9  receive a verbal coaching?
10 A. Yes, I'm sorry. I'm just pausing
11 because --
12       Yeah. I was just reading the
13 journal, I'm sorry. Yes, I would agree.
14 Q. Isn't it true, Ms. Franz, that a
15 verbal coaching, being the first step in the
16 sequence, normally indicates a potential
17 infraction, but not a serious infraction?
18 It's just a verbal coaching?
19 A. Can you rephrase that?
20 Q. Don't you agree that a verbal
21 coaching, being the first step in the
22 sequence, it implies a not very serious piece
23 of performance or conduct or attendance, such
24 that it's merely a verbal and not any more
25 serious?

Page 35

1  A. I apologize. I'm hung up on the
2  word "serious".
3  Q. An employee at Delta who receives
4  a verbal coaching is not on the verge of
5  being fired, are they?
6  A. They could be.
7  Q. From a verbal?
8  A. Is that the only thing in their
9  record? I'm not sure I understand what
10 you're asking.
11 Q. Yeah. Let's say the only thing on
12 their record is one verbal coaching. Is that
13 employee in danger of being fired?
14 A. They could be.
15 Q. Depending on what they do going
16 forward, right?
17 A. Correct.
18 Q. But based on one single entry of a
19 verbal coaching and no other bad conduct or
20 performance, that employee is not necessarily
21 in jeopardy?
22      MS. GROSS: Object to relevance
23 given that's not the facts of this case.
24      But you can go ahead.
25      THE WITNESS: Can you repeat that?

Page 36

1  I'm sorry.
2  BY MR. BURG:
3  Q. I'll withdraw the question.
4       What I'm getting at is this, if
5  you look at the second page of Mr. Nicholas'
6  journal, there's a final corrective action
7  notice. Do you see that?
8  A. I do.
9  Q. And then after that, June of '12,
10 you go a year to June of '13, and then six
11 more months -- five more months to the
12 beginning of December of '13.
13      So you have 17 months after this
14 final corrective action notice where Jeff is
15 receiving just verbal coachings for different
16 issues: Verbal coaching for safety,
17 March 7th of '13; verbal coaching for job
18 performance, May 11 of '13; verbal coaching
19 for attendance, November 2 of '13.
20      Do you see that?
21 A. Can you repeat those back?
22 Q. So after the final June of 2012
23 corrective action notices --
24 A. Yes.
25 Q. -- the next performance

9 (Pages 33 to 36)

Tri-County Court Reporters
248-608-9250

BARBARA FRANZ
12/7/2017

Page 37

1  development event is August of '12, a verbal
2  coaching regarding his uniform --
3      A.  Yes.
4      Q.  -- right?
5      A.  Yes.
6      Q.  The next one is January of '13, a
7  verbal for attendance, right?
8      A.  Yes.
9      Q.  March of '13, a verbal for safety?
10 Yes?
11     A.  Yes.
12     Q.  May of '13, a verbal for
13 performance?
14     A.  Yes.
15     Q.  November of '13, a verbal for
16 attendance?
17     A.  Yes.
18     Q.  So it's a bunch of verbals
19 following the corrective action.
20         And so what I'm getting at is
21 Jeff's attendance, performance, and conduct
22 were all -- they weren't requiring
23 performance development at a serious level
24 after the final June '12 correction notice.
25 Do you agree?

Page 38

1      A.  Can you rephrase?
2      Q.  Because Jeff only received verbal
3  coachings in different areas after the June
4  of 2012 final corrective notice, doesn't that
5  imply that Jeff's performance, safety
6  practice, and attendance was being -- needed
7  to be developed, but they weren't serious
8  infractions after June of 2012?
9      A.  I'm sorry. I get caught up on the
10 word "serious."
11         So I would agree that they're
12 verbal coachings, but I'm not sure what you
13 mean by "serious."
14     Q.  I understand.
15         Ms. Franz, have you seen other
16 Delta employees' journals?
17     A.  Yes.
18     Q.  And you have seen journal entries
19 as good or as bad as Mr. Nicholas?
20     A.  Yeah, true.
21     Q.  Is this three-page journal a
22 typical length of journal, or does it depend
23 on how long an employee has been with the
24 company?
25     A.  Yeah. There's lots of factors.

Page 39

1      MR. BURG: All right. I'm going
2  off the record with my client. I'll be
3  right back.
4         (Break in proceedings, 12:02 p.m.
5         through 12:06 p.m.)
6  BY MR. BURG:
7      Q.  Ms. Franz, tell me, do you know if
8  this happens? Okay. Let's say a supervisor
9  makes a comment to an employee along the
10 lines of, "Hey, don't do that," or, "Hey,
11 wear your seatbelt." Okay? Now, does that
12 employee necessarily know if that supervisor
13 goes and enters something in that employee's
14 journal?
15     A.  I'm not sure of your question.
16 Can you rephrase?
17     Q.  Sure. So supervisors make entries
18 on an employee's journal, correct?
19     A.  Yes.
20     Q.  And they can do that whenever and
21 however they want to -- a supervisor, right?
22     A.  Yes.
23     Q.  Does an employee -- is there any
24 policy that requires a supervisor who is
25 making a journal entry to inform the employee

Page 40

1  that they're making a journal entry?
2      A.  No.
3      Q.  So when Jeff Nicholas testified
4  that he didn't know that there had been a
5  March 7, 2013, journal entry by Jerry Walter
6  about a failure to wear a seatbelt, that
7  could very well be true because there's no
8  requirement that employees know about such
9  journal entries, true?
10     A.  I don't -- I don't know that I can
11 answer that.
12     Q.  Well, let's do the steps then.
13     A.  Okay. Thank you.
14     Q.  Isn't it true that when a
15 supervisor makes a journal entry regarding a
16 conduct or performance or safety, the
17 supervisor is not required to tell the
18 employee that they have made that journal
19 entry?
20     A.  Correct.
21     Q.  So when Jeff Nicholas testified "I
22 didn't know there was a verbal coaching in my
23 journal about not wearing a seatbelt in
24 March 2013," that may very well be true. It
25 may very well be true that Jeff was never

10 (Pages 37 to 40)

Tri-County Court Reporters
248-608-9250

Electronically signed by Anne Vosburgh (101-198-978-5140)                da5c3500-9361-4a3b-a800-5fdf536e28

BARBARA FRANZ
12/7/2017

Page 41

1  told that there was a journal entry like
2  that, correct?
3      A. Specifically that there was a
4  journal entry -- I'm not the leader who made
5  that entry, so I don't know that I can speak
6  to what was said to Mr. Nicholas.
7      Q. No. But I'm not asking you to
8  know what actually happened. I'm saying
9  isn't it true that if Jeff says he didn't
10 know, it's possible that he didn't because
11 there's no requirement that he be told,
12 correct?
13     A. Yeah. I don't -- I don't know
14 that I can answer that.
15     Q. Ms. Franz, have you ever heard of
16 a Delta policy that says something along the
17 lines of there needs to be two management
18 personnel present, or four eyes, to verify
19 that an incident occurred? Did you ever hear
20 that?
21     A. No.
22     Q. You never heard of the four eyes
23 policy?
24     A. No.
25     Q. As an HR generalist -- or now in

Page 42

1  your job as general manager, do you and did
2  you have anything to do with Delta's
3  strategies for hiring ramp agents?
4      A. No.
5      Q. Does the company prefer younger
6  persons to take the job of ramp agents
7  because they're physically demanding?
8      A. No.
9         MR. BURG: Okay, Ms. Franz. I
10 have no more questions at this time.
11        MS. GROSS: Okay. I have just a
12 couple.
13                ---
14         EXAMINATION
15 BY MS. GROSS:
16     Q. If you would look again at the
17 journal, which I believe was Exhibit Number 1
18 to Mr. Parris' deposition.
19     A. Yes.
20     Q. So you were asked about the
21 differences between the Delta and the
22 Northwest system. Looking at this journal,
23 can you, based on your experience, form any
24 conclusions about which disciplines were
25 Northwest and which were Delta, in terms

Page 43

1  of --
2      A. Yes.
3      Q. What can you tell us about that?
4      A. So the level 2 and the level 1
5  would have been a Northwest performance
6  development, and the final corrective action
7  would be Delta.
8      Q. So looking at the document, the
9  things that are summarized on the top half of
10 the first page, those descriptions indicate
11 which system?
12     A. Those would have come from EPD,
13 which would have been the Northwest system.
14     Q. And then after the dotted line,
15 where it begins with the April 20, 2012,
16 verbal coaching, is that terminology one
17 system or the other?
18     A. That's Delta.
19     Q. Do you recall, you know,
20 approximately when the system changed to
21 Delta?
22     A. I'm sorry. You cut out a little
23 bit. Can you repeat that?
24     Q. Sure. Let me back up and ask a
25 more foundational question.

Page 44

1      Was there a time after the merger
2  when the employees were Delta employees, but
3  they were still being administered under the
4  Northwest disciplinary system?
5      A. Yes.
6      Q. And was there a time when that
7  stopped happening?
8      A. Yes.
9      Q. Was there some particular event
10 associated with that, if any?
11     A. The union representation was
12 resolved.
13     Q. Once the union representation was
14 resolved, which disciplinary system applied?
15     A. The Delta system.
16     Q. And do you recall approximately
17 when that was?
18     A. In the March of 2012 time frame.
19     Q. So looking at Mr. Nicholas'
20 record, specifically the second page of
21 Exhibit Number 1, he was put on a final
22 corrective action notice under the Delta
23 system on June 1st, 2012; is that correct?
24     A. Correct.
25     Q. What would have been -- that's the

11 (Pages 41 to 44)

Electronically signed by Anne Vosburgh (101-198-978-5140)

da5c3500-9361-4a3b-a800-75fdf53e28

BARBARA FRANZ
12/7/2017

Page 45

1  last step in the Delta system prior to
2  termination?
3      A. Yes.
4      Q. And under the Northwest system,
5  what would have been the step below that?
6      A. A level 2.
7      Q. And looking at Mr. Nicholas'
8  record, can you tell whether or not he was on
9  a level 2 for anything, performance or
10 attendance, as of June 2012?
11     A. Yes, he was.
12     Q. How many?
13     A. Two.
14     Q. For what?
15     A. Two level 2s, one for performance
16 and one for attendance.
17     Q. So when the transition was made
18 from Northwest to Delta, how did you handle
19 moving from one system to the other, in terms
20 of progressing through the steps?
21     A. So the employees at Northwest came
22 into the Delta system with the performance
23 development they had at Northwest, and the
24 Delta system applied thereafter, based upon
25 their previous record.

Page 46

1      Q. So if they were at step 2 or
2  step 3, did they go to the next step in the
3  Delta system?
4      A. Correct.
5      Q. Once a Delta employee is on a
6  final corrective action notice, if they are
7  going to be administered performance
8  development at any level beyond just a verbal
9  coaching, what would be the next step?
10     A. Termination.
11     Q. Do you know anything about what
12 Mr. Lane's job assignment was in the
13 October/November/December of 2013 time frame?
14     A. Yes.
15     Q. What was that?
16     A. He was the safety leader. So he
17 would be responsible to go around the ramp
18 operations and call out safety-related
19 infractions.
20     Q. When you reviewed Mr. Lane's
21 statement to Mohamed Sarsour, which is
22 Exhibit Number 3 to Mr. Parris' deposition --
23     A. Yes.
24     Q. When Mr. Lane said that he clearly
25 saw Mr. Nicholas was not wearing his

Page 47

1  seatbelt, did you have any reason to believe
2  that he was lying?
3      A. I'm sorry. You cut out at the end
4  there.
5      Q. Sure. Where the statement says
6  that Mr. Lane says that he observed that
7  Mr. Nicholas was clearly not wearing his
8  seatbelt, did you have any reason to believe
9  that Mr. Lane was lying about that?
10     A. No.
11     Q. Had Mr. Lane ever been disciplined
12 for lying about Delta records or falsifying
13 company records?
14     A. No.
15     Q. What, if anything, does Mr. Lane's
16 write-up say about what Mr. Nicholas said in
17 terms of whether he was or was not wearing
18 his seatbelt?
19     A. Mr. Lane states that during the
20 conversation with Jeffrey Nicholas, "He
21 admitted he was not wearing his seatbelt and
22 asked that I not write an infraction because
23 he currently had admin action."
24     Q. Could you take a look at what was
25 marked as Exhibit Number 6 to Mr. Parris'

Page 48

1  deposition? It is a handwritten statement by
2  Mr. Nicholas dated December 13, 2013.
3      A. Yes.
4      Q. Had you ever seen that before?
5      A. Yes.
6      Q. Did you see it at the time you
7  were making your recommendation concurrent to
8  terminate Mr. Nicholas' employment?
9      A. Yes.
10     Q. Do you see anything in that
11 statement where Mr. Nicholas states that he
12 was most definitely wearing his seatbelt?
13     A. No, I do not.
14     Q. Are you aware of Mr. Nicholas ever
15 having filed any complaint of discrimination
16 by Mr. Lane prior to his termination?
17     A. No, I'm not.
18     MS. GROSS: Andrea, do you have
19 the seven safety absolutes by Mr.
20 Rogermike Row?
21     (Discussion held.)
22 BY MS. GROSS:
23     Q. So for the record, Ms. Franz, if
24 you would look at what was previously marked
25 as Number 4 to Mr. Nicholas' deposition, can

12 (Pages 45 to 48)

Tri-County Court Reporters
248-608-9250

BARBARA FRANZ
12/7/2017

Page 49

1  you tell me what that is? Do you recognize
2  the document?
3      A.  Yes.
4      Q.  What is it?
5      A.  It is a memo from Rogermike Rowe
6  with a read and sign of the seven safety
7  absolutes.
8      Q.  Does that refresh your
9  recollection at all as to what the time frame
10 was of the rollout of the seven safety
11 absolutes?
12     A.  Yes.
13     Q.  What is the time frame?
14     A.  It's dated October 10 of 2013.
15     Q.  And looking back at Mr. Nicholas'
16 journal, which was Exhibit 1 to Mr. Parris'
17 deposition, you were asked about a coaching
18 that -- a verbal coaching that Mr. Nicholas
19 received from Jerry Walter on March 7, 2013,
20 for not wearing his seatbelt?
21     A.  Yes.
22     Q.  Do you have an opinion whether
23 that coaching took place before or after the
24 seven safety absolutes were rolled out?
25     A.  So that coaching would have taken

Page 50

1  place before the seven safety absolutes were
2  rolled out.
3      Q.  Looking at the next page in the
4  journal, there's also a verbal coaching for
5  job performance on 11, May 2013 by Stacy
6  Parris.
7      Do you see that?
8      A.  Yes.
9      Q.  So as an HR person under the Delta
10 system, given that Mr. Nicholas was already
11 on an FCAN, had Mr. Parris done anything
12 higher than a verbal coaching, would it
13 necessarily have been termination?
14     I mean, if he decided to take
15 disciplinary action, what's the next step off
16 of an FCAN?
17     A.  It could have been termination.
18     MS. GROSS:  I have nothing
19 further.
20     ---
21     RE-EXAMINATION
22 BY MR. BURG:
23     Q.  Ms. Franz, sticking with the memo,
24 Exhibit 4 in the Nicholas deposition about
25 the seven safety absolutes -- do you see it?

Page 51

1      A.  Yes.
2      Q.  Mr. Rowe wrote this memo. And at
3  the end of the first paragraph, he writes
4  "As of 10/19/13, any non-compliance will
5  likely result in admin action and journal
6  entry." Correct?
7      A.  Yes.
8      Q.  Now, Mr. Rowe did not write: "Any
9  non-compliance will result in admin action
10 and journal entry." He did not write that,
11 correct?
12     A.  Correct.
13     Q.  He used the word "likely." Do you
14 see that?
15     A.  Yes.
16     Q.  Does that not mean that this
17 system carries with it some discretion on the
18 part of the supervisor as to whether to take
19 admin action or make a journal entry?
20     A.  Yes.
21     Q.  Also, I want to go back to
22 something I asked you before to make sure I
23 understand it. In this time frame, fall of
24 '13, you were an HR generalist at Detroit
25 Metro, right?

Page 52

1      A.  Yes.
2      Q.  And you said you would be -- you
3  would become aware of seatbelt violations if
4  people were written up for them?
5      A.  I could be, yes.
6      Q.  And tell me why that would be. I
7  mean, you're in the HR office. Are you just
8  opening up people's journals and looking
9  every day at what's been entered? Or how
10 would you become aware of ongoing violations?
11     A.  Discussions with the supervisor.
12     Q.  Was it a practice for supervisors
13 who would make journal entries to come to you
14 and tell you, for your information, what they
15 had done?
16     A.  Not always, no.
17     Q.  I mean, did HR generalists have
18 meetings with supervisors to kind of go over
19 the status and, you know, the performance and
20 the conduct of the employees the supervisors
21 were supervising?
22     A.  No.
23     Q.  To your knowledge, is there a
24 written policy that Delta provides to
25 supervisors which instructs supervisors how

13 (Pages 49 to 52)

Tri-County Court Reporters
248-608-9250

Electronically signed by Anne Vosburgh (101-198-978-5140)

da5c3500-9361-4a3b-a800-75fdf53...e28

Page 53

1  to write up journal entries or memos such as
2  what Lane wrote on December 6th, 2013?
3     A. No.
4     Q. So Delta has no guidelines for
5  supervisors in terms of what to put into
6  these memos?
7     A. No.
8     MR. BURG: Okay, Ms. Franz.
9  That's all I have.
10    MS. GROSS: One last question.
11    ---
12    RE-EXAMINATION
13 BY MS. GROSS:
14    Q. Would the level at which
15 performance development was being taken with
16 respect to a seatbelt violation have any --
17 play any factor in whether or not it would
18 come to your attention?
19    A. Yes.
20    Q. What would typically come to your
21 attention, what level of discipline?
22    A. So a final corrective action
23 notice or termination, typically.
24    Q. If performance development is
25 being addressed at a lower level than final

Page 54

1  corrective action or termination, were
2  supervisors required to come talk to you as
3  their HR support to discuss that?
4     A. No.
5     Q. And if you know, approximately how
6  many CSAs were employed at Metro in 2013?
7     A. I would say around 1,200-ish, with
8  about 7 to 800 of those being in this
9  department.
10    MR. BURG: That's all I have.
11    (The deposition was concluded at
12    12:28 p.m.)

Page 55

1  CERTIFICATE
2
3    I ANNE E. VOSBURGH, Certified Shorthand
4  Reporter, Registered Professional Reporter,
5  Certified Realtime Reporter, and Notary
6  Public, hereby certify that Barbara Franz,
7  the witness whose deposition is hereinbefore
8  set forth, was duly sworn by me, an
9  authorized Notary Public, and that such
10 deposition is a true record of the testimony
11 given by such witness.
12    I further certify that I am not
13 physically, nor by marriage, related to any
14 of the parties to this action; and that I am
15 in no way interested in the outcome of this
16 matter.
17    In witness whereof, I have hereunto set
18 my hand this day, December 12
19
20    Anne E. Vosburgh, CSR-6804, RPR, CRR