UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JEFFREY NICHOLAS,

       Plaintiff,                               Case Number 17-10481

v.                                            Honorable David M. Lawson

DELTA AIRLINES, INC.,

       Defendant.

_____/

## OPINION AND ORDER GRANTING MOTION
## FOR SUMMARY JUDGMENT AND DISMISSING CASE

Plaintiff Jeffrey Nicholas, a Delta Airlines baggage handler at the Detroit Metropolitan Airport, was already skating on thin ice when he was caught driving a tug and not wearing a seatbelt. Delta itself had been cited for safety violations by OSHA, and was strictly enforcing its safety work rules. At the time of the seatbelt violation Nicholas was laboring under "FCAN status," which meant that he had been issued a Final Corrective Action Notice, the last step before termination in Delta's progressive disciplinary scheme. The seatbelt violation resulted in his termination in January 2014. However, Nicholas maintains in this lawsuit that his discipline-based termination was in fact a pretext for age discrimination in violation of Michigan's Elliott-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2101 *et seq*. But Delta argues in a motion for summary judgment that the undisputed facts show that the termination was lawful. After hearing the parties arguments in open court on February 6, 2018, the Court is constrained to agree. Therefore, the motion will be granted and the case will be dismissed.

I.

Nicholas began working for Northwest Airlines in June of 2006 at the age of 42. He started at the Detroit Metropolitan Wayne County Airport (DTW) as a "Customer Service Agent" (CSA), loading and unloading aircraft and moving baggage around the airport facility on "baggage tugs," small trucks that pull baggage trailers. Delta refers to personnel in these roles as "below the wing" or "ramp" employees. While employed with Northwest, Nicholas was promoted to a leadership position and worked as an "Aircraft Load Assistant" (ALA). As an ALA, Nicholas was responsible for "parking" planes as they approached their gates, weighing and logging bags into Northwest's computer system, and overseeing a small crew of other CSAs. For at least one month during his tenure as an ALA, Nicholas was recognized as being in the top five percent of ALAs for on-time performance.

Northwest merged with Delta Airlines, a process that took place over several years, and was finalized in January of 2010. Nicholas became a Delta employee and retained his ALA leadership position, performing the same duties he had at Northwest.

Delta employees are subject to a progressive discipline policy. At the first stage, employees violating work rules are issued a verbal "coaching." Subsequent offenses will proceed through two levels of formal written coaching (also referred to as level one and level two warnings), which may involve loss of privileges or other remedial action. After that, an employee who commits another violation is issued a Final Corrective Action Notice (FCAN). But depending on the nature and severity of an infraction, Delta might begin the process at any stage. Once an employee is placed on FCAN status, that designation remains active on that employee's disciplinary file for three years. Any subsequent offenses during that three-year period can result in immediate termination, although

managers may exercise discretion depending on the individual case.  According to Barbara Franz, General Manager of Human Resources at Delta, termination is typically recommended for subsequent infractions by employees on FCAN status "if coaching has not resulted in sustained improvement in performance."

According to Franz, Northwest's employee discipline policy during Nicholas' tenure closely resembled Delta's policy.  Although they used different terminology, both systems "began with a formal verbal coaching, followed by two levels of written warnings, and a final warning prior to termination."  In his deposition, Nicholas expressed confusion as to whether former Northwest employees were subject to the old Northwest disciplinary system or to Delta's following the merger.  Nicholas believed he was subject to the Northwest disciplinary system through his termination.  Based on that belief, Nicholas alleges that he was entitled to the "two or three coachings" between each disciplinary level (level one, level two, and FCAN) prescribed by the Northwest system.  According to Franz, former Northwest employees were subject to the Northwest disciplinary system after the merger until approximately March 2012 when Delta employees voted against union representation.  After that vote, all employees were subject to the Delta system.  Because these systems were similar, former Northwest employees saw their disciplinary history transition to the Delta system, rather than being given a clean slate.

That traveling history is significant for Nicholas.  While working for Northwest, he was disciplined several times.  He was disciplined in April 2007 for a safety violation, but that level-one warning was reduced to a verbal coaching after an appeal by Nicholas's union.  In September 2007, August 2008, and November 2008, Nicholas was disciplined for attendance issues.  For his August 2008 infraction, Nicholas was issued a level-one warning.  After his November 2008 attendance

reprimand, that was escalated to a level-two warning. In July 2009, Nicholas was disciplined for failure to follow loading procedure thereby causing a 27-minute delay, and was issued another level-one warning.

Nicholas' disciplinary issues continued after Delta's merger with Northwest. In January 2010, December 2010, and August 2011, Nicholas was disciplined for poor attendance. For his 2010 citations, Nicholas was issued a level-one warning. For his 2011 attendance citation, Nicholas was issued a level-two warning and was required to submit medical documentation for any future sick leave.

In October 2011, Nicholas was disciplined for being uncooperative with a supervisor during a verbal coaching. At that time, Nicholas was on level-one status for performance and level two-status for attendance.

Nicholas was disciplined again in January 2012, this time for damaging an aircraft antenna while operating a baggage vehicle, forcing Delta to substitute the damaged aircraft and causing a delay. Although Delta could have issued Nicholas an FCAN notice, as he was at the time on level-two status due to his attendance issues, Nicholas instead was issued an additional level-two warning — this one for performance.

Citing a failure to improve despite numerous disciplinary actions, Delta stripped Nicholas of his ALA position and returned him to a non-lead CSA position in April 2012. In June of 2012, Nicholas was placed on FCAN status for violating attendance policies, having been absent for more than a month without notice, and was further required to provide medical documentation of any injury or illness resulting in missed work for the next six months. This FCAN status was due to expire from Nicholas' disciplinary file in June of 2015.

Despite having been placed on FCAN status, Nicholas accrued a number of additional disciplinary violations, provoking five instances of verbal coaching. In August 2012, Nicholas was issued a verbal coaching for failing to comply with Delta's uniform policy. In January 2013, Nicholas received a verbal coaching for poor attendance, and for failure to present sufficient medical documentation of his absences.

In March 2013, Nicholas received a verbal coaching for failure to wear a seatbelt while driving a luggage tug. Nicholas stated that he does not remember this incident, but "is not saying it didn't happen." In May 2013, Nicholas was issued a verbal coaching after he improperly routed bags to the terminal from a flight that had landed after a delay, rather than sending them directly to the appropriate departing flight, forcing the departing flight to return to the gate and collect the missing bags. Finally, Nicholas was issued a verbal coaching in November 2013 for continued attendance issues.

Meanwhile, in April of 2012, Delta signed a settlement agreement with the United States Department of Labor's Occupational Safety and Health Administration (OSHA) after a Delta employee not wearing a seatbelt was ejected from a baggage tug and killed. Delta agreed that it would install seatbelts on all ground service equipment currently lacking them and to train its employees in the proper use of seat belts within the first year of the settlement. In the second year after the settlement, Delta agreed to "fully enforce seat belt use among its employees," and to hire safety consultants to monitor the implementation of the settlement terms.

Between October and November of 2013, Rogermike Rowe, the Delta Department Manger responsible for overseeing baggage operations at DTW, required Nicholas and all other "below wing" CSAs to review and sign a document titled "7 Safety Absolutes." This document was

intended to remind employees of Delta's most essential safety rules. The first "safety absolute" highlighted the seatbelt requirement for all employees operating ground service equipment, including baggage tugs. On November 3, 2013, Nicholas signed this document to confirm his receipt and understanding of these rules.

All of this set the stage for the incident on December 6, 2013 that led to Nicholas's firing. On that day, Safety Performance Leader Jeff Lane saw Nicholas driving a baggage tug without wearing a seatbelt. Lane had been specially reassigned from his regular managerial duties to focus on safety compliance — particularly enforcement of the more stringent seatbelt requirements Delta instituted as part of their OSHA settlement. As Lane was driving along the airport's "zipper road" (the road that runs parallel to the terminal and directly behind the tails of airplanes parked at their gates), he noticed that someone had neglected to place a necessary traffic cone under the tail of an aircraft, which warns employees where not to drive due to the aircraft's low clearance. Lane parked his vehicle at the tail of the aircraft to investigate the situation. While Lane was parked, he observed Nicholas driving a baggage tug along the zipper road with the canvas door open and "clearly" not wearing a seat belt.

After following Nicholas to the baggage drop-off area, Lane assisted Nicholas in unloading the bags before discussing Nicholas' seatbelt use. According to Lane, Nicholas admitted that he had not been wearing a seatbelt and asked Lane not to report the infraction due to Nicholas' outstanding disciplinary issues (his FCAN status). Lane responded that he would "be objective and write the infraction in every case when it is clear," and that in this case, "the employee was clearly not wearing his seat belt." After their discussion, Lane inspected the vehicle and confirmed that it was equipped with a seat belt. In his deposition, Lane testified that he could see Nicholas' seatbelt

unbuckled and dangling through the unzipped canvas door panel, although that detail does not appear in the memo he wrote at the time of the incident.

Lane testified that he had no knowledge of Nicholas' age at the time of this incident. Nicholas stated that he had never heard Lane make any derogatory comments about Nicholas's age (although Nicholas believed Lane did not like "his personality").

One week after the incident, Nicholas was required to submit his own account. In his handwritten statement, Nicholas wrote that, since he was already unloading bags from the tug when Lane arrived and raised the issue of his seat belt, he "couldn't recall if [he] had used his belt or not" while driving from the gate to the baggage drop-off area.

On December 11, 2013, Nicholas's supervisor, Stacy Parris, recommended that Nicholas be terminated, as Nicholas was on FCAN status at the time of this incident, had previously been reprimanded for failure to use a seatbelt, and had a significant disciplinary history outside of those issues. In his deposition, department manager Rogermike Rowe testified that Nicholas's termination was based on his cumulative record, and unlike Nicholas's previous infractions, his second seatbelt violation suggested to management that Nicholas was incorrigible.

Delta terminated Nicholas on January 2, 2014. Nicholas was 49 at the time of his termination.

On December 29, 2016, Nicholas filed a one-count complaint in the Wayne County, Michigan circuit court, alleging age discrimination in violation of the Michigan Elliott-Larsen Civil Rights Act, Mich. Comp. Laws § 37.2101 *et seq*. Delta removed the case to this Court based on diversity jurisdiction. After discovery concluded, Delta filed its motion for summary judgment, arguing that there is no direct evidence of age discrimination, and the plaintiff cannot maintain a

circumstantial case because he cannot muster evidence constituting a *prima facie* case, and his discipline record furnished a legitimate, non-pretextual basis for his termination.

II.

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). When reviewing the motion record, "[t]he court must view the evidence and draw all reasonable inferences in favor of the non-moving party, and determine 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law.'" *Alexander v. CareSource*, 576 F.3d 551, 557-58 (6th Cir. 2009) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251-52 (1986)).

"The party bringing the summary judgment motion has the initial burden of informing the district court of the basis for its motion and identifying portions of the record that demonstrate the absence of a genuine dispute over material facts." *Id.* at 558. (citing *Mt. Lebanon Personal Care Home, Inc. v. Hoover Universal, Inc.*, 276 F.3d 845, 848 (6th Cir. 2002)). "Once that occurs, the party opposing the motion then may not 'rely on the hope that the trier of fact will disbelieve the movant's denial of a disputed fact' but must make an affirmative showing with proper evidence in order to defeat the motion." *Ibid.* (quoting *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1479 (6th Cir. 1989)).

"[T]he party opposing the summary judgment motion must do more than simply show that there is some 'metaphysical doubt as to the material facts.'" *Highland Capital, Inc. v. Franklin Nat'l Bank*, 350 F.3d 558, 564 (6th Cir. 2003) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)) (internal quotation marks omitted). A party opposing a motion

for summary judgment must designate specific facts in affidavits, depositions, or other factual material showing "evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252. If the non-moving party, after sufficient opportunity for discovery, is unable to meet her burden of proof, summary judgment is clearly proper. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).

Irrelevant or unnecessary factual disputes do not create genuine issues of material fact. *St. Francis Health Care Centre v. Shalala*, 205 F.3d 937, 943 (6th Cir. 2000). A fact is "material" if its resolution affects the outcome of the lawsuit. *Lenning v. Commercial Union Ins. Co.*, 260 F.3d 574, 581 (6th Cir. 2001). "Materiality" is determined by the substantive law claim. *Boyd v. Baeppler*, 215 F.3d 594, 599 (6th Cir. 2000). An issue is "genuine" if a "reasonable jury could return a verdict for the nonmoving party." *Henson v. Nat'l Aeronautics & Space Admin.*, 14 F.3d 1143, 1148 (6th Cir. 1994) (quoting 477 U.S. at 248).

Michigan's Elliot-Larsen Civil Rights Act (ELCRA) prohibits "discriminat[ing] against an individual with respect to employment, compensation, or a term, condition, or privilege of employment, because of . . . age[.]" Mich. Comp. Laws § 37.2202(1)(a). To succeed on a claim under this statute, a plaintiff must show that his employer took adverse action against him, and that his age was a "substantial" or "motivating" factor in the decision." *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 818 (6th Cir. 2011) (citing *Sniecinski v. Blue Cross & Blue Shield of Mich.*, 469 Mich. 124, 666 N.W.2d 186, 192-93 (2003)). As with the federal age discrimination statutory counterpart, the plaintiff may prove his case via direct or circumstantial evidence. *Geiger v. Tower Auto.*, 579 F.3d 614, 620 (6th Cir. 2009). Where, as here, there is no direct evidence of age discrimination, courts assess the circumstantial case using the familiar *McDonnell Douglas* burden-

shifting approach. *Provenzano*, 663 F.3d at 818 (citing *Cicero v. Borg-Warner Auto., Inc.*, 280 F.3d 579, 584 (6th Cir. 2002)); *see also Lytle v. Malady*, 458 Mich. 153, 172-73, 173 n.19, 579 N.W.2d 906, 914-15, 915 n.19 (1998) (applying the *McDonnell Douglas* analysis for age discrimination cases under ELCRA).

That framework, taken from *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), requires Nicholas to establish a *prima facie* case of discrimination. *Tilley v. Kalamazoo Cty. Rd. Comm'n*, 777 F.3d 303, 308 (6th Cir. 2015). If he succeeds, the burden then shifts to Delta "to articulate a legitimate nondiscriminatory reason for the adverse employment action." *Ibid.* (quoting *Schoonmaker v. Spartan Graphics Leasing, LLC*, 595 F.3d 261, 264 (6th Cir. 2010)). Nicholas would then have the burden to "show that [Delta's] explanation was a mere pretext for intentional age discrimination." *Ibid.*

A.

Nicholas's *prima facie* case must contain proof of the following elements: 1) he was a member of a protected class; 2) his employer took adverse action against him, such as termination; 3) he was qualified for the position he was fired from; and 4) he was replaced by someone outside of the protected class, that is, a younger individual. *Tilley*, 777 F.3d at 308 (quoting *Schoonmaker*, 595 F.3d at 264). Alternatively, Nicholas can satisfy the fourth element by offering evidence that he was treated less favorably than a younger person who engaged in like conduct. *Provenzano*, 663 F.3d at 818 (citing *Town v. Michigan Bell Telephone Co.*, 455 Mich. 688, 695, 568 N.W.2d 64, 68 (1997)).

The parties do not dispute that the plaintiff has met the first three elements: Delta fired Nicholas, he was 49 at the time, and he was qualified for the position that he held. At age 49,

Nicholas presumptively fell within the age range defined by Michigan courts as "protected." *See Lytle*, 458 Mich. at 177 n.26, 589 N.W.2d at 917 n.26. Termination certainly qualifies as adverse job action. And Nicholas had worked at virtually the same job since 2006 and was qualified to do so.

Delta challenges Nicholas's evidence on the last element: whether Delta replaced him with younger employees or whether younger employees who engaged in similar conduct were treated differently. That argument has two parts. *First*, Delta says that Nicholas was not actually replaced by any particular employee, but by dozens of reserve employees who perform below the wing duties. According to Rogermike Rowe, the termination or departure of one "below wing" worker typically "does not trigger a replacement hire," as other CSA employees or part-time ramp workers from Delta's existing "Ready Reserves" absorb the duties of the departing employee. Delta's Ready Reserves consist of part-time and seasonal employees who work fewer than 1400 hours per year. They perform the same general duties as full time CSAs, but are entitled only to limited benefits. Ready Reserve employees occasionally transition from the Ready Reserve to a full time CSA position by "bidding" for CSA openings. All CSA employees begin as Ready Reserves.

Nicholas argues that two Ready Reserve employees who "bid in" to full-time CSA positions in Delta's cargo department in September 2014 represent his replacement. Those employees had been hired into Delta's Ready Reserve in 2011 before Nicholas' termination, and were 31 and 25 years old, respectively, when they were converted to full-time CSAs. But Delta stated that since the plaintiff's termination, there have been no new hires directly into "below the wing" CSA positions.

Delta's evidence is unrebutted, and severely undercuts Nicholas's proofs on the fourth element. The Sixth Circuit has made clear that a "person is not replaced when another employee

is assigned to perform the plaintiff's duties in addition to other duties, or when the work is redistributed among other existing employees already performing related work. A person is replaced only when another employee is hired or reassigned to perform the plaintiff's duties." *Barnes v. GenCorp Inc.*, 896 F.2d 1457, 1465 (6th Cir. 1990) (citing *Sahadi v. Reynolds Chem.*, 636 F.2d 1116, 1117 (6th Cir. 1980)); *see also Lilley v. BTM Corp.*, 958 F.2d 746, 752 (6th Cir. 1992) ("Spreading the former duties of a terminated employee among the remaining employees does not constitute replacement.").

Nicholas takes a different tack, however, by offering statistics that suggest, he says, that Delta systematically backfilled the Ready Reserve pool with younger individuals, so that inevitably Nicholas, once terminated, would be replaced by a younger employee. He characterizes "younger" as at least six years younger than he, invoking the spread endorsed by the Sixth Circuit. *See Grosjean v. First Energy Corp.*, 349 F.3d 332, 340 (6th Cir. 2003). He argues that between January 1, 2013 and January 1, 2016, Delta hired 589 Ready Reserve employees. Of those, 80 (13.58%) were over the age of 43.61 and 509 (86.42%) were under the age of 42.7. Nicholas argues that of the 38 employees hired after his termination, 6 (15.7%) were older than 43.61, and 32 (84.2%) were younger than 43.61.

According to Nicholas, over this period, Delta terminated 92 employees in a Ready Reserve or CSA position. Of those, 23 (25%) were below the age of 43.61, and 69 (75%) were above the age of 43.61. Nicholas contends that Delta is firing employees over the age of 43.61 at twice the rate it is hiring them.

There are problems with that reasoning that invalidate the plaintiff's inference: Nicholas does not provide information on the age makeup of the underlying applicant pool or the age makeup of

the Delta CSA workforce, both of which would be necessary to draw legitimate statistical conclusions. Delta provided the following summary of the age composition of the CSA workforce for 2013, 2014, and 2015, respectively:

CSAs over age 43.6 = 627/953 (66%)     CSAs under age 43.6 = 326/953 (34%)
CSAs over age 43.6 = 621/914 (68%)     CSAs under age 43.6 = 293/914 (32%)
CSAs over age 43.6 = 608/874 (70%)     CSAs under age 43.6 = 266/874 (30%)

With the underlying age composition in mind, Delta explains that the rate of termination of CSAs under 43.6 is actually higher than the rate of termination of CSAs over 43.6. In the years surrounding Nicholas' termination, Delta terminated five out of the 627 CSAs over age 43.6 (.8%), as compared to five out of the 326 CSAs under age 43.6 (1.5%). Delta does not provide statistics on its hiring rates for CSAs because information on applicants' ages apparently is a prohibited pre-employment inquiry.

Moreover, there is no clear connection between Nicholas's termination and the assignment of Ready Reserve fill-ins. And it is speculative to analyze hiring data of Ready Reserves after Nicholas's termination and conclude that he was replaced by only those hirees who were at least six years younger than he. Not only does that conclusion fail to take into account that Delta also hired several Ready Reserve workers who were older than the plaintiff, but it also relies on a subset of data that is immaterial in light of Delta's division of labor. For example, in *Heiler v. Hanover Ins. Co.*, 2016 WL 74869 (E.D. Mich. Jan. 7, 2016), after the plaintiff was discharged, the defendant dispersed the plaintiff's responsibilities among the team, and two younger individuals were hired internally several months later. *Heiler*, 2016 WL 74869, at *7. The court found that it was "doubtful that Heiler has raised any *genuine* issue of material fact as to whether a younger person

replaced her" because she had not "pointed to any evidence suggesting which one of the[] new hires, if any, actually was assigned to perform her duties and thus replaced her." *Ibid.*

So it is here. Nicholas has not pointed to any evidence indicating that any of the subsequently hired Ready Reserves actually were assigned to perform his duties. He ignores the fact that Ready Reserve workers are hired specifically to fill fluctuating operational demands in a variety of positions. Instead, he argues that the hiring of these back-up employees, the majority of which apparently were younger than the plaintiff, is evidence that he was replaced. There is nothing in the record that connects the hiring of several younger, Ready Reserve workers to the duties assigned to the plaintiff or refutes the defendant's assertion that Nicholas's work was absorbed by existing employees.

The more relevant inquiry is whether Delta hired any significantly younger workers directly into Nicholas' CSA position following his discharge. As noted, Delta says (in its answers to the plaintiff's interrogatories) that it did not. And although Nicholas urges the Court to infer that he was replaced by two younger Ready Reserve employees who bid into full-time, below the wing CSA positions (two years after Nicholas was fired), there is nothing in the record to support this inference, nor is there any evidence that those younger employees performed the plaintiff's duties, either before or after their re-classification.

*Second*, Delta contends that Nicholas has not identified anyone outside his age class that was treated more favorably than he. The Court agrees.

To be "outside the protected class," the comparator should be substantially younger than the plaintiff. *O'Connor v. Consol. Coin Caterers Corp.*, 517 U.S. 308, 313 (1996). More significantly, when comparing Delta's treatment of Nicholas to that of a younger employee, the comparator must

be "similar 'in all . . . *relevant* aspects.'" *Martin v. Toledo Cardiology Consultants, Inc.*, 548 F.3d 405, 412 (6th Cir. 2008) (quoting *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998)). To be "similarly situated," employees generally must "have dealt with the same supervisor" and "have been subject to the same standards." *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992).

Nicholas alleges that similarly-situated but substantially younger employees were subject to different discipline for the same violations. In his deposition, Nicholas identified one individual, Al Martin, who received a written coaching on January 5, 2015 for driving his tug without a seatbelt. Nicholas recalled that Martin was maybe five or six years younger than him, but "nothing happened to him" when "he got a seatbelt [violation]." Nicholas testified that he "[could not] think right now of another" example, but nevertheless had "never heard of anybody getting in trouble for a seatbelt the whole time [he] was out there."

Barbara Franz stated in her declaration that Martin is in fact older than Nicholas and was not on FCAN at the time he was caught without a seatbelt. The plaintiff has not offered any evidence to the contrary. Nicholas therefore has not been able to identify younger employees who committed seatbelt violations while on FCAN that were discharged.

The plaintiff has not established a *prima facie* case from which an inference of unlawful discrimination could be made.

B.

Even if Nicholas succeeded in satisfying his "minimal" *prima facie* burden, *see Dixon v. Gonzalez*, 481 F.3d 324, 333 (6th Cir. 2007), he has not offered evidence that shows Delta's legitimate reason for firing him was a pretext for age discrimination. Delta argues that Nicholas was

terminated because he violated one of Delta's 7 Safety Absolutes while on FCAN, and that the totality of his disciplinary history suggested there was no room for improvement.

Nicholas can show pretext in at least one of "'three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action.'" *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 530 (6th Cir. 2012) (quoting *Romans v. Mich. Dep't of Human Servs.*, 668 F.3d 826, 839 (6th Cir. 2012); *see also Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1084 (6th Cir. 1994), *overruled on other grounds by Gross v. FBL Fin. Servs.*, 557 U.S. 167, 179 (2009). Nicholas appears to have selected the first option, arguing that it is far from certain that he actually committed the seatbelt infraction.

In his deposition, Nicholas denied admitting to Lane that he was not wearing a seatbelt. Nicholas also asserted that Lane would not have been able to determine whether or not Nicholas was wearing a seatbelt based on the distance between the two vehicles, time of day, and location of the seatbelt within the tug. He insisted that if he had been driving a tug equipped with a seatbelt he would have been wearing the belt, but he acknowledged he had no specific memory or wearing one. He also reasoned that on the day of the incident, the temperature at DTW ranged from 23 to 32 degrees Fahrenheit, and he would not have been driving a baggage tug with the canvas door open in such conditions. Nicholas also argued that Lane was parked at least 24 feet from Nicholas as he drove by, and would have had difficulty identifying whether or not Nicholas was wearing a seatbelt at that distance. That contradicts Lane's account of the incident, in which he estimated the distance between the two vehicles to be approximately eight to ten feet. During the termination proceedings, Nicholas did not assert to Rogermike Rowe or any other supervisor that he in fact had been wearing

a seatbelt on December 6, nor did he question Lane's ability to see whether or not he was wearing a seatbelt.

That equivocal testimony does not establish a genuine fact issue, however, because Delta was able to exercise its business judgment based on its honest belief that Nicholas violated a key safety rule. If an employer has an "honest belief" in the nondiscriminatory basis upon which it has made its employment decision (i.e. the adverse action), then the employee will not be able to establish pretext. *Majewski v. Automatic Data Processing, Inc.*, 274 F.3d 1106, 1117 (6th Cir. 2001) (stating that "as long as an employer has an honest belief in its proffered nondiscriminatory reason for discharging an employee, the employee cannot establish that the reason was pretextual simply because it is ultimately shown to be incorrect"); *see also Dubey v. Stroh Brewery Co.*, 185 Mich. App. 561, 566, 462 N.W.2d 758, 760 (1990) ("The soundness of an employer's business judgment . . . may not be questioned as a means of showing pretext."); *Town v. Michigan Bell Telephone Co.*, 455 Mich. 688, 704, 568 N.W.2d 64, 72 (1997) ("[T]he plaintiff cannot simply show that the employer's decision was wrong or mistaken, since the factual dispute at issue is whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent.").

The employer's claim of honest belief is necessarily tied to the nature of its investigation and disciplinary decision process. The "key inquiry . . . is 'whether the employer made a reasonably informed and considered decision before taking' the complained-of action." *Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 598-99 (6th Cir. 2007) (quoting *Smith v. Chrysler Corp.*, 155 F.3d 799, 807 (6th Cir. 1998)). Here, Delta must point to particularized facts upon which it reasonably relied, which it has. However, the Court does "not require that the decisional process used by the

employer be optimal or that it left no stone unturned." *Smith*, 155 F.3d at 807; *see also Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 398 (6th Cir. 2008).

To defeat a summary judgment motion in such circumstances, Nicholas must submit "sufficient evidence from which the jury could reasonably reject [Delta's] explanation and infer that [it] . . . did not honestly believe in the proffered nondiscriminatory reason for its adverse employment action." *Braithwaite v. Timken Co.*, 258 F.3d 488, 493-94 (6th Cir. 2001) (internal citations, quotation marks, and brackets omitted) (alteration in original). For example, the plaintiff may produce evidence that an error by the employer was "too obvious to be unintentional." *Smith*, 155 F.3d at 807 (citation omitted). However, "[a]n employee's bare assertion that the employer's proffered reason has no basis in fact is insufficient to call an employer's honest belief into question, and fails to create a genuine issue of material fact." *Seeger v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 285 (6th Cir. 2012) (quoting *Joostberns v. United Parcel Servs., Inc.*, 166 F. App'x. 783, 791 (6th Cir. 2006)).

For these reasons, Nicholas's evidence of his mere inability to recall whether he was wearing a seatbelt does not create a genuine dispute of material fact on the question of pretext. Delta relied on particularized facts in making its decision to terminate Nicholas. That included Jeff Lane's and Nicholas's statements after the incident to inform its decision to terminate Nicholas, summarized above. Delta had no apparent reason to question Lane's account of what happened.

Moreover, Rogermike Rowe testified that the totality of Nicholas' disciplinary record, not just his seatbelt violation while on FCAN, favored termination. Under the honest-belief rule, as long as Rowe made a "reasonably informed and considered decision," *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 591 (6th Cir. 2014) (quotation marks and citation omitted), Delta is entitled

to rely on its judgment meting out discipline. In making his decision, Rowe reasonably relied on the fact that Nicholas had a prior seatbelt infraction and committed his second violation while on FCAN after he had signed a copy of Delta's 7 Safety Absolutes. Nicholas has not produced any evidence that suggests another motive. *See Richardson v. Wal-Mart Stores, Inc.*, 836 F.3d 698, 706 (6th Cir. 2016) ("Richardson offers no evidence that Darby, the supervisor responsible for firing her, did not honestly believe that Richardson's coaching history justified the termination decision.").

Nicholas has not presented sufficient evidence to show that Delta did not honestly believe that Nicholas had committed a seatbelt violation while on FCAN, and that the totality of his disciplinary record favored termination.

Nicholas also appears to argue another basis for pretext — that the seatbelt infraction was not sufficient to motivate the employer's decision to terminate. According to Nicholas, he became the "poster child" for seatbelt infractions at DTW. A former co-worker told him about the "Nervous Nick Rule" — that "[i]f you don't want to get fired, make sure you are strapped up." Nicholas believed Delta made an example out of him because to his knowledge, he was the first one to "get[] in trouble for a seatbelt." But that does not help him here. Nicholas could not say whether age was a factor:

> Q: Why do you think your age had something to do for [sic] you getting in trouble with a seatbelt as opposed to you being in trouble with [sic] the first one?
>
> A: I think management let me go because of my age, because I'm older. And they have a tendency to fire older people out there.
>
> Q: Sir, it's a really specific question. What information do you have that suggests to you that your age had something to do with you being made, as you put it, the poster child for the seatbelt rule?
>
> A: I don't know if that had anything to do with my age or not. I can't say that.

And the premise is undercut by the evidence. Excluding Nicholas, Delta terminated four other "below wing" employees between 2013 and 2016 for violating Delta's "7 Safety Absolutes." At the time of their terminations, those employees were 23, 25, 26, and 40 years old.

The record does not contain evidence that establishes a genuine fact question on whether Nicholas's termination for disciplinary reasons was a pretext for age discrimination.

III.

The plaintiff has not offered sufficient evidence to support his circumstantial case that age was a substantial factor in Delta's decision to fire him. Delta is entitled to judgment in its favor as a matter of law.

Accordingly, it is **ORDERED** that the defendant's motion for summary judgment [dkt. #21] is **GRANTED**.

It is further **ORDERED** that the complaint is **DISMISSED WITH PREJUDICE**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated: April 24, 2018

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on April 24, 2018.

s/Susan Pinkowski
SUSAN PINKOWSKI